1

2

3

4

5

6              UNITED STATES DISTRICT COURT

7            EASTERN DISTRICT OF CALIFORNIA

8

9   TEHAMA-COLUSA CANAL AUTHORITY,   )    1:10-cv-0712 OWW DLB
                                     )
10              Plaintiff,           )    MEMORANDUM DECISION ON
                                     )    CROSS MOTIONS FOR SUMMARY
11       v.                          )    JUDGMENT (DOCS. 52, 60, 62)
                                     )    AND MOTION TO STRIKE (DOC.
12  UNITED STATES DEPARTMENT OF THE  )    77)
    INTERIOR; KENNETH LEE SALAZAR,   )
13  in his official capacity as      )
    Secretary of the Interior;       )
14  UNITED STATES BUREAU OF          )
    RECLAMATION; MICHAEL L. CONNOR,  )
15  in his official capacity as the  )
    Commissioner of Reclamation, and )
16  DONALD R. GLASER, in his         )
    official capacity as Regional    )
17  Director of the Bureau of        )
    Reclamation for the Mid-Pacific  )
18  Region,                          )
                                     )
19              Defendants,          )
                                     )
20  SAN LUIS & DELTA-MENDOTA WATER   )
    AUTHORITY,                       )
21                                   )
                Defendant-           )
22              Intervenor,          )
                                     )
23  WESTLANDS WATER DISTRICT,        )
                                     )
24              Defendant-           )
                Intervenor           )
25                                   )
    _____)
26

27

28

                          1

I. INTRODUCTION.
   . . . . . . . . . . . . . . . . . . . . . . . . . .   4

II. JURISDICTION . . . . . . . . . . . . . . . . . . . .   5
      A.   5 U.S.C. § 706(2). . . . . . . . . . . . . . .   8
      B.   5 U.S.C. § 706(1). . . . . . . . . . . . . . .   9

III. HISTORICAL BACKGROUND. . . . . . . . . . . . . . .  11
      A.   CREATION OF THE CVP. . . . . . . . . . . . . .  11
      B.   OPERATION OF THE CVP. . . . . . . . . . . . .  14
      C.   ALLOCATION OF CVP WATER. . . . . . . . . . . .  15
      D.   STATE LAW AREA OF ORIGIN STATUTES. . . . . . .  16
           1.   THE CALIFORNIA ATTORNEY GENERAL ANALYZES THE AREA
                OF ORIGIN STATUTES. . . . . . . . . . . .  16
           2.   THE BUREAU'S PERMITS FOR CVP WATER SUPPLY ARE
                CONDITIONED TO PROTECT APPROPRIATION OF WATER
                WITHIN THE AREA OF ORIGIN. . . . . . . . .  17
           3.   APPLICATION OF THE AREA OF ORIGIN STATUTES BY
                SWRCB AND REJECTION OF TCAA CLAIM FOR PREFERENCE
                TO CVP WATER. . . . . . . . . . . . . . .  19
      E.   THE DISPUTED CVP WATER SERVICE CONTRACTS. . .  22
           1.   TCCA MEMBERS' RIGHT TO CVP WATER UNDER THEIR LONG-
                TERM CVP WATER SERVICE CONTRACTS. . . . .  24
           2.   INTERIM CONTRACTS. . . . . . . . . . . . .  25
           3.   NEGOTIATION OF CURRENTLY OPERATIVE TCCA RENEWAL
                CONTRACTS: THE BUREAU'S INTERPRETATION AND
                PERFORMANCE.
                . . . . . . . . . . . . . . . . . . . . .  25
           4.   TCCA ACCEPTS LONG-TERM RENEWAL CONTRACTS WITHOUT
                PRIORITY ALLOCATION TERMS: THE SHORTAGE
                PROVISIONS. . . . . . . . . . . . . . . .  27
           5.   TCCA MEMBERS' VALIDATION OF ALL RENEWAL CONTRACTS
                IN STATE COURT. . . . . . . . . . . . . .  30
           6.   EXECUTION BY PERFORMANCE AND CONDUCT UNDER THE
                TCCA RENEWAL CONTRACTS. . . . . . . . . .  30

IV.  PROCEDURAL BACKGROUND. . . . . . . . . . . . . . .  31

V.   STANDARDS OF DECISION. . . . . . . . . . . . . . .  32

VI.  LAW AND ANALYSIS. . . . . . . . . . . . . . . . . .  33
      A.   STATUTE OF LIMITATIONS. . . . . . . . . . . .  33
      B.   CVP STATUTES AND SECTION 11460 DO NOT CONTAIN OR
           SUPPORT THE PRIORITY ALLOCATION RIGHT TO CVP WATER THAT
           TCCA ADVANCES. . . . . . . . . . . . . . . . .  33
           1.   STATUTORY INTERPRETATION OF THE CVP STATUTES. .  35
                a.   Plain Language. . . . . . . . . . . .  35
                b.   Legislative History of the CVP Statutes. .  37
           2.   STATUTORY INTERPRETATION OF SECTION 11460. . . .  39
                a.   Plain Language. . . . . . . . . . . .  39
                b.   Decades of Consistent Interpretation By the
                     California Attorney General, the SWRCB, and
                     the Bureau is That Section 11460 Governs
                     Appropriation Not Allocation of Water in the

                    Area of Origin... . . . . . . . . . .   41
                         i.    Attorney General Opinion.
                               . . . . . . . . . . . . . .   41
                         ii.   The Bureau's Interpretation of
                               Reclamation Law... . . . . . .  42
                         iii.  The SWRCB Has Independently Interpreted
                               Section 11460 in the same manner as the
                               AG Op. . . . . . . . . . . . .  44
               3.    SECTION 11460's INTERPRETATION BY THE AG Op,
                     SWRCB, AND THE BUREAU ARE ALL CONSISTENT WITH THE
                     PERMIT TERMS.. . . . . . . . . . . . . .  44
               4.    SUBSEQUENT LEGISLATIVE ACTS... . . . . . .  46
               5.    CALIFORNIA CASE LAW... . . . . . . . . . .  47
                     a.    The El Dorado and Phelps Decisions. . . .  48
                     b.    The SWRCB Cases Provide No Binding Or
                           Persuasive Precedent. . . . . . . . .  50
               6.    Plaintiff's Interpretation of Section 11460
                     Conflicts With The Congressional Directive of the
                     1950 Act.. . . . . . . . . . . . . . . . .  53
     C.   CONCLUSION RE: STATUTES.. . . . . . . . . . . . . .  56
     D.   INTERPRETATION OF LONG-TERM CVP WATER SERVICE
          CONTRACTS.. . . . . . . . . . . . . . . . . . . . .  56
          1.    FEDERAL CONTRACT LAW. . . . . . . . . . . . .  57
          2.    STANDARDS RE: THE BUREAU'S STATUTORY DISCRETION TO
                APPORTION CVP WATER IN TIMES OF SHORTAGE.
                . . . . . . . . . . . . . . . . . . . . . . .  60
          3.    TCCA MEMBER LONG-TERM CVP CONTRACTS: SHORTAGE
                TERMS... . . . . . . . . . . . . . . . . . . .  62
                a.    Discretionary Interpretive Authority in
                      Renewal Contract Shortage Provisions... .  63
                b.    The Renewal Contract's Shortage Provisions
                      Are Not a Limitation on the Bureau's
                      Discretion to Apportion Contract Water...  65
                c.    Article 18(a) in Not a Limitation on the
                      Bureau's Discretion to Apportion Contract
                      Water.. . . . . . . . . . . . . . . . . .  70
                d.    Article 3 and 1(u) Are Not a Limitation on
                      the Bureau's Discretion to Apportion Contract
                      Water.. . . . . . . . . . . . . . . . . .  71
          4.    CONTRACT NEGOTIATION AND PERFORMANCE.. . . . .  72
          5.    CONCLUSION RE: INTERPRETATION OF THE CONTRACT
                RENEWAL TERMS.. . . . . . . . . . . . . . . .  76
          6.    EFFECT OF TCCA RENEWAL CONTRACT VALIDATION.. .  77
     E.   THE BAR OF EQUITABLE ESTOPPEL.. . . . . . . . . . .  80
     F.   PLAINTIFF'S FUTILITY ARGUMENT IS WITHOUT MERIT... .  86

     VII. CONCLUSION... . . . . . . . . . . . . . . . . . . .  86

1

2

3

4

5

6                    UNITED STATES DISTRICT COURT

7                   EASTERN DISTRICT OF CALIFORNIA

8

9  TEHAMA-COLUSA CANAL AUTHORITY, )      1:10-cv-0712 OWW DLB
                                  )
10              Plaintiff,        )      MEMORANDUM DECISION ON CROSS
                                  )      MOTIONS FOR SUMMARY JUDGMENT
11      v.                        )      (DOCS 52, 60, 62) AND MOTION
                                  )      TO STRIKE (DOC. 77)
12  UNITED STATES DEPARTMENT OF   )
    THE INTERIOR; KENNETH LEE     )
13  SALAZAR, in his official      )
    capacity as Secretary of the )
14  Interior; UNITED STATES BUREAU)
    OF RECLAMATION; MICHAEL L.    )
15  CONNOR, in his official       )
    capacity as the Commissioner  )
16  of Reclamation, and DONALD R. )
    GLASER, in his official       )
17  capacity as Regional Director )
    of the Bureau of Reclamation  )
18  for the Mid-Pacific Region,   )
                                  )
19              Defendants,       )
                                  )
20  SAN LUIS & DELTA-MENDOTA      )
    WATER AUTHORITY,              )
21                                )
        Defendant-Intervenor,     )
22                                )
    WESTLANDS WATER DISTRICT,     )
23                                )
        Defendant-Intervenor.     )
24  _____)

25

26                    I.  INTRODUCTION.

27      This lawsuit is brought by an association of Federal Water

28  Contractors for federal water from the Sacramento River Division

                              4

of the Central Valley Project ("CVP") north of the San Joaquin-Sacramento Delta against the United States Department of the Interior ("Interior"), its Secretary, the Bureau of Reclamation ("Bureau"), and its Regional Director of the Mid-Pacific Region, and by Defendant-Intervenors, San Luis & Delta-Mendota Water Authority and Westlands Water District, Federal Contractors, who use CVP water on lands south of the Sacramento-San Joaquin Delta, seeks to establish superior water rights under CVP water service contracts in the Sacramento Valley, which would limit and exclude export of CVP water south of the Delta, until after Plaintiff and its Members first receive 100% of their allocated CVP contractual water supply.

The Plaintiff, Tehama Colusa Canal Authority, ("TCCA") is a Joint Powers Authority organized under the laws of the State of California, is comprised of 16 water agency members on whose behalf the case is brought.  Cal. Gov't Code § 6500, *et seq*. Plaintiff filed this suit on February 11, 2010, seeking injunctive and declaratory relief against implementation of the shortage provisions of Federal water service contracts under the Federal Administrative Procedure Act ("APA"), 5 U.S.C. §§ 702 to 706.  Specifically, §§ 706(1) and 706(2).

## II. <u>JURISDICTION</u>

Jurisdiction exists under 28 U.S.C. § 1331, as this case arises under the laws of the United States, specifically, § 8 of the United States Reclamation Act of 1902.  Reclamation Act of 1902, ch. 1093, § 8, 32 Stat. 390 (codified at 43 U.S.C. § 383 (2006)).  Section 8 is part of Federal Reclamation law that

5

1  governs the Bureau's operation of the CVP Act, authorizing the

2  construction, repair, and preservation of certain public works on

3  rivers and harbors, Pub. L. No. 75-392, § 2, 50 Stat. 844, 850

4  (1937), as amended and supplemented, August 4, 1939 (53 Stat.

5  1187), as amended and supplemented, July 2, 1956 (70 Stat. 483),

6  as amended and supplemented, June 21, 1963 (77 Stat. 68), as

7  amended and supplemented, October 12, 1982 (96 Stat. 1263), as

8  amended and supplemented October 27, 1986 (100 Stat. 3050), and

9  Title XXXIV of the Act of October 30, 1992 (106 Stat. 4706)

10 (Central Valley Project Improvement Act ("CVPIA")) collectively

11 referred to as "Reclamation Law;" (authorizing the Central Valley

12 Project); *South Delta Water Agency v. United States*, 767 F.2d

13 531, 536 (9th Cir. 1985).

14     Jurisdiction is also invoked under the United States APA.

15 Section 702 of the APA waives the sovereign immunity of the

16 United States, its agencies, and its individual officers acting

17 in their official capacity. *U.S. v. Park Place Associates, Ltd.*,

18 563 F.3d 907, 929, n.15 (9th Cir. 2009) (APA waives sovereign

19 immunity but does not confer federal jurisdiction).  APA Section

20 704 authorizes review of "final agency action for which there is

21 no other adequate remedy in a court."  Because neither Federal

22 Reclamation law nor California Water Code ("CWC") § 11460

23 ("Section 11460") grants a right of judicial review, the APA

24 provides the appropriate cause of action. *South Delta Water*

25 *Agency,* 767 F.2d at 536-541 (holding that a claim that the

26 Bureau's operation of the CVP violated Section 11460 was

27 reviewable under the APA.)

28     Plaintiff's declaratory and injunctive relief claims are

**6**

under 28 U.S.C. § 1361, 43 U.S.C. § 383, 28 U.S.C. § 2201
(declaratory relief) and Fed. R. Civ. Proc. 65 (injunctive
relief).

Plaintiff claims 16 of its public agency members that supply
water to agricultural or municipal and industrial water users or
to both, received water from the CVP through the CVP's Tehama-
Colusa and/or Corning Canals pursuant to a "Long-Term Renewal
Contract Providing for Project Water Service From the Sacramento
River Division" between each member and the Bureau.  TCCA, in
turn, has a separate contract with the Bureau under which TCCA
operates and maintains the Tehama-Colusa and Corning Canals and
their related facilities on behalf of its members.  All
Defendants' water service contracts are entered into and
performed under Reclamation law.

Plaintiff and its Members' first claim is based on the
Bureau allegedly:

a)  Reducing Plaintiff's water allocations under their water
service contracts in times of "water shortage" disregarding area
of origin protections and alleged priority right of Plaintiff's
provided by CWC §§ 11460, 11463 and 11128; Reclamation Law;
denial of Fifth Amendment due process; and protection of state
law water rights under *California v. United States*, 438 U.S. 645
(1978);

b)  Improperly declaring conditions of shortage as to
Plaintiff while exporting CVP water outside the Sacramento River
watershed and reducing Plaintiff's full contractual water
allocations;

c)  Arbitrarily allocating pro rata water allocations and/or

7

1  shortages among all CVP water service contractors without
2  applying area of origin protections and Plaintiff's "priority
3  rights" to CVP water;

4      d)   Violating the terms of Reclamation's State-issued
5  permits to operate the CVP by ignoring area of origin protection;
6  and

7      e)   Announcing conditions of water shortage, issuing a
8  statement of legal authority to allocate CVP supply without
9  compliance with area of origin protections, thereby issuing
10 unlawfully restricted licenses to CVP supply, imposing an order
11 or sanctions on Plaintiff as to its supply, and denying relief to
12 Plaintiff.

13     The second claim is for injunctive relief under Fed. R. Civ.
14 P. 65.

15     The third claim is for declaratory judgment under 28 U.S.C.
16 § 2201.

17     The fourth claim seeks attorney's fees pursuant to 5 U.S.C.
18 §§ 504(a)(1) and 504(b)(1)(C) and the Equal Access to Justice
19 Act, 28 U.S.C. §§ 2412(b) and (d).

20

21 A.   5 U.S.C. § 706(2).

22     Plaintiff asserts its claims are for violation of 5 U.S.C.
23 § 706(2) for alleged agency actions that are arbitrary,
24 capricious, unlawful, and in excess of statutory authority.

25     Defendants concede that review is available under Section
26 706(2), but is limited to the six year statute of limitations
27 under the APA. *Hells Canyon Preservation Council v. U.S. Forest*
28 *Service*, 593 F.3d 923, 930 (9th Cir 2010).

1   **B.   5 U.S.C. § 706(1).**

2        TCCA further asserts that jurisdiction is proper under 5

3   U.S.C. § 706(1). Section 706(1) applies to compel agency action

4   unlawfully withheld or unreasonably delayed.  Pursuant to Section

5   11460, Plaintiff seeks to preclude the export of CVP project

6   water necessary to preserve sufficient supply to meet TCCA

7   Members' and the area of origin's present and future needs to the

8   extent of their full contractual supplies. Judicial intervention

9   under § 706(1) to compel action only applies to discrete agency

10  action the agency is required to take. *Norton v. S. Utah*

11  *Wilderness Alliance*, 542 U.S. 55, 64 (2004).  A required

12  "ministerial or nondiscretionary act on which an agency can be

13  ordered "to take action upon a matter, without directing how it

14  shall act." *Center for Biological Diversity v. Veneman*, 394 F.3d

15  1108, 1112 (9th Cir. 2005).  Plaintiff suggests that water

16  deliveries under the water service contracts is only ministerial.

17  The Bureau's annual water allocations under the CVP water service

18  contracts are not ministerial, but rather entail uniquely

19  discretionary action that requires it to interpret CVP contracts

20  and balance all competing interests under operational

21  constraints, to comply with other statutory requirements,

22  including but not limited to, decisions of the SWRCB, the CVPIA,

23  Reclamation law and the ESA. *Westlands Water Dist. v. U.S.*, 153

24  F.Supp.2d 1133, 1144 (2001) ("*Westlands 2001*") ("[the Bureau] has

25  contractual authority and administrative discretion over how it

26  provides water service among the CVP's water and power-users, and

27  how it picks its priorities among them.")

28        Plaintiff invokes *Natural Resources Defense Council v.*

1  *Patterson*, 333 F.Supp.2d 906 (E.D. Cal. 2004) as authority for
2  section 706(1)'s application because Section 11460's "plain
3  meaning, legislative history, and construction by the state
4  court" all confirm Plaintiff's interpretation. *Patterson* is
5  distinguishable as Cal. Water Code § 5937, at issue in that case,
6  expressly required the Bureau to comply with its mandate to
7  release water from Friant Dam.  *Id.* at 916.  Here, Congress
8  leaves "to Interior the use of its considerable experience and
9  expertise to implement CVP water supply allocations."  *Central*
10 *Valley Water Agency v. United States*, 327 F.Supp.2d 1180, 1206
11 (E.D. Cal. 2004), *San Luis & Delta-Mendota Water Authority v.*
12 *U.S. Dept. of Int.*, 637 F.Supp.2d 777, 805 (E.D. Cal. 2008)
13 (Bureau's accounting [is] a complex process within the agency's
14 discretion).

15         Section 11460 does not provide a mandatory duty or
16 ministerial discretion.  Although § 11460 instructs that areas of
17 origin are not to be "denied" of the "prior right" to "the water
18 reasonably required to adequately supply the beneficial needs of
19 the watershed," it does not specifically identify what action the
20 Bureau is required to take to protect such "prior right."
21 Section 11460 does not address whether: 1) the "prior right" is
22 protectable by a requirement that limits the Bureau's ability to
23 divert water for export as the SWRCB has continuously interpreted
24 the statute, or 2) whether the Bureau must provide CVP
25 contractors within an area of origin a preference to CVP water at
26 the expense of other CVP contractors.  Without a mandatory duty
27 or ministerial action, the Court is limited to the inquiry
28 whether the Bureau has made a discretionary decision, not to

1   second guess whether the agency should have made a different

2   decision.  *Coos County Board of Commissioners v. Kempthorne*, 531

3   F.3d 792, 883 (9th Cir. 2008).  The Bureau makes discretionary

4   allocation determinations in performing all its CVP water service

5   contracts.  Plaintiff is not entitled to relief under § 706(1).

6       Relief by way of writ of mandate is equally unavailable

7   under 28 U.S.C. § 1361 because that extraordinary remedy lies

8   only to compel the performance of a clear nondiscretionary duty.

9   *Pittston Cost Group v. Sebben*, 48 U.S. 105, 121 (1988).

10

11                  III.  **HISTORICAL BACKGROUND**.

12  **A.**   **CREATION OF THE CVP**.

13      California's two largest rivers, the Sacramento and the San

14  Joaquin, meet to form the Sacramento-San Joaquin Delta ("Delta")

15  south of the City of Sacramento.  Their combined waters, if not

16  diverted, flow through the Delta, Suisan Bay, and San Francisco

17  Bay, to the Pacific Ocean.  This region, commonly known as the

18  Bay-Delta, is the hub of California's two largest water

19  distribution systems, the CVP, operated by the Bureau, and the

20  State Water Project ("SWP"), operated by the California

21  Department of Water Resources ("DWR").  *In re Bay Delta*

22  *Programmatic Environmental Impact Report Coordinated Proceedings*,

23  43 Cal.4th 1143, 1151 (2008).  Plaintiff makes no claims against

24  the DWR or its operation of the SWP.  The CVP and SWP are

25  operated in a coordinated manner under the Coordinated Operating

26  Agreement, (Administrative Record ("AR") at 5046, *et seq*.), and

27  State Water Resources Control Board ("SWRCB") Decision 1641(d),

28  AR at 4106.

                              11

1    The California Legislature originally conceived the CVP "to
2 conserve and put to maximum beneficial use the waters of the
3 Central Valley of California." *South Delta Water Agency*, 767
4 F.2d at 533-34.  Maximizing the use of the Central Valley's water
5 would be achieved by constructing an irrigation project capable
6 of moving water from where water was plentiful in the north part
7 of California above the Sacramento Valley, to the San Joaquin
8 Valley, south of the Delta, which had abundant land but a
9 shortage of water.  *United States v. Gerlach Live Stock Co.*, 339
10 U.S. 725, 728 (1950); *see also,* California State Engineer
11 Bulletin 12 at 22, Supplemental Administrative Record ("SAR") at
12 3136.

13    The first step in development of the Projects was the
14 California legislature's enactment of the Central Valley Project
15 Act of 1933, ch. 1042, 1933 Cal. Stat. 2643 (1933), which
16 authorized construction of Kennett Dam and Reservoir (now Shasta
17 Dam and Shasta Lake) on the Sacramento River, to pump water from
18 the lower Sacramento River to the lower San Joaquin River, and
19 Friant Dam on the San Joaquin River, with canals to carry water
20 to the southern San Joaquin Valley.  The Act also included the
21 area of origin statutes, codified as CWC sections 11460-11463 and
22 intended to protect water use within areas of origin.  CWC
23 §§ 11460 and 11463 were made applicable to the Bureau in 1951.
24 See CWC § 11128.[1]

25

26    [1] Section 11463 addresses water exchanges and is not
27 implicated here.  The CWC includes an area of origin statute
    designed to protect counties, CWC § 10505, not directly at issue
28 in this case.

12

1    The State of California was unable to finance the Project
2 alone and sought participation by the United States to do so.
3 Federal authorization for the CVP was enacted under the
4 provisions of the Emergency Relief Appropriation Act of 1935, ch.
5 48, 49 Stat. 115, § 4.  Congress re-authorized the CVP pursuant
6 to the Rivers & Harbors Act of August 26, 1937, ch. 832, 50 Stat.
7 844, 850 and the Act of October 17, 1940, 54 Stat. 1198 (1940)
8 ("Rivers & Harbors Act"). As initially authorized, the CVP did
9 not include any facilities intended to provide water to the
10 Sacramento Valley. Congress did not authorize any facilities for
11 the CVP until 1950.  See An Act to Authorize Sacramento Valley
12 Irrigation Canals, Central Valley Project, California, Pub. L.
13 No. 81-839, 64 Stat. 1036, § 2 (1950) ("1950 Act"), AR at 9136-
14 38.

15    It is undisputed that the federal Legislative history for
16 the 1950 Act describes it as: "a desirable step to implement the
17 intent of the legislation of the State of California which
18 preserves the water supply that will be required to meet present
19 and future beneficial needs in the various watersheds of origin."
20 S.Rep. No. 81-2447 at 638-39 (1950), AR at 9131-32.  Congress
21 effectuated the California Legislature's intent by bringing
22 subsidized irrigation water to a valley that was then primarily
23 devoted to dry-farming to "create a much more intensified and
24 diversified farming economy."  Id. at 636, AR at 9133.  The 1950
25 Act specifically addressed how the canals of the CVP, that served
26 Plaintiff's members, would be operated.  The 1950 Act did not
27 direct that the canals be operated to provide area of origin
28 contractors with a priority over other contractors, rather

13

1  Congress required that the canals be "coordinated and integrated"

2  with the operation of "the existing features of the Central

3  Valley Project in such manner as will effectuate the fullest and

4  most economic utilization of the land and water resources of the

5  Central Valley of California *for the widest public benefit*." 1950

6  Act, § 4 (emphasis added).  This irreconcilable conflict between

7  Plaintiff's position that areas of origin have statutory priority

8  and the Congressional enactment that provided the existing

9  features of the CVP were to be coordinated and integrated to

10  effectuate the fullest and most economic use of the lands and

11  water resources of the Central Valley of California FOR THE

12  WIDEST POSSIBLE PUBLIC BENEFIT is the crux of this dispute.

13

14  B.   OPERATION OF THE CVP

15       The CVP operates under a Coordinated Operating Agreement

16  between the Bureau and the DWR as an integrated unit.  *Westlands*

17  *2001*, 153 F.Supp.2d at 1170-71. The modern CVP encompasses more

18  than twenty (20) reservoirs and five hundred (500) miles of major

19  canals, it continues to be generally operated as an integrated

20  unit. *Id.*  Contractors receiving water from the CVP do not apply

21  for appropriative water rights from the SWRCB, as is required to

22  perfect a water right from a California water source.  Instead,

23  they obtain CVP water — developed or appropriated through Bureau

24  facilities — by contracting solely with the Bureau.  43 U.S.C.

25  § 511 (authorizing Interior to contract with irrigation entities,

26  not individual water users, for the delivery of Bureau Project

27  water).  It is undisputed that the Plaintiff nor any of its

28  Members has ever applied for, nor has the SWRCB ever issued to

**14**

1    them, appropriate water rights permits.

2

3    C.    ALLOCATION OF CVP WATER.

4         The Bureau normally allocates CVP water between its

5    divisions on a pro rata basis; except when 1) operational

6    constraints or 2) contract provisions dictate priority

7    allocation.  M&I Water Shortage Policy at 1, SAR at 853

8    (providing general policy and operational constraints); *Del*

9    *Puerto Water Dist. v. U.S. Bureau of Reclamation*, 271 F.Supp.2d

10   1234, 1243 (E.D. Cal. 2003), *aff'd O'Neill v. United States*, 50

11   F.3d 677 (9th Cir. 1995) (recognizing contract-based priority of

12   Exchange Contractors to CVP water.)  In dry water years, all CVP

13   contractors have received less than their full contractual

14   entitlements of water.  The drought's impact on water supplies,

15   reservoir storage levels, and water allocation within the CVP has

16   not been uniform.  Operational limitations at the Delta

17   facilities mean that allocation shortages are not solely a

18   reflection of water supply conditions and contractors south-of-

19   Delta usually bear an increased burden of the shortages.

20        The two dry water years at issue in this case are 2008 and

21   2009. In 2008, TCCA and other north-of-Delta water service

22   contractors received 100% of their allocation, while south-of-

23   the-Delta contractors received only 50%.  AR at 2244.

24   In 2009, a drought year that caused the Governor of California to

25   declare a State of Emergency; AR at 1862, north-of-Delta received

26   40% of their contractual quantity, while south-of-Delta

27   contractors subject to operational constraints received only 10%.

28   AR at 1862.

1  D.    **STATE LAW AREA OF ORIGIN STATUTES**.

2        The area of origin statutes, CWC §§ 11460-11465 ("area of

3  origin statutes"), were enacted to alleviate the concern that

4  construction of the CVP would leave inadequate water supplies for

5  local uses.  *United States v. State Water Resources Control Bd.*,

6  182 Cal.App.3d 82, 138 (1986).  Reclamation's appropriation of

7  water for the CVP is subject to those statutes.  *Natural Res.*

8  *Des. Council v. Kempthorne*, 621 F.Supp.2d 954, 993 (E.D. Cal.

9  2009) *clarified on other grounds*, 2009 WL 2424569 (Aug. 6, 2009).

10 However, Area of Origin statutes do not dictate the allocation by

11 the Bureau of CVP water.  Area of Origin statutes help determine

12 the quantity of water available to the Bureau for allocation, not

13 how the water is allocated by the Bureau's Contracting Officer.

14

15        1.    **THE CALIFORNIA ATTORNEY GENERAL ANALYZES THE AREA OF**

16              **ORIGIN STATUTES**.

17        In 1955, a California Attorney General Opinion ("AG Op.")

18 performed an analysis of the scope and Effect of area of origin

19 statutes.  25 Ops. Cal. Att'y Gen. 8 (1955)  ("A.G. Op."), AR at

20 9498.  The AG Op found Section 11460 was intended to protect area

21 of origin water users by creating an "inchoate" priority to a

22 water right.  AG Op at 20; AR at 9509.  To protect the statutory

23 right, inhabitants of any area of origin "must comply with the

24 general water law of the state . . . to apply for and perfect a

25 water right . . . ."  AG Op at 20-21; AR at 9509-10.

26        The Attorney General opined that Area of Origin provisions

27 were constitutional and California had the authority to

28 incorporate their protections into conditions on the permits

16

1  issued to the Bureau for the CVP.  AG Op at 28-29, 32; AR at
2  9517-18, 9521.

3

4  **2.  THE BUREAU'S PERMITS FOR CVP WATER SUPPLY ARE
       CONDITIONED TO PROTECT APPROPRIATION OF WATER WITHIN
5       THE AREA OF ORIGIN.**

6  In 1961, the SWRCB approved the United States' application

7  to appropriate Sacramento River water for the CVP by Decision 990

8  ("D-990").  AR at 5463. D-990 recognized one of the CVP's

9  principal functions is to export water from the Sacramento River

10  watershed into the San Joaquin Valley. D-990 at 65, AR at 5528.

11  D-990 also spoke to the SWRCB's interpretation of the area of

12  origin statutes:

13      The public interest requires that water originating in the
        Sacramento Valley Basin be made available for use within the
14      Basin and the Sacramento-San Joaquin Delta before it is
        exported to more distant areas, and the permits granted
15      herein will so provide.

16  D-990 at 72-73; AR at 5535-36.

17  This protection was implemented by the condition Term 22

18  imposed on the Bureau's water rights permits.  Term 22 made the

19  Bureau's water permits "subject to rights initiated by

20  <u>applications for use</u> within said watershed and Delta regardless

21  of the date of filing said applications." D-990 at 73, 85; AR at

22  5536, 5548 (emphasis added.)   Term 22 protects *appropriators* of

23  water with permits within the area of origin, not CVP

24  contractors.

25  The Bureau's permits also include a condition, Term 23, that

26  addresses the use of Project water by water users within an area

27  of origin. Term 23 does not require CVP water to be allocated for

28  the benefit of areas of origin.  Rather, it granted then-current

1    water users within the Sacramento River watershed a three year

2    period to request water service contracts from the Bureau which

3    would be preferred over requests from users outside the

4    watershed.  It also included a ten year preference in obtaining a

5    water service contract to those within a watershed area then

6    using water.  D-990 at 73, 85-86; AR at 5536, 5548-49. SWRCB

7    decision D-1641 states that the "basis for Term 23 may have been

8    protection of the public interest, but it was not compelled by

9    the area of origin statutes."  D-1641 at 100; AR at 4217.

10          In 1978 the SWRCB modified the Bureau's CVP permits to

11   require the Bureau to meet water quality standards in the Delta

12   and Suisan Marsh.  D-1485 at 10; AR at 5188.  This required the

13   CVP to either release water from storage or to curtail diversions

14   so that outflow from the Delta would be sufficient to prevent sea

15   water from intruding into the Delta and to enhance water quality

16   by decreased salinity. D-1594 at 1-3, SAR at 1377-79; *United*

17   *States v. SWRCB*, 182 Cal.App.3d at 125.  The California Court of

18   Appeal affirmed D-1485 recognizing the SWRCB's authority to

19   modify the Bureau's water right permits, but criticized the SWRCB

20   for actions it took to meet water quality standards solely by

21   restricting the CVP and the SWP while imposing no obligations on

22   other water rights holders.

23          To protect water availability, in 1965 the SWRCB added Term

24   80 to new water rights permits which reserved the SWRCB's

25   jurisdiction over the permit.  In 1984 the Board responded to the

26   Court of Appeals' criticism with D-1594, which addressed how to

27   determine water availability for over 500 water rights permit

28   holders in the Sacramento-San Joaquin Delta watershed that were

1    issued with Term 80. See D-1594 at 2; SAR at 1378.   The

2    implementation means was Term 91 which has been applied to those

3    and all subsequent water permits within the watershed.   *El Dorado*

4    *Irr. Dist. v. State Water Res. Control Bd.*, 142 Cal.App.4th 937,

5    951 (2006).

6         The SWRCB adopted Term 91 "to protect persons claiming

7    paramount rights to divert water from the Delta and the water

8    quality upon which such rights depend and to protect fish and

9    wildlife."  *El Dorado,* 142 Cal.App.4th at 953.   Term 91 imposes

10   on new appropriators shared responsibility to meet Delta water

11   quality standards.   D-1594 at 9, SAR at 1372.   "Term 91 prohibits

12   permitees from diverting water when stored Project water is being

13   released to meet Delta water quality standards or other in-basin

14   demands."  D-1594 at 8, SAR at 01385; *El Dorado*, 142 Cal.App.4th

15   at 950.   This Term 91 prohibition is to ensure sufficient outflow

16   of water from the Delta to keep sea water from intruding into the

17   Delta and increasing salinity which degrades water quality.

18   Adequate water quality increases availability of water throughout

19   the Delta watershed.   D-1594 at 2, SAR at 1378.   Term 91 uses the

20   affected area of origin provisions because Term 91 assumes that

21   the CVP's and SWP's export water rights are junior to all other

22   water rights in the watersheds of origin.   *Phelps v. State Water*

23   *Res. Control Bd.*, 157 Cal.App.4th 89, 107 (2007), D-1594 at 40,

24   SAR at 01417 (an underlying assumption of Term 91 methodology is

25   to prefer in-basin permittees over CVP and SWP exports.)

26        3.    APPLICATION OF THE AREA OF ORIGIN STATUTES BY SWRCB AND
              REJECTION OF TCAA CLAIM FOR PREFERENCE TO CVP WATER.

27

28

1    Plaintiff contends that since the Bureau first obtained

2  water rights through the SWRCB permit process, 50 years ago,

3  § 11460 has been applied to protect the ability of potential in-

4  basin water users to obtain a natural flow water right by

5  appropriation.   The terms of the Bureau's water rights permits,

6  and those of hundreds of other water rights holders, in effect

7  treat the CVP's right to export water out of the area of origin

8  as junior to all water rights, even future water rights, within

9  an area of origin.

10    Based on this premise, two TCCA member agencies, Glyde and

11  Orland-Artois Water Districts, filed a complaint with the SWRCB

12  in 1991 claiming preferential access to CVP water supply under

13  the area of origin statutes, which was rejected by the SWRCB's

14  decision that the TCCA members had no preferential access to CVP

15  water supply under the area of origin statutes.   The SWRCB

16  explained: Sections 11460-11463 "allow [] water users within the

17  watershed of origin to appropriate water under a priority senior

18  to rights of the Bureau . . . ."   AR at 4952 (May 24, 1991 Letter

19  from SWRCB.)   The SWRCB interpreted § 11460 in that response:

20          The statutes and permit terms protecting the areas
         of origin do not guarantee that the water supply needs
21       of the entire area of origin, or any particular water
         users within the area of origin, will be met.   Rather,
22       the area-of-origin protections protect water users
         within the area of origin against previous
23       appropriations for export.   They are a guarantee that,
         up to the amount of the exports, the Board will not
24       reject a new application in the area of origin on the
         basis that no water is available for appropriation.

25

26          The area-of-origin provisions provide only
         priority; export projects approved subject to the area-
27       of-origin requirements do not have rights senior to
         water projects approved by the Board subsequently for
28       the area of origin.   The right to obtain a priority
         does not accord other rights such as a right to obtain

water at the price it would cost under a contract from
an exporter.

AR at 4956.

The SWRCB restated its interpretation during the 1990's.
Order 95-6 confirmed that the correct way to obtain area of
origin protections is to "file a water right application and
receive a permit with seniority over the rights of the DWR or the
USBR to export water from the area." SAR at 1256-57; see also
SWRCB Order 98-09 (1998), SAR at 1037.  Plaintiff and its Members
hold no such water rights permits. The SWRCB again addressed area
of origin statutes in D-1641, issued December 29, 1999.  AR at
4428.  The SWRCB rejected TCCA's arguments "that the CVP is
required under Water Code §§ 11460, et seq. to supply water to
meet the needs of users in the Sacramento Valley." D-1641 at 99,
101-102.  The Board responded to petitions for reconsideration of
D-1641, by removing its findings regarding area of origin law at
pp. 101-102 of the original D-1641.  AR at 4438.  On
reconsideration, the Board explained: "TCCA has been advised in
the past that the appropriate way to obtain additional service
water supplies under the Watershed Protection Act is to file
applications to appropriate the additional water." AR at 4217.
The revised D-1641 confirmed: "[T]he USBR is subject to Water
Code sections 11460 and 11463, which are part of the area of
origin laws, and if it violates those sections, the SWRCB has
authority to require compliance." AR at 4211.  The SWRCB has
never found that the Bureau violated the Watershed Protection
Act.

**E.    THE DISPUTED CVP WATER SERVICE CONTRACTS**.

CVP water is only available under water service contracts with the United States through Interior and the Bureau. *Westlands 2001*, 153 F.Supp. 2d at 1144 (*citing*, 42 U.S.C. § 511). Reclamation has contracted with water districts from the CVP's nine divisions, including the Sacramento, San Luis, San Felipe, and Delta Divisions to provide CVP water service.  Plaintiff's 16 members are located within the Sacramento Division, north of the Delta.  SAR at 129; 706.  Defendant Intervenors San Luis & Delta-Mendota Water Authority and Westlands Water District are located south of the Delta, within the CVP's San Luis, San Felipe and Delta Divisions.  *Westlands 2001*, 153 F.Supp.2d at 142.  In CVP Federal water service contracting, there are at least three categories of contracts.  The first are "Exchange Contracts which give express contractual priority to CVP water service to designated "Exchange Contractors" on the basis of their pre-existing pre-1914 riparian and appropriative rights to the San Joaquin River.  *Westlands Water Dist. v. U.S.*, 337 F.3d 1092, 1096 (9th Cir. 2003) ("*Westlands 2003*").  The Exchange Contractors "traded" their pre-existing water rights to the Bureau, which obtained water permits from the SWRCB based on these exchanged water rights, for which the Bureau in turn granted priority access to CVP water supply to the Exchange Contractors in federal water service contracts.  This enabled the Bureau to provide water for a proposed CVP expansion in other areas of the San Joaquin Valley.  *Westlands 2003*, 337 F.3d at 1096-97 (*citing*, *Westlands Water Dist. v. U.S.*, 864 F.Supp. 1536, 1539 (E.D. Cal. 1994).

1     The second category of CVP contracts are Settlement
2  Contracts including the Sacramento River Settlement ("SRS")
3  Contracts, which grant a contractual priority to CVP water supply
4  through limitations on shortage provisions.[2]  *Kempthorne*, 2008 WL
5  5054115 at *23 (E.D. Cal. 2008) (not reported).  The SRS
6  Contracts' priority arises from: "[T]he CVP's water rights are
7  subject to the Settlement Contractors' [pre-existing water
8  rights]" which include riparian, appropriative, and other water
9  rights recognized by the State Board.  *Id.* at *23.

10    The third category of contracts are held by CVP contractors,
11 north-of-Delta, in-Delta, and south-of-Delta.  All of these third
12 category CVP contractors, which include TCCA and its Members,
13 (except Glen-Colusa), SLDMA and Westlands, held no pre-existing
14 water rights to offer as consideration for CVP water service and
15 have no priority access rights to CVP water supply or deliveries
16 in times of shortage; no guarantee of 100% contract water
17 deliveries; and no recognition they include pre-existing water
18 rights.  The Bureau allocates reduced CVP water supplies during
19 Shortages to the third category of CVP water service contractors
20 on a CVP-wide basis in accordance with the terms of all these
21 Contracting Districts' water service contracts.

22
23
24    [2] Glen-Colusa Irrigation District, a TCCA Member, holds a
25 Sacramento River Settlement Contract.  As a result, Glen-Colusa's
26 renewal contract has different shortage terms from other TCCA
   Member contracts.  Glen-Colusa receives lesser shortage
27 reductions based on the difference in its contract's shortage
   terms.  The Settlement Contract is not an issue in this case.  AR
28 at 3717-60.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

### 1. TCCA MEMBERS' RIGHT TO CVP WATER UNDER THEIR LONG-TERM CVP WATER SERVICE CONTRACTS.

TCCA Members executed their original CVP water service contracts in the 1960's and 1970's.  See AR at 2781, 2992, 3543 (1960's); AR at 2890, 2920, 3434 (1970's).  All original TCCA contracts contained "shortage" provisions which permitted the Bureau to apportion and reduce the available water supply in years of shortage.  See e.g., Dunnigan Water Service District Contract (Feb. 5, 1963) ("Dunnigan Renewal Contract"), Request for Judicial Notice ("RJN"), Ex. 3 at 17.  Before the original TCCA CVP contracts expired in 1995, the Bureau delivered less than 100% of contract amounts to TCCA Members in five shortage water years, 1977, 1990, 1991, 1992, and 1994.  SAR at 3177.  In those years, other third category contractors received similarly reduced amounts of water, including Westlands.  SAR at 3177.

In 1992, Congress enacted the Central Valley Project Improvement Act ("CVPIA"), Pub. L. No. 102-575, 106 Stat. 4706 (1992), which reallocated priorities for use of CVP water. Among other things, the CVPIA precluded the Secretary from entering into new CVP contracts for delivery of CVP water for any purpose other than fish and wildlife until certain environmental requirements were met and directed that 800,000 acre-feet of "Project yield" would be immediately dedicated to the implementation of the fish, wildlife and habitat restoration purposes established by the Act. CVPIA at §§ 3404(a), 3406(b)(2). The passage of the CVPIA came just as many CVP contracts were about to expire.  The process of developing new CVP water contracts began.

24

1

     2.  __INTERIM CONTRACTS__.

2       In 1995, TCCA Members entered into "interim" renewal

3 contracts awaiting review and assessment of long-term renewal

4 contracts.  SAR at 382.  Interim renewal contracts commenced

5 execution in 1995 and were subsequently renewed for periods up to

6 two years until 2005.  SAR at 382.  The TCCA interim contracts

7 included water shortage provisions prescribed by Article 12,

8 authorizing the Bureau to determine conditions of shortage and to

9 apportion the reduced available water supply among CVP

10 contractors.  See Dunnigan Renewal Contract at 24-25.  TCCA

11 Members' interim contracts did not provide for preferential water

12 allocations based on area of origin.  SAR at 1065-66.  During the

13 interim TCCA contracts, the Bureau reduced available water supply

14 among all CVP water service contracts in four shortage years,

15 1995, 1997, 1999, and 2001.  Through 2005 TCCA CVP water service

16 contracts always included a shortage provision.

17

18       3.  __NEGOTIATION OF CURRENTLY OPERATIVE TCCA RENEWAL__

19         __CONTRACTS: THE BUREAU'S INTERPRETATION AND PERFORMANCE.__

20       TCCA was afforded an opportunity to comment and discuss the

21 renewal of long-term contract provisions with the Bureau. SAR at

22 518.  The Bureau and TCCA Members extensively discussed the

23 applicability of area of origin laws to the CVP contracts and the

24 Bureau's authority to reduce water deliveries to CVP contractors

in times of shortage.

25       The Bureau asserted the non-applicability of Section 11460

26 to allocation and delivery of CVP water under CVP contracts.  In

27 1994 the Bureau issued a November 2, Area of Origin Issue Paper,

28

SAR at 1317, which stated the Bureau's position that Section

11460 is "directed toward obtaining prior water rights, not

obtaining deliveries of water under the Project's rights."   In

1996 another Bureau draft report addressed applicability of area

of origin statutes to the CVP, confirming that area of origin

statutes in California water law "do not guarantee that the water

supply needs of an entire area of origin, will or can be met."

SAR at 1154:

> Under these statutes, water rights applicants
> within the area of origin are essentially guaranteed
> that new water right applications filed for the
> development of water within the area of origin, will
> not be rejected by the [Board] on the basis that no
> water is available for appropriation by virtue of a
> senior water right to export the water from the water
> shed.   While the area of origin statutes may result in
> future reductions in the quantities of CVP water that
> can be delivered to CVP export customers, the area of
> origin provisions do not become part of a contract for
> the delivery of water; they are part of the water
> rights on which the contract is based and subject that
> right to appropriations by users within the area of
> origin.

The Bureau found: "Area of origin statutes . . . do not

establish any priority to the allocation of CVP contract water or

CVP water used for implementation of the [CVPIA]".   SAR at 1156.

Many contractors responded to the draft report.   See, e.g., SAR

at 1105-11; 1125-32, 1133, 1134-37, 1138-40, 1150-53.   TCCA then

acknowledged that "[T]he Bureau's conclusions come as no

surprise, as this is a restatement of positions they [sic] have

articulated on numerous occasions in the past."   SAR at 1141.   In

2000, Reclamation again stated: "Area of origin/county of origin

statutes do not give any CVP user a priority over any other CVP

user regarding water service provided by CVP contracts . . . this

1   is also the position of the State Water Resources Control Board .
2   . . ."  SAR at 977.

3       The Bureau consistently rejected requests that an area of
4   origin provision be included in north-of-Delta CVP contracts.
5   SAR at 1317; 1308; 3238.  TCCA proposed draft contract language
6   precluding water reductions to TCCA Members "unless and until
7   reductions have also been imposed in irrigation users receiving
8   water from the integrated CVP water supply who are outside the
9   Sacramento River watershed."  SAR at 3238. TCCA contractors
10  requested area of origin transfer provisions and increased CVP
11  contract water allocations based on alleged area of origin
12  protections.  SAR at 1004-7 (request for area of origin transfer
13  provisions); SAR at 1021-24 (request for water quantity
14  increase); SAR at 1000-1 (same); SAR at 831 (same).  Both interim
15  TCCA contracts included a similar area of origin transfer
16  provision, SAR at 1308, as did the TCCA Renewal Contracts AR at
17  307-71. The Bureau did not adopt contract terms to increase
18  contract quantities or afford protection against shortages.  AR
19  at 3056 (same contract amounts in interim and renewal contracts).

20
21
22          4.   TCCA ACCEPTS LONG-TERM RENEWAL CONTRACTS WITHOUT
                 PRIORITY ALLOCATION TERMS: THE SHORTAGE PROVISIONS.
23
24      All TCCA Members executed long-term CVP water service
    contracts in 2005 ("TCCA Renewal Contracts").  All TCCA renewal
25
    contracts contain identical shortage provisions, including
26
    Dunnigan Water District, AR at 3043-97; Colusa County Water
27
    District, AR at 3539-93; Corning Water District, AR at 2777-2834;
28

                                27

1   Cortina Water District, AR at 2917-30; Colusa County Water

2   District, AR at 3539-93; Corning Water District AR at 2777-2834;

3   Cortina Water District AR at 2917-30; Davis Water District AR at

4   3150-3201; 4M Water District, AR at 2887-2901; Glyde Water

5   District, AR at 3430-82; Holthouse Water District, AR at 2960-73;

6   Canawha Water District, AR at 3098-3149; Kirkwood Water District,

7   AR at 2673-2723; LaGrande Water District, AR at 3377-3429; Orland

8   Artois Water District, AR at 3322-76; Proberta Water District, AR

9   at 2835-86; Thomes Creek Water District, AR at 2724-76; Westside

10   & Westside Water District, AR at 3202-52.

11       All TCCA Renewal Contracts contain an Article 12 shortage

12   provision substantively identical to the shortage provision in

13   the prior long term contracts under which the Bureau declared

14   conditions of shortage and then allocated less than full

15   contractual amounts to TCCA and its Members under interim TCCA

16   contracts.  See Dunnigan Renewal Contract at 24-25.  The TCCA

17   long term renewal contracts memorialize the agreement of "the

18   United States and [each] contractor . . . to enter into the

19   contract pursuant to Federal Reclamation law on the terms and

20   conditions set forth below."  AR at 3208.  These purposes

21   include: operation of the CVP "for diversion, storage, carriage,

22   distribution and beneficial use, for flood control, irrigation,

23   municipal, domestic, industrial, fish and wildlife mitigation,

24   protection and restoration, generation and distribution of

25   electric energy, salinity control, navigation and other

26   beneficial uses."

27

28

The TCCA Renewal Contract's Article 12 shortage provision authorize the Bureau to determine shortages and apportion waters in times of shortage:

> 12(a): in its operation of the Project, the Contracting Officer will use all reasonable means to guard against a Condition of Shortage in the quantity of water to be made available to the Contractor pursuant to this contract.  In the event the Contracting Officer determines that a Condition of Shortage appears probable, the Contracting Officer will notify the Contractor of said determination as soon as practicable.

> 12(b): if there is a Condition of Shortage because of errors in physical operations of the Project, drought, or other physical causes beyond the control of the Contracting Officer or actions taken by the Contracting Officer to meet legal obligations then, except as provided in subdivision (a) of Article 18 of this Contract, no liability shall accrue against the United States or any of its officers, agents, or employees, for any damage, direct or indirect, arising therefrom.

> 12(c): In any year in which there may occur a shortage for any of the reasons specified in subdivision (b) above, the Contracting Officer shall apportion the available Project Water supply among the Contractor and others entitled, under existing contracts and future contracts . . . and renewals thereof, to receive Project Water consistent with the contractual obligations of the United States.

> 12(d): Project Water furnished under this Contract will be allocated in accordance with the then-existing Project M&I Water Shortage Policy.  Such Policy shall be amended, modified, or superseded only through a public notice and comment procedure.

See, e.g., AR at 3073-74.  Article 12 authorizes the Bureau to decrease the apportionment available CVP supply among all CVP water service contractors during conditions of shortage, without regard to whether those water service contractors are within or outside an area of origin as it has for the over-sixty year history of the CVP and almost forty years of active dispute with

TCCA over area of origin alleged priority in CVP federal water
service contracts.

   5.   **TCCA MEMBERS' VALIDATION OF ALL RENEWAL CONTRACTS IN
        STATE COURT**.

      Article 38 of the TCCA Renewal Contracts provides that TCCA
Members obtain a State Court judgment validating each member
contract.  AR at 3090("The Contractor shall furnish the United
States a certified copy of the Final Decree, the validation
proceedings, and all pertinent supporting records of the Court
approving and confirming this Contract, and decreeing and
adjudging it to be lawful, valid, and binding on the
Contractor.")  This validation process, undertaken by each TCCA
member confirmed and validated under state law each renewal
contract, establishing the valid execution and enforceability of
every provision of the TCCA Renewal Contracts by judgment of the
State Superior Court.  SAR at 23-31; 34-42; 43-45; 46-59; 60-64.

   6.   **EXECUTION BY PERFORMANCE AND CONDUCT UNDER THE TCCA
        RENEWAL CONTRACTS**.

      Following execution and validation of the TCCA Renewal
Contracts, the Bureau continued to make water deliveries and
performed by reducing Plaintiffs' water allocations in water
years when shortages were declared, as it had previously done
under the original and interim TCCA contracts.  Under Article 12,
the Bureau declared conditions of shortage in 2007, 2008, and
2009.  SAR at 317-80.  The Bureau delivered less than full
contract amounts to all CVP water service contractors, including
TCCA members in 2008 and 2009.  AR at 1591 (the cause of

30

1    reduction was "the ongoing absence of precipitation in Northern

2    California").  In correspondence that followed execution of the

3    TCCA Renewal Contracts, the Bureau affirmed its interpretation

4    that area of origin laws did not conflict with the terms of

5    Article 12 of the Renewal Contracts and the reduced apportionment

6    of CVP water so authorized.  AR at 1602-3; 1589.  TCCA admitted

7    that the Bureau had "consistently maintained more than a decade

8    that CVP contractors in the Sacramento River watershed are

9    entitled to no priority to CVP water supplies under Section

10   11460."  AR at 1596.

11

12                    IV.   PROCEDURAL BACKGROUND

13        After TCCA filed its complaint February 11, 2010, Defendant-

14   Intervenors, San Luis & Delta-Mendota Water Authority and

15   Westlands Water District were granted leave to intervene on April

16   16, 2010.  (Doc. 23; Doc. 34).  The case was reassigned to this

17   Court on April 23, 2010.  (Doc. 30).  Federal Defendants filed

18   the Administrative Record on July 16, 2010, and filed a

19   Supplemental Administrative Record on October 14, 2010.  (Doc.

20   39; Doc. 43).  On December 1, 2010 Plaintiff filed a motion for

21   summary judgment. (Doc. 52.) Federal Defendants and Defendant-

22   Interveners filed cross-motions for summary judgment on July 1,

23   2010. (Doc. 60, 62, respectively.)[3]

24

25   _____

26        [3] Defendant-Interveners also move to strike Plaintiffs'
     Reply to Defendant-Interveners' Opposition to Plaintiff's
27   Statement of Undisputed Facts ("Plaintiff's SUF Reply"). (Doc.
     77.) Plaintiff's SUF Reply was not considered. Plaintiff's Motion
28   to Strike is moot.

                              31

1

## V.  STANDARDS OF DECISION.

2      A motion for summary judgment must be granted when "there
3 is no genuine issue as to any material fact and . . . the moving
4 party is entitled to judgment as a matter of law."  Fed. R. Civ.
5 P. 56(c); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48
6 (1986).  *See, Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)
7 (summary judgment motion should be granted "so long as whatever
8 is before the district court" shows that the standard set by Rule
9 56(c) is satisfied.

10      For purposes of summary judgment, a fact is "material," when
11 it could affect the outcome of the suit.  *Anderson*, 477 U.S. at
12 248.  A dispute about a material fact is "genuine" when the
13 evidence is such that a reasonable jury could return a verdict
14 for the party opposing the motion.  *Id.* at 248.  The moving party
15 must show that it is entitled to summary judgment because, under
16 the governing law, there can be but one reasonable determination
17 of the relevant cause of action or issue.  *Id.* at 250; *Margolis*
18 *v. Ryan*, 140 F.3d 850, 852 (9th Cir. 1998).  In ruling on a
19 motion for summary judgment, the court draws all inferences in
20 favor of the non-moving party, makes no credibility
21 determinations, and does not weigh the evidence.  *Anderson*, 477
22 U.S. at 249-250. If the matter can be decided as a matter of law,
23 because there are no genuine factual issues, there is no need for
24 a trial and summary judgment is proper.  *Id.* at 250-251.

25      In a judicial review and Administrative Procedures Act case,
26 the Court may not resolve factual questions but determines
27 "whether or not, as a matter of law, the evidence in the
28 Administrative Record permitted the agency to make the decision

1   it did." *Consolidated Delta Smelt Cases*, No. 1:09-cv-0409 **OWW**

2   **DLB** (E.D. Cal. Mem. Decision re Cross-Motions for Summary

3   Judgment (Dec. 14, 2010, at 18)) (quoting *Sierra Club v.*

4   *Mainella*, 459 F.Supp.2d 76, 90 (D.D.C. 2006).  In administrative

5   review cases, the Court determines "whether the Agency action is

6   supported by the Administrative Record and otherwise consistent

7   with the APA standard of review."  *Id.* at 90.

8

9                    **VI.  LAW AND ANALYSIS.**

10  A.   **STATUTE OF LIMITATIONS.**

11       Plaintiff's counsel conceded at oral argument that APA

12  claims are subject to a six year statute of limitations and any

13  claims prior to February 11, 2004 are time-barred.  *Hells Canyon*

14  *Preservation Council*, 593 F.3d at 930. Water shortages have been

15  declared under CVP water service contracts in 10 of the last 33

16  years.  Summary judgment is GRANTED as to any claims arising

17  before February 11, 2004. Only the water shortages declared in

18  2008 and 2009 remain in dispute.

19

20  B.   **CVP STATUTES AND SECTION 11460 DO NOT CONTAIN OR SUPPORT THE**
    **PRIORITY ALLOCATION RIGHT TO CVP WATER THAT TCCA ADVANCES.**
21

22       TCCA contends that Congress, the State of California, and

23  Reclamation "all intended the CVP to provide for the water needs

    of the Sacramento Valley with a priority over exports."  The non-
24
    Federal Defendants rejoin that TCCA's reliance on engineering
25
    documents, reports, statements by State officials, and state
26
    laws, need not be referenced based on unambiguous federal
27
    statutory language and do not bear on Congress' intent in passing
28

                                   33

1  Federal laws that authorize the CVP and are inconsistent with
2  state law.

3      TCCA argues:

4      1.   Water service and deliveries to TCCA members must be
5  given priority over other CVP divisions and water service
6  contractors to provide 100% contract allocations to TCCA members
7  before south-of-Delta CVP contractors receive water service; and

8      2.   Its proposed allocation aligns with the 1950 Act's
9  directive to "effectuate the fullest and most economic
10 utilization of the land and water resources of the Central Valley
11 of California for the widest possible public benefit."  1950 Act,
12 § 4.

13     The Federal-Defendants argue that TCCA's construction of
14 Section 11460 conflicts with the congressional directive in the
15 legislation authorizing the CVP canals, emphasizing the total
16 lack of any language in the Reclamation Acts, or CVPIA,
17 recognizing or granting such origin priority to TCCA.  To the
18 contrary, Congressional enactments have repeated the federal
19 legislative intent that the CVP created was for multiple public
20 benefits throughout the Central Valley and that Interior's
21 mandate was to integrate and coordinate the Sacramento River
22 Division into the entire CVP to achieve the legislative purpose
23 of "the widest possible public benefit."

24     As a matter of ascertaining legislative intent, a court
25 looks first to the words of the statute.  *U.S. v. Monsanto*, 491
26 U.S. 600, 610 (1989) ("Congress' intent is 'best determined by
27 [looking to] the statutory language that it chooses . . .'")
28 Where the plain language of a statute clearly expresses Congress'

1  intent, there is no need to resort to legislative history.
2  *Abraham & Sons Enterprises v. Equilon Enterprises ORC*, 292 F.3d
3  958, 963 (9th Cir. 2002).

4

5          1.   <u>STATUTORY INTERPRETATION OF THE CVP STATUTES.</u>
6               a.   <u>Plain Language.</u>

7          The language of the original enactment for the CVP in 1935
8  grants no area of origin priority or intended preference to store
9  and provide water with priority for users in the Sacramento
10 Valley. Emergency Relief Appropriations Act of 1935, 49 Stat. 115
11 (1935). Congress' express language manifests its intent that the
12 CVP be used to satisfy multiple purposes to achieve the broadest
13 public benefit for the entire Central Valley.  The Rivers &
14 Harbors Act of 1937 stated the original purposes for creating the
15 CVP:

16               Improving navigation, regulating the flow of the San
17          Joaquin River and the Sacramento River, controlling floods,
               providing for storage and for the delivery of the stored
18          waters thereof, for the reclamation of arid and semi-arid
               lands and lands of Indian reservations, and other beneficial
19          uses and for the generation and sale of electric energy . . .

20         Rivers & Harbors Act of August 26, 1937, Pub. L. No. 75 392,
21 50 Stat. 844, 850 (1937).

22         None of the Federal laws authorizing the CVP include an
23 "area of origin" provision directing the Bureau to deliver 100%
24 of CVP water contract-allocations to Sacramento Valley users
25 before deliveries to other CVP contractors.  Rather, Congress
26 intended the CVP to be used and operated for multiple purposes to
27 achieve broad public benefits for the entire Central Valley.
28 *Dugan v. Rank*, 372 U.S. 609, 612 (1963) (footnote omitted) (CVP

1    intended "to conserve and put to maximum beneficial use, the

2    waters of the Central Valley of California.")

3        TCCA contends that "Congress authorized the physical means

4    to meet the CVP's [area of origin] obligations" through the 1950

5    Act.  TCCA refers to § 3 of the 1950 Act, which relates to

6    "locating and designing [of] the works authorized by § 2,"

7    concerning engineering and construction. TCCA asserts § 3

8    directed the Secretary of the Interior to give the State Engineer

9    Bulletins 13 and 26 "due consideration" in locating and designing

10   the Sacramento Canals Unit.  According to Plaintiff, this

11   language demonstrates that Congress was well aware of the

12   Bulletins and of the Act's affect on "local interests." 1950 Act

13   at § 3. This section says nothing about an area of origin

14   priority.

15       Defendants rejoin that § 4 of the 1950 Act ("Section 4")

16   expressly states as to the Tehama-Colusa Conduit Canal:

17           [T]he Secretary of the Interior is directed to
             cause the operation of said work . . . to be
18           coordinated and integrated with the operation of . . .
             the existing features of the Central Valley Project in
19           such manner as will effectuate the fullest and most
             economic utilization of the land and water resources of
20           the Central Valley of California for the widest public
             benefit.
21

22       TCCA contends that Section 4 is a "broad mandate" which does

23   not direct agencies to perform any specific nondiscretionary

24   actions. Under Section 4 of the 1950 Act, Congress gave two

25   instructions for the Unit's operation: (1) the canals are to be

26   operated to achieve the widest possible public benefit and (2)

27   that benefit would be realized by the fullest and most economic

28

                                  36

1  utilization of the land and water resources of the Central

2  Valley, not just the Sacramento Valley.

3       The lack of any federal statutory language recognizing or

4  granting an area of origin priority in CVP water service

5  contracts defeats TCCA's self-serving, and wholly unsupported

6  contention that such a priority exists and is not inconsistent

7  with the CVP's purposes.  *See Westlands Water District v.*

8  *Firebaugh Canal*, 10 F.3d 667, 671 (9th Cir. 1993).  *Firebaugh*

9  *Canal* reviewed the district court's refusal to grant San Luis

10 (non-priority contractors) a CVP water priority under the

11 authorizing statute:

12        **The strongest argument in favor of the Bureau is that the**
          **Act nowhere mandates that the Reservoir first be used to**
13        **satisfy the needs of the San Luis Contractors before any**
          **diversion to other contractors is allowed. Creating a**
14        **preference in favor of the San Luis Contractors and others**
          **similarly situated, or providing that Reservoir water is for**
15        **their exclusive benefit, would have been a simple enough**
          **drafting exercise for Congress. In effect, the San Luis**
16        **Contractors ask us to add an important substantive provision**
          **to the Act. Such a provision cannot be found in the plain**
17        **language of the Act, and indeed would be inconsistent with**
          **the mandate that the San Luis Unit be operated as an**
18        **integral part of the whole CVP.**

19        *Id*. at 671.

20        b.   <u>Legislative History of the CVP Statutes.</u>

21       Both sides claim support in the legislative history of the

22 1950 Act. TCCA asserts that select documents, including a letter

23 to then-Congress member Engle from the Assistant Secretary of the

24 Interior, represent "unequivocal policy statements" by

25 Reclamation that only excess water would be diverted outside of

26 the Sacramento Valley basin. Doc. 53 at 7 (citing AR 9735 ("I can

27 assure you that the Bureau will determine the amounts of water

28 required in the Sacramento Valley drainage basin to the best of

37

1  its ability so that only surplus waters would be exported to the
2  San Joaquin. . .").)

3       Plaintiff's legal authority cited to support finding
4  Engle's remarks "informative" demonstrate the opposite:   "We are
5  mindful of the limited persuasive value of the remarks of an
6  individual legislator.   Nevertheless, the <u>unanimously</u> expressed
7  understanding of the scope of [Federal legislation] assists our
8  analysis, particularly when that expressed understanding is in
9  complete harmony with the Congressional purpose and statutory
10 text."   *Ileto v. Glock, Inc.*, 565 F.3d 1126, 1137 (9th Cir.
11 2009).   No evidence has been submitted of later Congressional
12 history of any uniform understanding that any legislation
13 authorizing or implementing the CVP recognized a state area of
14 origin priority.

15      To the contrary, the same CVP Documents Plaintiff invokes
16 provide statements defeating the existence of any uniform
17 understanding.   The House Special Subcommittee on Irrigation and
18 Reclamation, cited by TCCA, provides:

19          (a) That the statements of policy with respect to the
            importation of surplus water from the Sacramento Valley
20          made by the State of California, the original sponsors
            of the Project, and subsequently repeated in a similar
21          manner by Interior Department representatives, are
            certainly confusing, if not misleading;
22
            (b) Categorical statements about the reservation of
23          water for Sacramento Valley needs, such as the
            assurance given by Secretary Krug in Oroville on
24          October 12, 1948, cannot be substantiated as a
            practical matter in view of the increasing Sacramento
25          Valley uses . . . .

26      AR at 9162.

27      The Special Subcommittee further stated:   "[T]he statements
28 by Federal officials in the reports appear to guarantee water for

1  the Sacramento valley.  However, as Chairman Engle said at
2  Sacramento on October 28, 1951, ". . . these commitments must be
3  considered in the light of other commitments made then or since
4  that time."  AR at 9176.  Such "other commitments" are included
5  in the text of Federal CVP legislation including the 1950 Act and
6  the CVPIA.  The language of those statutes controls over the
7  conflicting statements of individual Federal officials.

8      This case cannot be decided on the anecdotal evidence from
9  individual legislators or conflicting legislative history of the
10  1950 Act.  Despite having knowledge of Reclamation's alleged
11  "unequivocal policy statements," Congress not only drafted the
12  1950 Act without any express provision, or even any language
13  inferentially providing any water rights preference for in-basin
14  users; the 1950 Act contains the exact opposite — a direction
15  that the Unit operate to achieve the widest possible benefit
16  across the entire Central Valley. The Rivers & Harbors Act and
17  the 1950 Act do not create or recognize a priority for area of
18  origin CVP contractors.

19          2.   STATUTORY INTERPRETATION OF SECTION 11460.

20              a.   Plain Language.

21      Plaintiff contends that the plain language of Section 11460
22  is "clear from its use of the definite article, 'the' prior
23  right," as opposed to, *inter alia*, "a", "previously perfected,"
24  or "appropriative rights." Defendant-Interveners rejoin that "the
25  word 'contract' does not appear . . . . Nor do words such as
26  'preference,' 'allocation,' or 'shortage.'" Defendant-Interveners
27  argue that while TCCA claims that its members are entitled to CVP
28  contracts that grant them preferential allocation of CVP water

39

1  during Conditions of Shortage, § 11460's plain terms include no

2  such entitlement. Defendant-Interveners further argue that the

3  area of origin statutes only allow for new property rights

4  against the *DWR*, not Reclamation. Federal Defendants join

5  Interveners, asserting that reading the area of origin statutes

6  together demonstrates that Section 11460 applies only to rights

7  previously perfected by way of application to the SWRCB. (Doc. 76

8  at 10.) Section 11460 provides:

9      In the construction and operation by the Department of any
10     project and with the provisions of this part, a watershed or
       area of origin wherein water originates, or any area
11     immediately adjacent thereto which can be conveniently
       supplied with water therefrom, shall not be deprived by the
12     Department directly or indirectly of the prior right to all
       of the water reasonably required to adequately supply the
13     beneficial needs of the watershed area, or any of the
       inhabitants or property owners therein.

14  Section 11462 provides: "[T]he provisions of this Article

15  shall not be so construed as to create any new property rights

16  other than against the department [of Water Resources] as

17  provided in this part . . . ."[4]

18  That the area of origin statues list only the DWR, and not

19  the Bureau is significant. Given section 11462's specific

20  limitation, Section 11460 cannot be construed to allow a CVP

21  contract to create any state based water right against *the*

22  *Bureau*. *See El Dorado*, 142 Cal. App. 4th at 976 ("In other words,

23  although [a permitee] may be entitled to assert a priority under

24  Section 11460 over the Bureau and the [DWR] to the diversion of

25  water originating in the watershed of [origin], that priority

26

27

    [4] "Department" means Department of Water Resources. CWC §
28  22.

                            40

does *not* extend to water the projects have properly diverted to storage at an earlier date.")(emphasis in original).[5] Section 11462 categorically precludes a finding that Section 11460 confers a right in users in the area of origin to insist on a preferential water contract to *Bureau's* diverted and stored water.[6]

> ### b. Decades of Consistent Interpretation By the California Attorney General, the SWRCB, and the Bureau is That Section 11460 Governs Appropriation Not Allocation of Water in the Area of Origin.

> #### i. Attorney General Opinion.

Under California law, "in the absence of controlling authority, an Attorney General opinion may be persuasive because we presume the Legislature is aware of the opinion and would have amended the statute if it disagreed." *Life Care Centers of America v. Cal. Optima*, 133 Cal.App.4th 1169, 1178 (2005); *ARC Students for Liberty Campaign v. Los Rios Community College* 732 F.Supp.2d 1051, 1057 (2010) (*citing City of Irvine v. S. Cal. Ass'n of Gov'ts*, 175 Cal.App.4th 506, 521, 96 Cal.Rptr.3d 78 (Cal.Ct.App.2009) ("Under California law, the Attorney General's opinions are not binding, yet are 'entitled to great weight and,

---

[5] There is a total lack of proof that the water TCCA asserts Section 11460 priority over is not previously diverted and stored CVP water or that any such water originated in a relevant area of origin.

[6] It is undisputed that the Plaintiffs have never applied for, and the SWRCB has never issued, appropriative or other water rights permits to any of the Plaintiffs applicable to CVP water. Under state law, Plaintiffs are required to obtain any water right under Section 11460 by complying with SWRCB water project permitting process.

1  in the absence of contrary controlling authority,

2  persuasive.'")).

3      The 1955 AG Op. analyzed and addressed the application of

4  section 11460 and California's area of origin laws in detail.

5      The AG Op explains that the area of origin statutes do not

6  grant to the land or inhabitants in a watershed of origin a right

7  to use water stored by project facilities:

8      No inhabitant of a watershed of origin becomes possessed of
       any presently vested title or right to any specific quantity
9      of water as a result of this statute. As the need of such
       inhabitant develops he must comply with the general law of
10     the state, both substantively and procedurally, to apply for
       and perfect a water right for water which he then needs and
11     can then be put to beneficial use (secs. 1200 to 1800).
       However, when he makes such an application, as a member of
12     the class of persons protected by the statute, his
       application is not to be gainsaid, denied or limited by
13     reason of any activity on part of the Water Project
       Authority. Specifically, this means that if, prior to the
14     development of the applicant's increased needs, such use by
       the authority would not justify denial of the application.
15     Assuming the application to be otherwise meritorious, the
       State Engineer would grant a permit in the usual form, and
16     the authority would thereafter be compelled to honor the
       water right thus created and vested.

17
    A.G. Op. at 20-21.
18
              ii.   The Bureau's Interpretation of Reclamation
19                  Law.

20     "Unless unreasonable or clearly contrary to the statutory

21  language or purpose, the consistent construction of a statute by

22  an agency charged with responsibility for its implementation is

23  entitled to great deference." *Dix v. Superior Court*, 53 Cal.3d

24  442, 460 (1991); *RTC Transp., Inc. V. Conagra Poultry Co.*, 971

25  F.2d 368, 370 (9th Cir. 1992) ("We accord substantial deference

26  to statutory interpretations by an agency charged with

27  administering a statute."); *Mesa Verde Const. Co. v. Northern*

28  *California Dist. Council of Laborers*, 861 F.2d 1124, n. 5 (1988)

1  (*citing Chevron U.S.A. v. Natural Resources Defense Council,*
2  *Inc.*, 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984)("[A]
3  court may not substitute its own construction of a statutory
4  provision for a reasonable interpretation made by the
5  administrator of an agency.")).

6      The Bureau has consistently stated its position that Section
7  11460 does not create a priority allocation to TCCA Members or
8  any area or origin CVP water contractors. *See e.g.*, SAR at 1317
9  (1994) ("[Section 11460 is] directed toward obtaining prior water
10  rights, not obtaining deliveries of water under the Project's
11  rights."); SAR at 1154 (1996)("Area of origin statutes . . . do
12  not establish any priority to the allocation of CVP contract
13  water or CVP water used for implementation of the [CVPIA]"); SAR
14  at 977 (2000) ("Area of origin/county of origin statutes do not
15  give any CVP user a priority over any other CVP user regarding
16  water service provided by CVP contracts . . . this is also the
17  position of the State Water Resources Control Board.")

18      The Bureau consistently rejected requests that an area of
19  origin provision be included in north-of-Delta CVP contracts.
20  SAR at 1317; 1308; 3238.  TCCA proposed draft contract language
21  precluding water reductions to TCCA Members "unless and until
22  reductions have also been imposed in irrigation users receiving
23  water from the integrated CVP water supply who are outside the
24  Sacramento River watershed." AR at 2802. TCCA contractors
25  requested area of origin transfer provisions and increased CVP
26  contract water allocations based on alleged area of origin
27  protections.  SAR at 1004-7 (request for area of origin transfer
28  provisions); SAR at 1021-24 (request for water quantity

1   increase); SAR at 1000-1 (same); SAR at 831 (same). The Bureau

2   did not adopt any contract terms to increase contract quantities

3   or afford Plaintiff's Members protection against shortages.[7]   AR

4   at 3056 (same contract amounts in interim and renewal contracts).

5            iii.   **The SWRCB Has Independently Interpreted**
                    **Section 11460 in the same manner as the AG**
6                   **Op.**

7        The SWRCB decisions are consistent with the AG Op. and the

8   Bureau's interpretation, and have never recognized the water

9   rights Plaintiff and its Members claim. The SWRCB has

10  historically and continuously interpreted § 11460 in the same

11  manner as the AG Op.  *See e.g.*, AR at 4952-56 (interpreting area

12  of origin sections to give priority for new appropriations

13  only));  Order 95-6 (same), SAR at 1256; Order 98-09 (same), SAR

14  at 1037(same); see also AR at 4956 (1991 Letter from SWRCB

15  rejecting two TCCA members' complaint seeking area of origin

16  based preference to CVP water.)

17       3.   **SECTION 11460's INTERPRETATION BY THE AG Op, SWRCB, AND**
                **THE BUREAU ARE ALL CONSISTENT WITH THE PERMIT TERMS**.
18

19
        _____

20       [7] **As was recognized in *Westlands 2001*, Plaintiff's Members'
    contracts "do not create special, preferential rights, in
    derogation of the overall integrated management of the CVP.
21  Rather, they contain shortage provisions that abate the right []
    to receive CPV water .. . in water-short years." *Westlands 2001*,
22  153 F.Supp.2d at 1167.  TCCA's Members are not like the Exchange
    Contractors in *Westlands*.  There, the senior priority
23  appropriator and riparian water rights of the Exchange
    Contractors were both historically established and recognized by
24  the express language in the Exchange Contracts.  *Del Puerto Water
    Dist.*, 271 F.Supp.2d at 1243 (CVP contractor did not have an
25  unqualified right to the delivery of irrigation water).
    Plaintiff's Members' contracts recognize § 11460 limits the
26  Bureau's diversion of natural flow water for export, not its
    allocation of CVP water.**

1    D-990, which approved the United States' application to
2    appropriate Sacramento River water for the CVP, was implemented
3    by the conditions, Term 22 and 23. Term 22 made the Bureau's
4    water permits "subject to rights initiated by *applications* for
5    use within said watershed and Delta regardless of the date of
6    filing said applications." D-990 at 73, 85, AR at 5536,
7    5548(emphasis added.)  Term 22 protects *appropriators* of water
8    <u>with permits within the area of origin</u>, not CVP contractors.

9        Term 23 granted then-current water users within the
10   Sacramento River watershed a three year period (long-since
11   passed) to request water service contracts, which would be
12   preferred over requests from users outside the watershed. D-1641
13   at 100, AR at 4217.  D-1614 expressly states "[the] basis for
14   Term 23 may have been protection of the public interest, but it
15   was not, compelled by the area of origin statutes." By the
16   language of D-1641, the SWRCB explicitly clarified that area of
17   origin statutes do not apply to CVP contracts.

18       Finally, SWRCB adopted Term 91 "to protect persons claiming
19   paramount rights to divert water from the Delta and the water
20   quality upon which such rights depend and to protect fish and
21   wildlife." *El Dorado,* 142 Cal.App.4th at 953.  Term 91 imposes
22   on new *appropriators* shared responsibility to meet Delta water
23   quality standards.  D-1594 at 9, SAR Doc. 103.  "Term 91
24   prohibits permitees from diverting water when stored Project
25   water is being released to meet Delta water quality standards or
26   other in-basin demands." D-1594 at 8, SAR at 1385; *El Dorado*,
27   142 Cal.App.4th at 950. Term 91 does not grant an area of origin
28   priority to CVP contractors.

**45**

1          4.    <u>SUBSEQUENT LEGISLATIVE ACTS.</u>

2          Defendants assert that subsequent CVP legislative

3   authorizations reenforce that Congress did not intend the area of

4   origin statutes to apply in the manner TCCA suggests.  In 1955,

5   just after the AG Op. was published, the Bureau was authorized

6   "to construct, operate, and maintain, as an addition to and an

7   integral part of the Central Valley project, California, the

8   Trinity River division." Trinity River Division Act of August 12,

9   1955, Pub. L. No. 84-386, 69 Stat. 719 (1955). One purpose of the

10  Trinity River division is "to transport Trinity River water to

11  the Sacramento River." Id. Section 2 of the Act provides that

12  "the operation of the Trinity River division shall be integrated

13  and coordinated, from both a financial and an operational

14  standpoint, with the operation of other features of the Central

15  Valley project, as presently authorized and as may in the future

16  be authorized by Act of Congress, in such manner as will

17  effectuate the fullest, most beneficial, and most economic

18  utilization of the water resources hereby made available

19  <u>[Provided] [t]hat not less than 50,000 acre-feet shall be</u>

20  <u>released annually from the Trinity Reservoir and made available</u>

21  <u>to Humboldt County and downstream water users.</u>" Id. at § 2

22  (emphasis added).  The Trinity River furnishes substantial

23  volumes of CVP water that are stored for CVP use by conveyance

24  through the Sacramento River.

25        In 1962 Congress re-authorized the New Melones project on

26  the Stanislaus River. The New Melones project moves water from

27  the Stanislaus River basin to the San Joaquin River. The

28  authorizing statute directs that "before initiating any diversion

                                46

of water from the Stanislaus River Basin in connection with the operation of the Central Valley Project, <u>the Secretary of the Interior shall determine the quantity of water required to satisfy all existing and anticipated future needs within that basin and the diversions shall at all times be subordinate to the quantities so determined.</u>" Flood Control Act of 1962, Pub.L. No. 87-874, 73 Stat. 1180, 1191 (1962) (emphasis added).

These later enacted Trinity River and New Melones Acts, demonstrate that Congress knew how to create a preference in the allocation of CPV water for an area  when it wanted to do so. The Trinity River Division Act prioritizes 50,000 acre feet of CVP water to Humboldt County.  The New Melones Unit Act prioritizes CVP water for the Stanislaus River Basin.  Both these Acts employ express language to grant such priorities to CVP water.  The timing of these subsequent Acts is significant because they were enacted after the California State Legislature specifically applied § 11460 to Reclamation by CWC § 11128 and after the AG Op was published.  Had Congress believed a different approach was warranted, it certainly could have enacted a different statute. *Saxbe v. Bustos*, 419 U.S. 65, 74 (1974) (a "longstanding administrative construction is entitled to great weight, particularly when [] Congress has revisited the Act and left the practice untouched.").  Instead, recognizing the CVP Acts did not include area of origin protection, Congress created two express legislative priorities for use of CVP water with particularized statutory language applicable to the Trinity River Division and the New Melones Unit.

     5. <u>CALIFORNIA CASE LAW.</u>

47

1    Plaintiffs and Defendants both claim support from California

2  case law. Defendants assert that, the more recent case law, *El*

3  *Dorado Irrigation Dist.*, 142 Cal.App.4th 937 and *Phelps*, 157

4  Cal.App.4th 89, confirm that Section 11460 does not create an

5  area of origin priority to CVP water. Plaintiffs rejoin that

6  dicta from *Water Resources Control Bd. Cases*, 136 Cal.App.4th 674

7  (2006) ("SWRCB Cases") states that there is "no reason why" CVP

8  contractors cannot have a Section 11460 area of origin right to

9  priority CVP water allocation.

10          a.   The El Dorado and Phelps Decisions

11    The *El Dorado Irrigation Dist.* case, in response to a

12  challenge that application of Term 91 to the district's water

13  deliveries violated their area of origin priority, held that

14  "Section 11462 contradicted the trial court's conclusion that

15  appropriators [with water permits] in an area of origin may

16  assert a priority to water from that area or that was properly

17  stored by another in an earlier season."  142 Cal.App.4th at 976.

18  The court concluded: "Although El Dorado may be entitled to

19  assert a priority under § 11460 over the Bureau and the

20  Department to the diversion of water originating in the watershed

21  of the South Fork of the American River, that priority does not

22  extend to water the Projects have properly diverted to storage at

23  an earlier date."  *Id.* Although *El Dorado* is not on all fours

24  with this case, the decision demonstrates that California courts

25  have rejected the application of Section 11460 to the allocation

26

27

28

                                48

1    of stored CVP water; the same category water TCCA and its Members

2    use and to which they assert a Section 11460 priority.[8]

3    *Phelps*, addressed a challenge to a SWRCB civil liability

4    order assessing fines for water users' illegal diversion of water

5    during times when they were required to curtail diversions, while

6    the CVP and SWP were releasing stored water to meet water quality

7    standards.  157 Cal.App.4th at 99. The Plaintiffs there

8    challenged the SWRCB's imposition of term 91 diversion

9    restrictions on the grounds that those restrictions deprived

10   Plaintiffs of their rights under the area of origin statutes

11   §§ 11460-11463. *Id.*  The plaintiff there, as here, sought to

12   divert previously stored water released by the CVPand SWP.  The

13   *Phelps* decision affirmed the SWRCB's explanation for limiting

14   diversions of stored water:

> The water stored upstream by DWR and the USBR during
> periods of excess flow, however, is appropriated at
> times when its appropriation does not injure any other
> water rights holders.  When this water is subsequently
> released from the reservoirs to flow downstream to the
> export facilities, it is already appropriated, and is
> not naturally present in the rivers . . . Accordingly,
> the stored water transported to the rivers to the
> export pumps by the Projects, is not available for
> others to appropriate.

*Id.* at 107.

*Phelps* confirmed: "[W]e affirmed this reading of the [area

of origin statutes] in *El Dorado, supra*, 142 Cal.App.4th at p.

976 . . . ." *Id.*  As in *El Dorado*, *Phelps* held:  "Based on the

_____

[8] It cannot be disputed that the CVP stores carryover water
from prior seasons to meet a number of statutory, regulatory, and
operating requirements.  TCCA does not present any proof the
water TCCA asserts Section 11460 priority to is not previously
diverted and stored CVP water.

49

**foregoing authority, we conclude that the [area of origin statutes] do[] not bar enforcement of Term 91 against Plaintiffs;" affirming it was proper for the SWRCB to prohibit an area of origin user from diverting water when the only available water was stored upstream of the Delta CVP and SWP Project supply.  This California water jurisprudence defeats TCCA's Section 11460 priority assertion by** interpreting Section 11460 to mean that once water has been properly appropriated to storage by the Bureau, Section 11460 is inapplicable.  TCCA relies on a different California case, the SWRCB Cases, to justify TCCA and its Members' CVP Renewal Contracts claims for preferential rights to CVP water supply.

        b.    <u>The SWRCB Cases Provide No Binding Or Persuasive Precedent</u>.

      Plaintiff depends upon language from the *SWRCB Cases* decision, that no violation of Section § 11460 occurred from use of stored water in the New Melones Reservoir to meet Delta water quality standards, because the Delta was within the area of origin.  136 Cal.App.4th at 758-60.  Recognizing the inapplicability of this ruling because of the express statutory priority language for New Melones in-basin users, Plaintiff seizes on the following dicta:

> To the extent § 11460 reserves the inchoate priority for the beneficial use of water within its area of origin, <u>we see no reason why that priority cannot be asserted by someone who has [or seeks] a contract with the Bureau for the use of that water.</u>  (*See, Robie & Kletzing Area Area of Origin Statutes - the California Experience* (1979) 15 Idaho L. Rev. 419, 436-438 (discussing right of area of origin users to contract with Department for SWP water.)  This does not mean a user within the area of origin can compel the Bureau to deliver a greater quality of water than the user is otherwise entitled under the contracts.  It simply

means the Bureau cannot reduce that user's contractual allotment of water to supply water for uses outside the area of origin, absent some other legal basis for doing so that trumps § 11460.

136 Cal.App.4th at 758 (emphasis added).

There are at least three reasons why Plaintiff's reliance on this dicta is misplaced.

<u>First</u>, the operation and effect of the Bureau's federal water service CVP contracts was not an issue presented for nor necessary to *SWRCB Cases'* decision. *See United States v. Westlands Water Dist.*, 134 F.Supp.2d 1111, 1130 (E.D.Cal.2001) ("*Westlands*")(*citing Trent v. Valley Elec. Ass'n, Inc.*, 195 F.3d 534, 537 (9th Cir.1999) (interpreting prior panel's statement as dicta and therefore not binding under the law of the case doctrine)).[9]

---

[9] **Notwithstanding this language has nothing to do with the holding, Plaintiff urges its acceptance, citing *United States v. Johnson*, 256 F3d 895, 914 (9th Cir. 2001) (en banc) ("Where a panel confronts an issue germane to eventual resolution of the case, and resolves it after reasoned consideration in a published opinion, that decision becomes the law of the circuit (i.e., it is precedential) regardless of whether the decision was "necessary in some strict logical sense.") That the Ninth Circuit has a unique view of the force of dicta, does not apply to the jurisprudential effect of state court dicta. Further, the *SWRCB Cases'* decision does not meet the *Johnson* standard. The decision did not consider key elements required to make a determination whether a federal CVP contractor can assert an area of origin priority over the Bureau and other CVP contracts. The SWRCB Cases court only poses the rhetorical question "why not?". In a decision subsequent to *Johnson*, *Cetacean Community v. Bush*, 386 F3d 1169, 1173 (9th Cir. 2004), the Ninth Circuit clarified that "rhetorical flourishes" are not precedential. *See also Camreta v. Greene*, 131 S. Ct. 2020, 2045 (2011) ("Judicial observations made in the course of explaining a case might give important instruction and be relevant. . . But as dicta those remarks would not establish law and would not qualify as binding precedent.").**

1    <u>Second</u>, no comprehensive analysis or in-depth scrutiny was
2    applied to federal CVP water Renewal Contract rights under
3    Conditions of Shortage. The portion of the cited law review
4    article quoted in the *SWRCB Cases* decision was exclusively
5    confined to state SWP contracts, not federal CVP contracts, and
6    addressed obligations and actions of the DWR, not the Bureau.  AR
7    at 5169-71.

8         The SWRCB Cases dicta offered a strong **caveat regarding CVP**
9    **contracts: "[T]his does not mean a user within the area of origin**
10   **can compel the Bureau to deliver a greater quantity of water than**
11   **the user is otherwise entitled [to] under the contract."** *SWRCB*
12   *Cases*, 136 Cal.App.4th at 758. **As the following discussion**
13   **explicates, the § 12 shortage provisions of Plaintiff's CVP**
14   **contracts gave no preference to Plaintiff or its Members in times**
15   **of shortage despite multiple requests for such priority.  The**
16   **Bureau remains subject to its contractual duty to reduce the**
17   **remaining CVP water to be allocated ratably among all federal**
18   **water service contractors in accordance with the terms of their**
19   **CVP Renewal Contracts.**

20        <u>Third</u>, **Plaintiff's interpretation and proposed application**
21   **of § 11460 to CVP water service contracts would bring the state**
22   **law, § 11460, into direct conflict with two express federal**
23   **Reclamation law Congressional directives.** *South Delta Water*
24   *Agency*, **767 F.2d at 537-41. Under Reclamation law, the Bureau**
25   **must renew CVP contracts on terms "mutually agreeable to the**
26   **parties."  43 U.S.C. § 485h-1(1).  The record of contract**
27   **negotiations and the express terms of Plaintiff's Renewal**
28   **Contracts unequivocally prove that the Bureau did not agree to**

52

include any term to grant a priority allocation of CVP water to TCCA Members based on area of origin priority.  TCCA and its Members were not compelled to sign contracts that were not mutually agreeable.  The CVPIA directed the Secretary of the Interior to "renew" existing CVP water contracts.  CVPIA § 3404(c).  Plaintiff's interpretation of § 11460 would grant them new, different and more favorable contract terms that have never been included in Plaintiff's and its Members' CVP contracts.  Such an interpretation and action bring § 11460 into conflict with federal law governing CVP contracts.

TCCA's proposed interpretation of Section 11460 also conflicts with § 4 of the 1950 Act's directive that the CVP be "coordinated and integrated" for the widest possible benefit to the entire Central Valley.

The SWRCB Cases provide no binding or persuasive precedent. The decision is distinguishable, and is not controlling in a federal court faced with different issues of fact and law.

6.   <u>Plaintiff's Interpretation of Section 11460 Conflicts With The Congressional Directive of the 1950 Act</u>.

In 1951, the California State Legislature expressly applied § 11460 to the Bureau via CWC § 11128. Under Section 8 of the 1902 Reclamation Act, federal reclamation projects must be operated in accordance with state water law, when not inconsistent with congressional directives. *California*, 438 U.S. at 674.[10] "[T]he federal statute [is examined] as a whole to

_____

[10] Here, the SWRCB's interpretation of Section 11460 is directly aligned with the Bureau's, reflecting "the 'cooperative

1  determine . . . whether, in light of the federal statute's

2  purpose and intended effects, state law poses an obstacle to the

3  accomplishment of Congress's objectives."

4      TCCA contends that Section 11460 is consistent with the 1950

5  Act, citing *Trinity Country v. Andrus*, 438 F. Supp. 1368, 1386 n.

6  10 (E.D. Cal. 1977). Footnote 10 states:

> A few statutes authorizing the construction of CVP units
> have specifically directed the Secretary to give priority to
> the needs of the area of origin. 43 U.S.C. § 616eee
> (Auburn-Folsom South Unit); River and Harbor Act of 1962,
> Pub.L.No.87-874, § 203, 76 Stat. 1173, 1191 (New Melones
> Project).

Congress knows how to and in the New Melones Unit Act

created an express priority for the Stanislaus River Basin. 76

Stat. at 1191. TCCA's interpretation of Section 11460 is

inconsistent with Congress' express mandate the Bureau operate

the CVP for the widest possible benefit.  The allocation priority

here sought, unlike the New Melones Act, is not based on the 1950

Act or any other express provision of reclamation law.

      The *Trinity County* case footnote also cites the

Folsom-Auburn Act, authorizing the Auburn-Folsom South unit of

the CVP.  That Act includes a similar operational directive

provision to the 1950 Act, § 4. *See* Pub.L.No. 89-161, 79 Stat.

615-618, § 2 (1965) ("the operation of the Auburn-Folsom South

unit, American River division, shall be integrated and

coordinated, from both a financial and an operational standpoint,

federalism' which the [1902 Reclamation] Act embodie[s] in § 8.'"
*California*, 438 U.S. at 648.  It is TCCA and its Members'
interpretation of Section 11460 that brings the state law into
conflict with the Congressional purpose prescribed by Section 4
of the 1950 Act.

1    with the operation of other features of the Central Valley

2    project. . . in such a manner as will effectuate the fullest,

3    most beneficial, and most economic utilization of the water

4    resources.") *Trinity County*'s finding that Section 11460 is

5    consistent with the Folsom-Auburn Act lends no support to the

6    claim that Plaintiff's interpretation of Section 11460 is

7    consistent with Congressional directives relating to the

8    operation of the CVP.  TCCA ignores a critical aspect of point

9    about *Trinity County*[11] that considered Section 11460 as it has

10   historically been applied, *not* as TCCA seeks to have the statute

11   applied.  No federal court has ever held that any "area of

12   origin" contractor enjoys a "prior right" to previously stored

13   and appropriated CVP water.  As it has been consistently

14   administered, Section 11460 complies with congressional

15   directives because the section has never been applied to dictate

16   how the Bureau *allocates* CVP water under its water service

17   contracts.

18       TCCA's construction of the statute would handcuff the

19   Bureau's discretionary allocation of Project water in its

20   administration of water service contracts and do so in a manner

21   violative of congressional intent.  The 1950 Act does not create

22   an allocation priority for area of origin CVP contractors.

23   Instead, the Act directs that the CVP be "coordinated and

24   integrated" in a way that utilizes the "land and water resources"

25   of the Central Valley for "the widest possible benefit." 1950

26

27           [11] TCCA also cites *South Delta Water Agency*, 767 F.2d at
28   536-539. The same analytical void applies.

Act, § 4. A piecemeal operation of the CVP that does not strive for and achieve this highest use of both land and water resources throughout the entire CVP, is inconsistent with Section 4.  The CVP is not intended to commit the water resources of one part of the Central Valley to the detriment of another part of the Central Valley.

C.    <u>CONCLUSION RE: STATUTES.</u>

Congress has never created an allocation preference for CVP water contractors in an area of origin. It is not the role of a trial court to grant Plaintiff relief that Congress and its delegee, the Bureau, have continuously refused to provide. *Schweiker v. Chillicky*, 487 U.S. 412, 429 (1988) (courts should defer to Congress' judgment because "Congress is the body charged with making the inevitable compromises required in the design of a massive and complex . . . program.") Plaintiff's demand under § 11460 is in material contravention to the express intent of Congress, and would turn the world of federal CVP water contracting on its head.

D.    <u>INTERPRETATION OF LONG-TERM CVP WATER SERVICE CONTRACTS.</u>

TCCA's claim is premised on a showing that the Bureau had no authority to allocate water as it did. Alternatively, that the Bureau acted arbitrarily, capriciously, or contrary to law in exercising its contracting authority and in performing TCCA's water service contracts. Defendant Intervenors respond:

1.) The express terms of the TCCA Renewal Contracts specifically authorized Reclamation to declare conditions of shortage and to apportion CVP water in times of shortage.

56

2.)   At the time Plaintiffs executed their TCCA Renewal Contracts, TCCA Members understood exactly how Article 12 would apply and had been applied to limit their CVP water deliveries in times of declared shortage.

3.)   The Bureau has statutory and contractual discretion to apportion CVP water pro-rata to TCCA Members and all other non-priority CVP water contractors during declared Conditions of Shortage.

4.)   The *post hoc* interpretation of the Contract terms by TCCA is entitled to no weight as it violates the Bureau's and TCCA's express mutual understanding of the meaning of and their agreement to the shortage provisions at the time they contracted based on almost forty years of contracting history, and because TCCA's interpretations are incorrect as a matter of law.

1.   <u>FEDERAL CONTRACT LAW.</u>

Federal law governs the interpretation of a contract if the United States is a party, especially federal reclamation contracts. See *Mojave Valley Irrigation & Drainage Dist. v. Norton*, 244 F.3d 1164, 1165 (9th Cir.2001) (citing cases); *see also Westlands*, 134 F.Supp.2d at 1135 (applying federal law to interpret Westlands' 1963 water-service contract) (*citing Klamath Water Users Protective Ass'n v. Patterson*, 204 F.3d 1206, 1210 (9th Cir.1999), *cert. denied*, 531 U.S. 812, 121 S.Ct. 44, 148 L.Ed.2d 14 (2000) (*citing O'Neill*, 50 F.3d at 682)). For guidance, federal courts also follow general principles of contract interpretation. *See Westlands*, 134 F.Supp.2d at 1135

(*citing Saavedra v. Donovan*, 700 F.2d 496, 498 (9th Cir.1983) (*citing United States v. Seckinger*, 397 U.S. 203, 209-11, 90 S.Ct. 880, 25 L.Ed.2d 224 (1970))).

   The plain language within the four corners of the contract must first be examined to determine the mutual intent of the contracting parties. *See, e.g., United States v. Clark*, 218 F.3d 1092, 1096 (9th Cir.2000) ("Following traditional rules of contract interpretation, we must examine the plain language of the term in the context of the document as a whole.") (quoting sources). In "cases of contracts, language is to be given, if possible, its usual and ordinary meaning. The object is to find out from the words used what the parties intended to do." *Fla. Cent. R.R. Co. v. Schutte*, 103 U.S. (Mem.) 118, 140, 13 Otto 118, 26 L.Ed. 327 (1880). "A written contract must be read as a whole and every part interpreted with reference to the whole, with preference given to reasonable interpretations." *Klamath*, 204 F.3d at 1210 (*citing Kennewick Irrigation Dist. v. United States*, 880 F.2d 1018, 1032 (9th Cir.1989)). "[C]ourts should attempt to construe contracts to avoid absurdity, and must reject interpretations which would make the contract unusual, extraordinary, harsh, unjust, or inequitable." *Blecher & Collins, P.C. v. N.W. Airlines, Inc.*, 858 F.Supp. 1442, 1459 (C.D.Cal.1994) (citing sources).

   "In fashioning federal rules, guidance is gained from general principles for interpreting contracts." *Saavedra,* 700 F.2d at 498 (*citing United States v. Seckinger*, 397 U.S. 203,

209–11, 90 S.Ct. 880, 25 L.Ed.2d 224 (1970)).[12]  The Uniform Commercial Code ("U.C.C.") is one source of federal common law used to interpret any contract to which the federal government is a party.  *See O'Neill*, 50 F.3d at 684 (applying the U.C.C. to the disputed contracts).  "[T]he backdrop of the legislative scheme that authorized" a government contract may also be examined to interpret that contract.  *Peterson v. U.S. Dept. of Interior*, 899 F.2d at 799, 807 (*citing Fed. Hous. Admin. v. Darlington, Inc.*, 358 U.S. 84, 87-88, 79 S.Ct. 141, 3 L.Ed.2d 132 (1958)).  Additional contract interpretation rules apply:

> (1) the four corners of the contract must be read as a whole;
>
> (2) preference is given to reasonable interpretations, favoring those that avoid internal conflict;

---

[12] Sources of federal common law include: (1) the Restatement of Contracts (2d); (2) the U.C.C.; (3) federal caselaw; and (4) state law.  *Westlands*, 134 F.Supp.2d at 1134 (citing Robert E. Jones, Gerald E. Rosen, William E. Wegner, and Jeffrey Scott, Federal Civil Trials and Evidence ¶ 8:4455 (2000) (citing cases)).

(3) under the U.C.C., extrinsic evidence, including usage of trade;[13] course of dealing[14]; and course of performance[15], is admissible to determine whether the contract is ambiguous;

(4) if the contract is ambiguous, i.e., whether "reasonable people could find its terms susceptible to more than one interpretation," extrinsic evidence may be considered to interpret the parties' intent in light of earlier negotiations, later conduct, related agreements, and industry-wide custom;

(5) whether a contract (or any term) is ambiguous is a question of law.

*See Westlands*, 134 F.Supp.2d at 1134-38 (quoting and citing cases).

2.  **STANDARDS RE: THE BUREAU'S STATUTORY DISCRETION TO APPORTION CVP WATER IN TIMES OF SHORTAGE.**

The Bureau, "has contractual authority and administrative discretion over how it provides water service among the CVP's

---

[13] Under U.C.C. § 1-205(2) usage of trade is:
    any practice or method of dealing having such regularity of observance in a place, vocation or trade as to justify an expectation that it will be observed with respect to the transaction in question. The existence and scope of such a usage are to be proved as facts.

[14] Under U.C.C. § 1-205(1) a course of dealing is:
    a sequence of previous conduct between the parties to a particular transaction which is fairly to be regarded as establishing a common basis of understanding for interpreting their expressions and other conduct.

[15] "Where the contract for sale involves repeated occasions for performance by either party with knowledge of the nature of the performance and opportunity for objection to it by the other, any course of performance accepted or acquiesced in without objection shall be relevant to determine the meaning of the agreement." U.C.C. § 2-208.

1  water and power-users, and how it picks its priorities among

2  them." *Westlands 2001*, 153 F.Supp.2d at 1144.  The Bureau is

3  expressly empowered to allocate CVP water under the shortage

4  provisions in its various CVP Contracts.  *Westlands Water Dist.*

5  *v. Bureau of Reclamation*, 805 F.Supp. 1503, 1513 (E.D.Cal.1992)

6  ("*Westlands 1992*").  In *Westlands 1992*, the court found the plain

7  language of similar water shortage provisions: "Vest[ed]

8  conclusive authority to apportion the entire . . . Unit water

9  supply in the Contracting Officers of the Bureau."  *Id*. at 1512.

10  The Bureau "had the prerogative to exercise its allocation powers

11  granted under the water shortage provisions in the relevant

12  supply contracts."  *Id*. at 1513; *see also, San Luis &*

13  *Delta-Mendota Water Authority v. U.S. Dept. of the Interior*, 637

14  F.Supp.2d 777, 795 (E.D. Cal. 2008) (recognizing discretion of

15  Interior through the Bureau to allocate water under the CVPIA).

16

17      The same prerogative exists under Plaintiff's and its

18  Members' Renewal CVP Contracts.  The Bureau has discretion to

19  declare Conditions of Shortage and to exercise its water

20  allocation powers accordingly.  Plaintiff's contention that the

21  Bureau lacks discretion to allocate prorata CVP water supply by

22  reducing deliveries under Conditions of Shortage is contrary to

23  *Westlands 1992* and the express language of Plaintiff's CVP

24  Renewal Contract.  TCCA correctly points out that Article 12(c)

25  does not specify that apportionment of limited Project Water

26  supply must be equal or pro-rata, however, that decision is

27  allocated to the Bureau's discretion to declare water shortages

28  and to allocate water accordingly during dry years.  The Bureau

has the discretion to perform the Contracts in the manner it has historically done and in accordance with the parties' long-standing course of dealing and course of performance. *Westlands 1992*, 805 F.Supp. at 1513. The Bureau's "water allocation decisions are entitled to judicial deference, [if] they are neither unlawful nor unreasonable." *Id*.

> 3.  <u>TCCA MEMBER LONG-TERM CVP CONTRACTS: SHORTAGE TERMS.</u>

Every TCCA renewal contract includes Article 12 empowering the Bureau to declare conditions of shortage and to apportion water in times of shortage.  The shortage provision states:

> (b) If there is a Condition of Shortage[16] because of errors in physical operations of the Project, drought, other physical causes beyond the control of the Contracting Officer or actions taken by the Contracting Officer to meet legal obligations then, except as provided in subdivision (a) of Article 18 of this Contract, no liability shall accrue against the United States or any of its officers, agents, or employees for any damage, direct or indirect, arising therefrom.
>
> (c) In any Year in which there may occur a shortage for any of the reasons specified in subdivision (b) above, the Contracting Officer shall apportion the available Project Water supply among the Contractor and others entitled, under existing contracts and future contracts (to the extent such future contracts are permitted under subsections (a) and (b) of Section 3404 of the CVPIA) and renewals thereof to receive Project Water consistent with the contractual obligations of the United States.
>
> (d) Project Water furnished under this Contract will be allocated in accordance with the then-existing Project M&I Water Shortage Policy."
>
> Renewal Contract, Article 16 (b), (c), (d).

---

[16] Article 1(c) defines condition of shortage as: "A condition respecting the Project during any Year such that the Contracting Officer is unable to deliver sufficient water to meet the Contract Total."

The present CVP M&I Water Shortage Policy generally allocates project water between divisions on a pro rata basis, except when "specific operational constraints on Reclamation require otherwise." SAR at 853, M&I Water Shortage Policy at 1.

### a. Discretionary Interpretive Authority in Renewal Contract Shortage Provisions.

TCCA Renewal Contract Article 12 grants the Bureau authority to determine when Conditions of Shortage occur and to ratably apportion CVP water during those times. AR at 3073-74. Article 12 defines "Condition of Shortage" as "a condition respecting the Project during any Year such that the Contracting Officer is unable to deliver sufficient water to meet the Contract Total." SAR at 3049. Article 12(b) provides that a "Condition of Shortage may occur "because of errors in physical operations of the Project, drought, or other physical causes beyond the control of the Contracting Officer or actions taken by the Contracting Officer to meet legal obligations." AR at 3073. The Contracting Officer must notify contractors when it determines that a Condition of Shortage is probable, and no liability shall accrue against the United States for any damage from a Condition of Shortage. Renewal Contract, Article 12(a); 12(c). The language of Article 12 grants the Bureau unqualified ability to determine when a Condition of Shortage exists under any CVP water service contract, absent language expressly limiting such discretion.

When the Bureau determines a Condition of Shortage exists, Article 12(c) directs that "the Contracting Officer shall

apportion the available Project Water[17] supply among the Contractor and others entitled . . . to receive Project Water consistent with the contractual obligations of the United States." None of the statutes authorizing the Project provide for area of origin priority nor does Plaintiff TCCA or its Members - with the possible exception of Tehama-Colusa Canal Company - hold priority water rights acquired pursuant to California law.[18]  The contractually required apportionment by the Contracting Officer, for the Bureau, calls for Project Water supply to be allocated among the Contractor and other CVP Contractors.

Further authority is granted to the Bureau during a declared shortage to apportion water among all CVP Contractors, within and outside the areas of origin under 12(d): "Project Water furnished under [each Renewal Contract] will be allocated in accordance with then-existing Project M&I Water Shortage Policy."  AR at 3074.[19]  The M&I Policy "define(s) water shortage terms and

---

[17] Contract Article 1(u) defines "Project Water" as "all water that is developed, diverted, stored and delivered by the Secretary in accordance with the statutes authorizing the Project and in accordance with the terms and conditions of water rights acquired pursuant to California law."  SAR at 3052.

[18] The Plaintiffs' Contracts do not define the term "apportion."  Apportion is defined in common usage as "to divide and assign in proportion."  Webster's Third New Int'l Dictionary 105 (1961).

[19] The draft M&I Water Shortage Policy dated September 11, 2001, governed the Bureau's water allocation to Plaintiffs during declared Conditions of Shortage in 2008 and 2009.  SAR at 843-57.

conditions applicable to *all* CVP M&I contractors."  SAR at 853

(emphasis added).  The M&I Policy requires the Bureau to allocate

to non-priority contractors a reduction in 5% increments until

75% of their contractual supply is reached, then, "(W)hen

allocation of irrigation water has been reduced below 75% and

still further water supply reductions are necessary, both the M&I

irrigation allocations will be reduced by the same percentage

increment."  SAR at 855-56.  The M&I Policy makes no distinction

between north-of-Delta and south-of-Delta water contractors.  Nor

does the M&I Policy distinguish between area of origin and non-

area of origin contractors.  Article (d) operates to require the

Bureau to allocate CVP water supply among all CVP contractors in

times of Condition of Shortage.

> **b.  The Renewal Contract's Shortage Provisions Are Not a Limitation on the Bureau's Discretion to Apportion Contract Water.**

Plaintiff advances multiple arguments related to the Renewal

Contracts' Condition of Shortage term: 1) a "Condition of

Shortage" cannot exist if water supply is provided to south-of-

Delta contractors; 2) other CVP water service contracts in other

CVP divisions do not create a "legal obligation" under Article

12(b); 3) the meaning of the term "others entitled" does not

apply to contractors holding non-area of origin CVP contracts;

and (4) Section 11460 is a legal obligation under Article 12(b)

to deliver all contract water to TCCA's Members before exporting

to other non-area of origin CVP contractors.

Plaintiff's first argument is addressed in part by the

contract definition that a "Condition of Shortage" is

65

specifically defined as "a condition respecting the Project."  AR
at 2841.  "Project refers to the entire Central Valley Project
"owned by the United States and managed by the Department of the
Interior, Bureau of Reclamation."  AR at 2843.  When the Bureau
is unable to deliver sufficient CVP water to all CVP water
service contractors, after calculating their contract
requirements in the aggregate, a Condition of Shortage respecting
the Project exists.  The Bureau has interpreted the shortage
provision to, in its discretion, require that "the remaining
supply has to be apportioned among all CVP Contractors pursuant
to Article 12(c), which could further reduce the amount of water
available to all CVP Contractors."  AR at 1591.  No other non-
priority CVP Contractors receive 100%, rather, all share in a
reduced allocation of the available CVP supply.  This
interpretation is reasonable, fair and equitable, and is
consistent with Congress' directive that the Bureau operate the
CVP "in such manner as will effectuate the fullest and most
economic utilization of the land and water resources of the
Central Valley of California for the widest possible public
benefit."  Federal Act of 1950, § 4.

     Second, Plaintiff argues that other CVP water service
contracts in other CVP divisions do not create a "legal
obligation" under Article 12(b) that constitutes a Condition of
Shortage.  There is no evidence the Bureau considered the
existence of additional CVP contracts as causing shortage, as it
cited drought as the justification for a declaring Condition of

Shortage in both 2008 and 2009.  The existence of multiple CVP contractors is not a shortage-causing condition.

Third, Plaintiff contends that the meaning of the term "others entitled" under Article 12(c) does not to apply contractors not in the area of origin. This view is discredited by Article 12(c)'s language that those holding "existing and future contracts" are entitled to CVP water without regard to their geographic location.  The apportionment of the available Project water supply under Article 12(c) is to those "entitled under existing contracts and future contracts . . . to receive Project Water . . . ."  No reference to geographic location is provided for any contractor.  Geographic location is not a qualifying condition to full water service.  TCCA ignores that although the Renewal Contracts did not define the term "others entitled," the Bureau, in its discretion, has historically and consistently maintained that "others entitled" means all other CVP Contractors.  AR at 4590 (1990 letter from the Bureau to TCCA Member Districts); AR at 4950 (1999 Bureau letter to CVP Contractors); AR at 4904 (1994 Bureau letter to CVP Contractors); SAR at 1154-56 (1996 Draft Paper on Applicability of Area of Origin Statutes).  The Bureau has without exception, allocated water pursuant to similar language in the original and the interim TCCA Contracts, pro rata among contractors without differentiating the amounts of reduction. TCCA has acknowledged the Bureau's consistent pro rata allocations.  SAR at 977; SAR at 865; AR at 1596 (A March 12, 2000 letter from TCCA stating "Reclamation has asserted the same position [concerning area of

origin protection] . . . in the long-term water service contract renewal negotiations completed in 2005").

Plaintiff cites *Westlands 2001* to support its final argument that "'available' Project Water, subject to allocation to export contractors under their own versions of Article 12(c), cannot include water needed to serve the 'prior right' [under Section 11460] held by TCCA contractors." *Westlands 2001* is factually distinguishable.  In *Westlands 2001*, Exchange Contractors held senior riparian and pre-1914 appropriative rights, recognized by the SWRCB under prior permits and those senior rights were expressly identified and reserved in the Exchange Contractors' CVP water service contracts.  In this case, Section 11460 creates no water allocation priority for CVP contractors in the area of origin and the TCCA Renewal Contracts have no express or implied reservation of priority to CVP water based on area of origin "right" to TCCA Members or any other legal priority of any kind or nature. No court has ever held that any "area of origin" contractor enjoys a "prior right" to CVP water that originates in an area of origin.

The Bureau is, however, under a legal obligation to "use all reasonable means to guard against a Condition of Shortage in the quantity of water to be made available to the Contractor."  AR at 3073, Renewal Contract, Article 12(a); AR at 2308. The Bureau is under a legal mandate to optimize deliveries for all CVP Contractors.  AR at 3072, Article 11(a); AR at 2307.  Each CVP Water Service Contractor is entitled to a "stated share or quantity of the Project's available water supply."  43 U.S.C.

68

§ 485h-1(4).  The Bureau has historically met this obligation in operating the CVP by apportioning CVP water supplies to Contractors in all Divisions of the CVP in times of shortage.

Plaintiff ignores and refuses to acknowledge that since the inception of the CVP and through the manifestly significant amendments to add non-water service priorities through the CVPIA, the Bureau has never recognized it is under any legal obligation to observe any area of origin "priority;" has never reduced CVP water deliveries on the basis of any area of origin legal obligations to Sacramento Valley CVP contractors; and has continuously and consistently refused to accept such an interpretation of Plaintiff's water service contracts; nor has it recognized any area of origin priority which would conflict with the federal CVP's legal purposes and mandate that the Bureau operate the CVP in such manner to effectuate the fullest and most economic utilization of the land and water resources of the Central Valley of California for the widest possible public benefit.[20] The Bureau's contractual interpretation and its performance and Plaintiffs' performance under prior and existing TCCA Renewal CVP Water Service Contracts comply with federal and state law and are not arbitrary or capricious.  *Central Arizona Irrigation & Drainage Dist. v. Lujan*, 764 F.Supp. 582, 590 (D. Az. 1991) (inclusion of term and Bureau water service contract not capricious because the "administrative record is replete with

_____

[20] No CVP contract now includes and has never included any contract provision that identifies a "legal obligation" under § 11460.

69

1  correspondence between all of the affected parties and the Bureau
2  of Reclamation").

3      Plaintiff's interpretation is contrary to and would
4  improperly restrain and limit the Bureau's contractual authority
5  and discretion to allocate the CVP water supply.

6          c.   **Article 18(a) in Not a Limitation on the Bureau's**
7               **Discretion to Apportion Contract Water.**

8      Plaintiff contends that Article 18(a) limits the shortage
9  provisions to favor Plaintiff or its Members. However, Article
10 18(a) only reserves the right of the Bureau and the Contractor to
11 challenge in court any action TCCA either believes is "predicated
12 upon arbitrary, capricious, or unreasonable opinions or
13 determinations." This provision says nothing about water
14 allocation.  Contract Article 12(c) specifically limits the
15 amount of CVP water any contractor is entitled to Contracting
16 Officer's exercise of discretion in allocating CVP water among
17 CVP contractors.  AR at 1590.  No language in the shortage
18 provisions or anywhere else in Plaintiff's or its Members'
19 contracts specify any entitlement to full contract deliveries
20 during a Condition of Shortage.[21]

21 _____

22     [21] There is, however, proof in the Renewal Contracts that
   Plaintiff and its Member knew how to reserve a disputed issue.
23 Article 7(n) is an express reservation regarding "Rates for M&I
   Water" that was in dispute between the parties at the time of
24 contracting.  Article 7(n) states in relevant part:

25
       "Contractor asserts that it is not legally obligated to
26     repay any Project deficits claimed by the United States to
       have accrued as of the date of the Contract. . . [T]he
27     Contractor does not waive any legal rights or remedies that
       it may have with respect to such issues. Notwithstanding
28

### d.   Article 3 and 1(u) Are Not a Limitation on the Bureau's Discretion to Apportion Contract Water.

Plaintiff argues that Article 3 and 1(u) of its Members' contracts incorporate state law, including § 11460.  Articles 3 and 1(u) recognize that § 11460 applies to the Bureau through the terms of the Bureau's water rights permits, limiting the Bureau's ability to divert natural flow water for export rather than mandating preferential allocation of CVP water.  The National Environmental Policy Act ("NEPA") review for these contracts was based on that understanding.  SAR at 130-3, Finding of No Significant Impact at Findings 1, 3 & 4.  Plaintiff again cites the *SWRCB Cases* decision and D-990, which authorized the Bureau's CVP water permits.  Term 22 of the Bureau's permits effectuating § 11460 does not direct the Bureau to recognize a priority in area of origin contractors; rather, it affords protection to state permitted appropriators of water within an area of origin, not federal water contractors.  D-990 at 73, 85, AR at 5536, 5548.  Consistent with approximately forty years of contracting with Plaintiff, § 11460 at most imposes limits on the Bureau's ability to divert natural flow in the area for export use.  It

_____

execution of this Contract. . . the Contractor may challenge in the appropriate administrative or judicial forums [regarding] [] the existence, computation, or imposition of any such deficit. . ."

AR at 2699.

No such express reservation exists as to Plaintiff's interpretation of Section 11460, despite decades of dispute on the issue.

does not require a preferential allocation to Plaintiff or its
Members of CVP water.

### 4. <u>CONTRACT NEGOTIATION AND PERFORMANCE.</u>

Plaintiff and its Members had express notice and knowledge
of the Bureau's historical and continuous interpretation of
Article 12 and the Bureau's actual past and intended performance
under its CVP Water Service Contracts.  See *Kemmis v. McGoldrick*,
767 F.2d 594, 597 (9th Cir. 1985) (ambiguous contract provisions
are interpreted based on parties' intent at the time contracts
are executed).  Plaintiff admits that "Reclamation has reduced
water deliveries under the Water Service Contracts north-of-
Delta, including deliveries to TCCA Members, in ten of the past
33 contract years, the period from 1976 through 2009."
(Complaint at 7:17-19).  The course of dealing and performance
between Plaintiff and the Bureau proves the Bureau has always
reduced water deliveries to Plaintiff's Members and applied
Article 12's mandated CVP-wide apportionment reduction in years
when "Reclamation delivered some quantity of CVP water to south-
of-Delta contractors" under declared Conditions of Shortage. SAR
at 3177-80.

Uncontradicted substantial evidence of the history of the
CVP establishes that TCCA recognized, understood, and disputed
the Bureau's long standing consistent application of Article 12,
including the Bureau's expressed disavowal of any intent to
recognize, coupled with its actual non-recognition of area of
origin preference in TCCA and its Members, in the present renewal
and under prior CVP contracts.  SAR at 977; 1154-56; 1308; 1317.

1   TCCA has on more than two occasions formally disputed the

2   Bureau's interpretation of the Article 12 shortage conditions and

3   has unsuccessfully sought to include area of origin priority in

4   their CVP Water Service Contracts, which the Bureau consistently

5   denied.

6       The historic practice of the Bureau during shortages has

7   been to, without exception, reduce CPV water deliveries to TCCA

8   and its Members to effect pro rata apportionment of CVP water to

9   all north-and south-of-Delta CVP Water Service Contractors.

10  TCCA's proffered interpretation of Article 12 is manifestly

11  different from the express understanding of the parties at the

12  time of contract formation that, pro-rata allocations and water

13  reductions were required of all contractors under Conditions of

14  Shortage.  Plaintiff now asserts for the first time in any

15  federal judicial proceeding that contract Article 12 is illegal

16  because the shortage provisions of Article 12 are wholly

17  inconsistent with the requirement that the Bureau apply § 11460

18  to those Contracts.  It is indisputable that when the latest

19  Renewal Contracts were executed, Plaintiff and its Members

20  possessed actual knowledge that a dispute over the area of origin

21  priority existed and that the Bureau had never acquiesced and did

22  not agree to Plaintiff's interpretation.  The Bureau notified a

23  TCCA Member in 1990:

24

25      Reclamation has reviewed the appropriate statute and has
        concluded that the Contract . . . between Reclamation and
26      your District satisfies any obligation Reclamation might
        have under the California Water Code to provide water for
27      the 'area of origin.'  The District has agreed to the terms
        and conditions of that Contract.  So, the imposition of
28      shortages on the District, in accordance with that Contract

73

1
2
3

> as a result of drought conditions, does not give the
> District the right to claim water in addition to the amount
> provided for in that Contract.  <u>Users of CVP water are
> sharing in the shortage of water from the CVP</u>.

4
5
6
7
8
9
10
11
12
13
14

AR at 4590 (May 27, 1990 Letter from the Bureau to Orland-Artois
Water District) (emphasis added). In 1994 the Bureau issued a
November 2nd, Area of Origin Issue Paper, SAR at 1317, which
stated the Bureau's position that Section 11460 is "directed
toward obtaining prior water rights, not obtaining deliveries of
water under the Project's rights."  In 1996 another Bureau draft
report addressed applicability of area of origin statutes to the
CVP, confirming that area of origin statutes in California water
law "do not guarantee that the water supply needs of an entire
area of origin, will or can be met."  SAR at 1154:

15
16
17
18
19
20
21
22

> Under these statutes, water rights applicants
> within the area of origin are essentially guaranteed
> that new water right applications filed for the
> development of water within the area of origin, will
> not be rejected by the [Board] on the basis that no
> water is available for appropriation by virtue of a
> senior water right to export the water from the water
> shed.  While the area of origin statutes may result in
> future reductions in the quantities of CVP water that
> can be delivered to CVP export customers, the area of
> origin provisions do not become part of a contract for
> the delivery of water; they are part of the water
> rights on which the contract is based and subject that
> right to appropriations by users within the area of
> origin.

23
24
25
26
27
28

The Bureau found: "Area of origin statutes . . . do not
establish any priority to the allocation of CVP contract water or
CVP water used for implementation of the [CVPIA]."  SAR at 1156.
Many contractors responded to the draft report.  See, e.g., SAR
at 1105-06; SAR at 1107-11; SAR at 1125-32; SAR at 1133; SAR at
1134-37; SAR at 1138-40; SAR at 1150-53.  TCCA then acknowledged

that "[T]he Bureau's conclusions come as no surprise, as this is a restatement of positions they [sic] have articulated on numerous occasions in the past." SAR at 1141(emphasis added). In 2000, the Bureau again stated: "Area of origin/county of origin statutes do not give any CVP user a priority over any other CVP user regarding water service provided by CVP contracts . . . this is also the position of the State Water Resources Control Board . . . ." SAR at 977.

The Bureau consistently rejected requests that an area of origin provision be included in north-of-Delta CVP contracts. SAR at 1317; 1308, see also, SAR at 3238. TCCA proposed draft contract language precluding water reductions to TCCA Members "unless and until reductions have also been imposed in irrigation users receiving water from the integrated CVP water supply who are outside the Sacramento River watershed." TCCA contractors requested area of origin transfer provisions and increased CVP contract water allocations based on alleged area of origin protections. SAR at 1004-7 (request for area of origin transfer provisions); SAR at 1021-24 (request for water quantity increase); SAR at 1000-1 (same); SAR at 831 (same). Both proposed interim TCCA contracts included a similar area of origin transfer provision SAR at 1308) as did the TCCA Renewal Contracts AR at 307-71. The Bureau did not adopt contract terms to increase contract quantities or afford protection against shortages. AR at 3056 (same contract amounts in interim and renewal contracts) Plaintiff and all TCCA Members signed their CVP Renewal Contracts with full knowledge of the Bureau's contracting position.

1    At the time the most recent long-term TCCA Renewal Contracts
2  were executed, shortages had been implemented in at least five
3  prior years and continued to be implemented in the same manner,
4  providing TCCA and its members express notice and actual
5  knowledge of the Bureau's consistent continuing performance of
6  the shortage conditions and pro-rata reduction of TCCA CVP water
7  deliveries during shortages without recognition of area of origin
8  priority. The Bureau is authorized under its state water permits
9  issued by the SWRCB to manage and deliver water under Federal CVP
10 water service contracts without recognizing the priority TCCA
11 seeks; has done so for almost the past 40 years; and TCCA has not
12 taken any judicial action to have its Federal water service
13 contract rights otherwise established.

14      5.   CONCLUSION RE: INTERPRETATION OF THE CONTRACT RENEWAL
15           TERMS.

16    Fatal to plaintiffs' interpretation of its CVP contracts is
17 the total absence of any language granting an area of origin
18 preference, or that limits or abrogates the Article 12 allocation
19 mandate which binds the Bureau and its Contracting Officer.  A
20 Court "cannot under the guise of construction, add words to a
21 contract, which would impermissibly re-write that contract."
22 *Westlands 2001*, 153 F.Supp.2d at 1162.  Plaintiff's water service
23 contract is devoid of any language that limits "available Project
24 Water" by the existence or operation of any area of origin
25 statute, nor does the language suggest that 'others entitled' is
26 limited solely to area of origin users."  Contract Article 12
27 contains no reference to "area of origin," Section § 11640, or

28

any preference or priority of any kind in favor of Plaintiff.[22]
The Bureau has performed Plaintiff's water service Contracts and
other third category water service contractors' contracts
precisely in accordance with the plain language of Article 12, in
2008 and 2009 and in prior years under similar shortage
provisions.

In the two disputed shortage years, 2008 and 2009, the
Contracting Officer declared a Condition of Shortage when it was
determined inadequate CVP water supplies existed to deliver full
contract allocations to all CVP contractors.  AR at 2128-30.  The
Bureau cited drought as the basis for the Conditions of Shortage
pursuant to Article 12(b).  See AR at 2091 (referencing
"critically dry period").  The Bureau ratably reduced CVP water
deliveries among all CVP Water Service Contractors to honor the
terms and conditions of all CVP Water Service Contracts.

   6.   **EFFECT OF TCCA RENEWAL CONTRACT VALIDATION.**

After they executed their most recent Renewal Contracts,
TCCA and its Members invoked the procedures under Cal. Code Civ.
Proc. § 860 *et seq.*, to obtain validation judgments that each of
their Renewal CVP Water Service Contracts is valid and
enforceable.  Under validation precepts, a public agency is
authorized to "bring an action in the Superior Court of the
County in which the principal office of the public agency is

---

   [22] The "others entitled" language is included in CVP Water
Service Contracts throughout the divisions of the CVP although
modified to some extent on a division-by-division basis.  AR at
2309.

located to determine the validity of such matters," and the "action shall be in the nature of a proceeding in rem."  Such validation proceedings under state law are the exclusive means by which to challenge the validity of certain contracts and their terms.  Cal. Code Civ. Proc. § 869: "No contest . . . of anything or matter under this chapter shall be made other than within the time and manner herein specified."  California law prescribes that validation statutes are construed to uphold the purpose of affording public agencies a prompt method for settling all questions regarding the validity of their actions.  *McLeod v. Vista Unified School District*, 158 Cal.App.4th 1156, 1166 (2008).

The validation proceedings were instituted in the Superior Court of California for the County of Colusa and each TCCA Member sought an "order, judgment and decree approving, confirming, and declaring valid and binding upon the respective parties thereto, each and all provisions of the Contracts . . . ."  See e.g., SAR at 30.  Each validation judgment provides: "The Contract has been validly executed and each and all provisions thereof are lawful, valid, enforceable and binding upon the respective parties thereto."  SAR at 26-31; 34-42; 43-45; 46-59; 60-64 (judgments for other TCCA Renewal Contracts)).  All Plaintiffs' validation judgments became final in 2005.  Under Cal. Code Civ. Proc. § 870, each validation judgment is now:

> forever binding and conclusive, as to all matters therein adjudicated or which at the time could have adjudicated against the agency and against all other persons, and the judgment shall permanently enjoin the institution by any person of any action or proceeding raising issue as to which the judgment is binding or inconclusive.  All such validated contracts pursuant to the respective validation judgments do

78

not include any area of origin priority to CVP water
deliveries therein, nor does any such contract address the
Bureau's ability to declare Conditions of Shortage and
apportion CVP water deliveries under the terms of each
Member's CVP Water Service Contract without regard to state
area of origin laws all of which are foreclosed by the
validated judgments.

The validation judgments are entitled to full faith and
credit in the United States Courts pursuant to 28 U.S.C. § 1738,
which provides:

The records and judicial proceedings of any court of any
such State. . . or copies thereof, shall be proved or
admitted in other courts within the United States . . . by
the attestation of the clerk and seal of the court annexed,
if a seal exists, together with a certificate of a judge of
the court that the said attestation is in proper form.

Such Acts, records and judicial proceedings or copies
thereof, so authenticated, shall have the same full faith and
credit in every court within the United States. . . as they have
by law or usage in the courts of such State. . . from which they
are taken. The claim for preclusive effect of a validation § 870
judgment includes matters "which have been or which could have
been adjudicated in a validation action, such matters - including
constitutional challenges - must be raised within the statutory
limitations period (30 days from entry of judgment) in § 870 et
seq., or they are waived." *Friedland v. City of Long Beach*, 62
Cal.App.4th 825, 846-847 (1998). Plaintiff TCCA and its Members
are categorically barred from raising any challenge to the
legality, validity, and enforceability of the TCCA Renewal
Contracts they signed and by which they agreed to be bound.

As mentioned above, the plain preclusive effect of the State
Court validation judgments are given effect under 28 U.S.C.

§ 1738 because it is "settled that a federal court must give to a state court judgment the same preclusive effect as would be given that judgment under the law of the state in which the judgment was granted." *Migra v. Warren City School Dist. Bd. of Educ.*, 465 U.S. 75, 81 (1984); see *Heath v. Clairy*, 708 F.2d 1376, 1379 (9th Cir. 1983) (relying on 28 U.S.C. § 1738) ("To determine whether to give preclusive effect to a state court decision both in terms of collateral estoppel and res judicata, you look to the law of the state in question.")  Plaintiff and its Members are bound by their conduct in judicially validating every provision of their Renewal Contracts which include the Article 12 shortage provisions.  These California judgments are afforded full faith and credit and preclude any subsequent challenge to the validity enforceability of all TCCA and its Members' Renewal Contracts. These validated contacts are as a matter of law enforceable and not illegal.  Plaintiff and its Members sought validation knowing of this dispute and are presumed to know the legal effect and consequences of their choice.  **TCCA Members voluntarily validated their CVP Renewal Contracts with full knowledge of the Bureau's interpretation and performance of the Shortage provisions in contravention of Plaintiff's and its Members' interpretation.**

**E.    THE BAR OF EQUITABLE ESTOPPEL.**

     **"Equitable estoppel precludes a party from claiming the benefits of a contract while simultaneously attempting to avoid the burdens that contract imposes."  *Mundi v. Union Sec. Lic. Ins.*, 555 F.3d 1042, 1045 (9th Cir. 2009) (citing *Comer v. Micor Inc.*, 436 F.3d 1098, 1101 (9th Cir. 2006).  Equitable estoppel**

80

also applies to alleged third party beneficiaries' rights under a contract based on equity and fairness, which prevent a litigant from "having it both ways" by claiming benefits, while denying obligations contained in the contract for the convenience of the parties seeking to avoid the effects of that parties' prior conduct. *Omega Indus. Inc. v. Raffaele*, 894 F.Supp. 1425, 1433 (D. Nev. 1995) (equitable estoppel "stands for the basic precepts of common honesty, clear fairness and good conscience").

A party seeking to invoke the doctrine of estoppel must establish the following four elements: (1) the party to be estopped knows the facts; (2) he or she intends that his or her conduct will be acted on or must so act that the party invoking estoppel has a right to believe it is so intended; (3) the party invoking estoppel must be ignorant of the true facts; and (4) he or she must detrimentally rely on the former's conduct. *Lehman v. United States*, 154 F.3d 1010, 1016-1017 (9th Cir. 1998).

Defendants' theory is that the first element of estoppel is established because TCCA had full knowledge of all facts, that before they entered into the disputed long term Renewal Contracts the Bureau had always disagreed and never recognized or granted an entitlement in TCCA members to preferential CVP water allocations during shortages. *Lehman*, 154 F.3d at 1016-1017. For almost 40 years since the first CVP Water Service Contracts were negotiated and executed by Plaintiff and its Members with the Bureau, and interim Renewal Contracts and Renewal Contracts for all CVP Water Service; the Bureau has, without exception, maintained that CVP Water Service Contract Article 12 authorizes

and invests the Bureau with discretion to determine Conditions of Shortage and for the Bureau to effect CVP-wide allocation among all CVP Water Service Contractors, including all previous pre-TCCA Water Service Contracts.  SAR at 977; 1154-56; 1308; 1317.

The second element of estoppel, conduct that misleads the other party to its detriment, is said to be established through Plaintiff's Members' negotiation and execution of the Renewal Contracts, while not disclosing their true intent to sue the Bureau to reform and/or avoid the Bureau's interpretation of Article 12 that reduced their CVP water allocations in times of shortage.  Defendants argue that TCCA needed to renew the CVP contracts to provide a basis for suit against the Bureau. Defendants maintain that by having the Renewal Contracts validated with the same shortage terms that historically existed under the parties' prior performance and course of dealing under such similar shortage terms, that Plaintiff and its Members have waived, cannot upset the terms of their Renewal Contracts, and cannot now refuse to be bound by those judicially validated contracts that have never recognized areas of origin priority.

The third and fourth elements, whether the Bureau was ignorant of the true facts and whether the Bureau detrimentally relied on TCCA's objective manifestation of assent, are undisputed.  Plaintiff and its Members in no way disclosed that despite their express manifestation of intent by signing the contracts, without any reservation of rights, with full knowledge of the history of performance, they would sue to overturn the shortage provisions.  Federal Defendants noted at the oral

hearing that an express reservation of rights was made in Article 7(n) of the contracts regarding "Rates for M&I Water," that was in dispute between the parties at the time of contracting. The provision states in relevant part:

> "Contractor asserts that it is not legally obligated to repay any Project deficits claimed by the United States to have accrued as of the date of the Contract. . . [T]he Contractor does not waive any legal rights or remedies that it may have with respect to such issues. Notwithstanding execution of this Contract. . . the Contractor may challenge in the appropriate administrative or judicial forums [regarding] [] the existence, computation, or imposition of any such deficit. . ."

AR at 2699.

Plaintiff and its Members knew how to reserve a disputed issue, but did not do so for the area of origin dispute. This intentional omission to disclose material facts induced detrimental reliance by the Bureau resulting in execution of the TCCA Renewal Contracts which provided the basis for this lawsuit to avoid the binding effect of and the plain meaning and historical execution by performance of the shortage provisions.

Defendants argue that TCCA's strategy of feigning agreement to induce the Bureau to execute the Renewal Contracts so it could then claim there was no agreement to the essential terms governing shortage is behavior equity should not countenance. Citing *First National Bank of Portland v. Dudley*, 231 F.2d 396, 400-401 (9th Cir. 1956) (citing *Dickerson v. Colgrove*, 100 U.S. 578, 580 (1879)).

Plaintiff has consistently argued and objected that it is not subject to ratable allocation when Conditions of Shortage are

83

declared based on its alleged area of origin priority.  Plaintiff previously complained to the SWRCB that the Bureau's implementation of Plaintiff's and its Members' Water Service Contracts violated California area of origin law and the Bureau's state water rights permits by which it operates the CVP.  The SWRCB rejected Plaintiff's Complaint and found no violation of state law, explaining that Plaintiff had to apply for an appropriative water right to gain any priority protection afforded by the area of origin laws.  AR at 4952-56.

During negotiations for long term renewal of TCCA Water Service Contracts, Plaintiff and its Members knew their renewed contracts did not include and were not intended to include or reserve any area of origin water service priority to CVP water supplies based on the Bureau's consistent refusal to acknowledge any such rights or priorities.  To the contrary, several of TCCA's Members had express knowledge, based on historical reallocations, that the Bureau intended to and would perform the Water Service Contracts by reducing pro rata deliveries to TCCA Members, and other CVP contractors whenever water shortages caused by drought conditions made it impossible for the Bureau to deliver full contract water supplies to all CVP Water Service Contractors, whether north-or south-of-Delta.  Plaintiff and its members knew of these burdens based on the Bureau's unwavering interpretation of their Water Service Contracts for almost forty years, and at the time they executed the current Renewal Contracts.  Plaintiff's revisionist lawsuit to reinvent the CVP water world is founded on delay that has caused prejudice to the

Bureau and all other CVP Water Service Contractors who have
relied upon the Renewal Contracts' validity and enforceability.

For decades, Plaintiff and its Members could have filed a
claim with the SWRCB that the Bureau was allegedly violating the
water permits from the SWRCB by performing the contracts to
reduce water deliveries in times of CVP water shortage.  They did
not.  Plaintiffs could have filed a lawsuit to determine area of
origin rights long ago.  They did not.  Instead, they judicially
validated their latest long-term Renewal Contracts.  The Bureau,
as contracting party, was entitled to rely upon Plaintiff and its
Members' acquiescence in the Bureau's categorically consistent
interpretation that federal CVP Water Service Contracts do not
and have never been performed to recognize any area of origin
priority in water allocations.  The law demands there must be
certainty in contracting.

Such inequitable conduct estops Plaintiff and its Members
from seeking "a preliminary and permanent injunction prohibiting
. . . (export of CVP water supplies) whenever such supplies are
needed to meet the full contractual supplies for (TCCA)" and from
obtaining any "declaratory judgment providing that Defendants
must . . . implement the Water Service Contracts in accordance
with the area of origin protections . . . ."  If the Bureau had
known the true facts that Plaintiff and its Members did not
intend to perform the Renewal Contracts as they had always been
performed, the Bureau could have gained Plaintiff's express
acquiescence and waiver, or elected not to execute new contracts.
Plaintiff and its Members' conduct requires they be equitably

estopped from obtaining the benefit of federal CVP water service without accepting the burden of those that reduces their water allocation during water shortages.

F.   **PLAINTIFF'S FUTILITY ARGUMENT IS WITHOUT MERIT**.

Plaintiff claims it would be "futile" for its Members to obtain their own water rights and build their own water conveyance facilities, separate from their Bureau-contracted water rights, which entitles them to use of CVP water conveyance facilities.  This ignores the law.  Plaintiff and its Members have been told that the only way to obtain water rights they seek is to apply to the SWRCB for a permit.  Plaintiff and its Members seek to change the rules of the game after almost 40 years of contracting for CVP water service, to judicially create new contract terms granting preferential treatment to Plaintiff and its Members to CVP water supply during Conditions of Shortage that Congress, the Interior, the Bureau, SWRCB and TCCA's contracts have never provided.  Defendant Interveners correctly argue, now, the law requires Plaintiffs to apply to the SWRCB for water rights permits.

## VII. CONCLUSION.

As a matter of statutory interpretation, Plaintiff's post hoc view of the water world is that the CVP was authorized by Congress to first benefit them, and to operate to the exclusion of all other CVP users, to protect the Sacramento Valley and its water users.  Although this may have been a purpose sought by a local legislator, Congressman Engle, at the time the more

86

parochial state CVP became a federally authorized and funded project.  Congress unequivocally expressed its intent that it created the CVP to benefit <u>all</u> the people of the Central Valley, Federal Act of 1950, § 4 (compelling coordinated operation of CVP "as will effectuate the fullest economic utilization of land and water resources of the Central Valley of California for the widest possible public benefit").  Notably absent from Congress' stated purposes in the CVP legislation is any recognition that the "widest possible public benefit" was subject to a prior right that prefers the Sacramento Valley and its water users.  The ratable reduced allocation of CVP water among all non-priority CVP water service contracts during Conditions of Shortage achieves the widest possible public benefit intended by the CVP authorizing legislation.

This lawsuit brings new meaning to the adage: "If you do not at first succeed, try and try again." The reality of the state area of origin priority statutes is that no express water rights are created by the law.  At most, TCCA has an inchoate water right that must be perfected by application for and issuance by the SWRCB of a water permit.  After more than twenty years of active dispute and having been told to do so by the Bureau, state courts, the SWRCB, and the AG Op, Plaintiff and its Members have chosen not to obtain such water rights.  The Bureau owes them no more CVP water than they have received.  All their disputed water service contracts provide for is pro-rata reductions which have been consistently administered to give full effect to the

1  unambiguous contract terms requiring reductions for Shortages in

2  the discretion of the Bureau's contracting officer.

3
4        For all the reasons stated above, Judgment shall be entered

5  against Plaintiff and/or Plaintiff's Members as third party

6  beneficiaries, and in favor of Federal Defendants and Defendant

7  Interveners on all Plaintiff's claims for equitable, declaratory,

   and injunctive relief pursuant to the APA, 5 U.S.C. §§ 702, 703,
8
   706(1), 706(2); the Declaratory Judgment Act of 1934, 28 U.S.C.
9
   §§ 2201-2202; and Fed. R. Civ. Pro. 65(d). Plaintiff's motions
10
   for summary judgment and/or summary adjudication are DENIED.
11
   Federal Defendants' and Defendant-Interveners' motions for
12
   summary judgment are GRANTED.
13

14        Defendants shall submit a form of judgment consistent with

15  this decision within five (5) days following electronic service

16  of this decision.

17  DATED:  July 29, 2011.

18

19                              /s/ Oliver W. Wanger

20                              Oliver W. Wanger

21                         UNITED STATES DISTRICT JUDGE

22

23

24

25

26

27

28

                              88