UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| TEHAMA-COLUSA CANAL AUTHORITY, | 1:10-cv-0712 OWW DLB |
| Plaintiff, | MEMORANDUM DECISION ON CROSS MOTIONS FOR SUMMARY |
| v. | JUDGMENT (DOCS. 52, 60, 62) AND MOTION TO STRIKE (DOC. |
| UNITED STATES DEPARTMENT OF THE INTERIOR; KENNETH LEE SALAZAR, in his official capacity as Secretary of the Interior; UNITED STATES BUREAU OF RECLAMATION; MICHAEL L. CONNOR, in his official capacity as the Commissioner of Reclamation, and DONALD R. GLASER, in his official capacity as Regional Director of the Bureau of Reclamation for the Mid-Pacific Region, | 77) |
| Defendants, | |
| SAN LUIS & DELTA-MENDOTA WATER AUTHORITY, | |
| Defendant-Intervenor, | |
| WESTLANDS WATER DISTRICT, | |
| Defendant-Intervenor | |

I. INTRODUCTION.
   . . . . . . . . . . . . . . . . . . . . . . . . . 4

II. JURISDICTION . . . . . . . . . . . . . . . . . . . . . 5
    A.   5 U.S.C. § 706(2). . . . . . . . . . . . . . . . 8
    B.   5 U.S.C. § 706(1). . . . . . . . . . . . . . . . 9

III. HISTORICAL BACKGROUND. . . . . . . . . . . . . . . . 11
     A.   CREATION OF THE CVP. . . . . . . . . . . . . . 11
     B.   OPERATION OF THE CVP. . . . . . . . . . . . . . 14
     C.   ALLOCATION OF CVP WATER. . . . . . . . . . . . 15
     D.   STATE LAW AREA OF ORIGIN STATUTES. . . . . . . 16
          1.   THE CALIFORNIA ATTORNEY GENERAL ANALYZES THE AREA
               OF ORIGIN STATUTES. . . . . . . . . . . . . 16
          2.   THE BUREAU'S PERMITS FOR CVP WATER SUPPLY ARE
               CONDITIONED TO PROTECT APPROPRIATION OF WATER
               WITHIN THE AREA OF ORIGIN. . . . . . . . . 17
          3.   APPLICATION OF THE AREA OF ORIGIN STATUTES BY
               SWRCB AND REJECTION OF TCAA CLAIM FOR PREFERENCE
               TO CVP WATER. . . . . . . . . . . . . . . . 19
     E.   THE DISPUTED CVP WATER SERVICE CONTRACTS. . . . 22
          1.   TCCA MEMBERS' RIGHT TO CVP WATER UNDER THEIR LONG-
               TERM CVP WATER SERVICE CONTRACTS. . . . . . 24
          2.   INTERIM CONTRACTS. . . . . . . . . . . . . 25
          3.   NEGOTIATION OF CURRENTLY OPERATIVE TCCA RENEWAL
               CONTRACTS: THE BUREAU'S INTERPRETATION AND
               PERFORMANCE.
               . . . . . . . . . . . . . . . . . . . . . 25
          4.   TCCA ACCEPTS LONG-TERM RENEWAL CONTRACTS WITHOUT
               PRIORITY ALLOCATION TERMS: THE SHORTAGE
               PROVISIONS. . . . . . . . . . . . . . . . . 27
          5.   TCCA MEMBERS' VALIDATION OF ALL RENEWAL CONTRACTS
               IN STATE COURT. . . . . . . . . . . . . . . 30
          6.   EXECUTION BY PERFORMANCE AND CONDUCT UNDER THE
               TCCA RENEWAL CONTRACTS. . . . . . . . . . . 30

IV.  PROCEDURAL BACKGROUND. . . . . . . . . . . . . . . . 31

V.   STANDARDS OF DECISION. . . . . . . . . . . . . . . . 32

VI.  LAW AND ANALYSIS. . . . . . . . . . . . . . . . . . 33
     A.   STATUTE OF LIMITATIONS. . . . . . . . . . . . . 33
     B.   CVP STATUTES AND SECTION 11460 DO NOT CONTAIN OR
          SUPPORT THE PRIORITY ALLOCATION RIGHT TO CVP WATER THAT
          TCCA ADVANCES. . . . . . . . . . . . . . . . . 33
          1.   STATUTORY INTERPRETATION OF THE CVP STATUTES. 35
               a.   Plain Language. . . . . . . . . . . . 35
               b.   Legislative History of the CVP Statutes. 37
          2.   STATUTORY INTERPRETATION OF SECTION 11460. . 39
               a.   Plain Language. . . . . . . . . . . . 39
               b.   Decades of Consistent Interpretation By the
                    California Attorney General, the SWRCB, and
                    the Bureau is That Section 11460 Governs
                    Appropriation Not Allocation of Water in the

Area of Origin... . . . . . . . . . . 41
    i.   Attorney General Opinion.
         . . . . . . . . . . . . . . . 41
    ii.  The Bureau's Interpretation of
         Reclamation Law... . . . . . . 42
    iii. The SWRCB Has Independently Interpreted
         Section 11460 in the same manner as the
         AG Op. . . . . . . . . . . . 44
  3.   SECTION 11460's INTERPRETATION BY THE AG Op,
       SWRCB, AND THE BUREAU ARE ALL CONSISTENT WITH THE
       PERMIT TERMS.... . . . . . . . . . 44
  4.   SUBSEQUENT LEGISLATIVE ACTS.. . . . . . . 46
  5.   CALIFORNIA CASE LAW... . . . . . . . . 47
       a.   The El Dorado and Phelps Decisions. . . . 48
       b.   The SWRCB Cases Provide No Binding Or
            Persuasive Precedent. . . . . . . . . 50
  6.   Plaintiff's Interpretation of Section 11460
       Conflicts With The Congressional Directive of the
       1950 Act.. . . . . . . . . . . . . . 53
C. CONCLUSION RE: STATUTES.. . . . . . . . . 56
D. INTERPRETATION OF LONG-TERM CVP WATER SERVICE
   CONTRACTS.. . . . . . . . . . . . . . . 56
  1.   FEDERAL CONTRACT LAW. . . . . . . . . . 57
  2.   STANDARDS RE: THE BUREAU'S STATUTORY DISCRETION TO
       APPORTION CVP WATER IN TIMES OF SHORTAGE.
       . . . . . . . . . . . . . . . . . 60
  3.   TCCA MEMBER LONG-TERM CVP CONTRACTS: SHORTAGE
       TERMS... . . . . . . . . . . . . . 62
       a.   Discretionary Interpretive Authority in
            Renewal Contract Shortage Provisions... . 63
       b.   The Renewal Contract's Shortage Provisions
            Are Not a Limitation on the Bureau's
            Discretion to Apportion Contract Water... 65
       c.   Article 18(a) in Not a Limitation on the
            Bureau's Discretion to Apportion Contract
            Water.. . . . . . . . . . . . . . 70
       d.   Article 3 and 1(u) Are Not a Limitation on
            the Bureau's Discretion to Apportion Contract
            Water.. . . . . . . . . . . . . . 71
  4.   CONTRACT NEGOTIATION AND PERFORMANCE.. . . . . 72
  5.   CONCLUSION RE: INTERPRETATION OF THE CONTRACT
       RENEWAL TERMS.. . . . . . . . . . . . 76
  6.   EFFECT OF TCCA RENEWAL CONTRACT VALIDATION.. . 77
E. THE BAR OF EQUITABLE ESTOPPEL.. . . . . . . . 80
F. PLAINTIFF'S FUTILITY ARGUMENT IS WITHOUT MERIT... 86

VII. CONCLUSION... . . . . . . . . . . . . . 86

3

1

2

3

4

5

6                    UNITED STATES DISTRICT COURT

7                   EASTERN DISTRICT OF CALIFORNIA

8

9   TEHAMA-COLUSA CANAL AUTHORITY, )    1:10-cv-0712 OWW DLB
                                   )
10                  Plaintiff,     )    MEMORANDUM DECISION ON CROSS
                                   )    MOTIONS FOR SUMMARY JUDGMENT
11       v.                        )    (DOCS 52, 60, 62) AND MOTION
                                   )    TO STRIKE (DOC. 77)
12   UNITED STATES DEPARTMENT OF   )
     THE INTERIOR; KENNETH LEE     )
13   SALAZAR, in his official      )
     capacity as Secretary of the  )
14   Interior; UNITED STATES BUREAU )
     OF RECLAMATION; MICHAEL L.    )
15   CONNOR, in his official       )
     capacity as the Commissioner  )
16   of Reclamation, and DONALD R. )
     GLASER, in his official       )
17   capacity as Regional Director )
     of the Bureau of Reclamation  )
18   for the Mid-Pacific Region,   )
                                   )
19                  Defendants,    )
                                   )
20   SAN LUIS & DELTA-MENDOTA      )
     WATER AUTHORITY,              )
21                                 )
          Defendant-Intervenor,    )
22                                 )
     WESTLANDS WATER DISTRICT,     )
23                                 )
          Defendant-Intervenor.    )
24                                 )
     _____)

25

26                    I.  INTRODUCTION.

27       This lawsuit is brought by an association of Federal Water

28   Contractors for federal water from the Sacramento River Division

                                 4

of the Central Valley Project ("CVP") north of the San Joaquin-Sacramento Delta against the United States Department of the Interior ("Interior"), its Secretary, the Bureau of Reclamation ("Bureau"), and its Regional Director of the Mid-Pacific Region, and by Defendant-Intervenors, San Luis & Delta-Mendota Water Authority and Westlands Water District, Federal Contractors, who use CVP water on lands south of the Sacramento-San Joaquin Delta, and seeks to establish superior water rights under CVP water service contracts in the Sacramento Valley, which would limit and exclude export of CVP water south of the Delta, until after Plaintiff and its Members first receive 100% of their allocated CVP contractual water supply.

The Plaintiff, Tehama Colusa Canal Authority ("TCCA"), a Joint Powers Authority organized under the laws of the State of California, is comprised of 16 water agency members on whose behalf the case is brought.  Cal. Gov't Code § 6500, *et seq*. Plaintiff filed this suit on February 11, 2010, seeking injunctive and declaratory relief against implementation of the shortage provisions of Federal water service contracts under the Federal Administrative Procedure Act ("APA"), 5 U.S.C. §§ 702 to 706.  Specifically, §§ 706(1) and 706(2).

## II.  PROCEDURAL BACKGROUND

After TCCA filed its complaint February 11, 2010, Defendant-Intervenors, San Luis & Delta-Mendota Water Authority and Westlands Water District were granted leave to intervene on April 16, 2010.  Doc. 23; Doc. 34.  The case was reassigned to this Court on April 23, 2010.  Doc. 30.  Federal Defendants filed the Administrative Record on July 16, 2010, and filed a Supplemental

1  Administrative Record on October 14, 2010.  Doc. 39; Doc. 43.  On
2  December 1, 2010 Plaintiff filed a motion for summary judgment.
3  Doc. 52.  Federal Defendants and Defendant-Interveners filed
4  cross-motions for summary judgment on July 1, 2010.  Doc. 60, 62,
5  respectively.[1]

6                       III. <u>JURISDICTION</u>

7          Jurisdiction exists under 28 U.S.C. § 1331, as this case
8  arises under the laws of the United States, specifically, § 8 of
9  the United States Reclamation Act of 1902.  Reclamation Act of
10 1902, ch. 1093, § 8, 32 Stat. 390 (codified at 43 U.S.C. § 383
11 (2006)).  Section 8 is part of Federal Reclamation law that
12 governs the Bureau's operation of the CVP Act, authorizing the
13 construction, repair, and preservation of certain public works on
14 rivers and harbors, Pub. L. No. 75-392, § 2, 50 Stat. 844, 850
15 (1937), as amended and supplemented, August 4, 1939 (53 Stat.
16 1187), July 2, 1956 (70 Stat. 483), June 21, 1963 (77 Stat. 68),
17 October 12, 1982 (96 Stat. 1263), as amended and supplemented
18 October 27, 1986 (100 Stat. 3050), and Title XXXIV of the Act of
19 October 30, 1992 (106 Stat. 4706) (Central Valley Project
20 Improvement Act ("CVPIA")) collectively referred to as
21 "Reclamation Law;" (authorizing the Central Valley Project); *S.*
22 *Delta Water Agency v. United States*, 767 F.2d
23 531, 536 (9th Cir. 1985).

24

25  _____

26        [1] Defendant-Interveners also move to strike Plaintiffs'
    Reply to Defendant-Interveners' Opposition to Plaintiff's
27  Statement of Undisputed Facts ("Plaintiff's SUF Reply").  Doc.
    77.  Plaintiff's SUF Reply was not considered. Plaintiff's Motion
28  to Strike is moot.

1    Jurisdiction is also invoked under the APA.  Section 702 of
2  the APA waives the sovereign immunity of the United States, its
3  agencies, and its individual officers acting in their official
4  capacity.  *U.S. v. Park Place Associates, Ltd.*, 563 F.3d 907,
5  929, n.15 (9th Cir. 2009) (APA waives sovereign immunity but does
6  not confer federal jurisdiction).  APA Section 704 authorizes
7  review of "final agency action for which there is no other
8  adequate remedy in a court."  Because neither Federal Reclamation
9  law nor California Water Code ("CWC") § 11460 ("Section 11460")
10  grants a right of judicial review, the APA provides the
11  appropriate standard of decision.  *S. Delta Water Agency,* 767
12  F.2d at 536-541 (holding that a claim that the Bureau's operation
13  of the CVP violated Section 11460 was reviewable under the APA.)

14    Plaintiff's declaratory and injunctive relief claims arise
15  under 28 U.S.C. § 1361, 43 U.S.C. § 383, 28 U.S.C. § 2201
16  (declaratory relief) and Fed. R. Civ. Proc. 65 (injunctive
17  relief).

18    Plaintiff claims 16 of its public agency members that supply
19  water to agricultural or municipal and industrial water users or
20  to both, received water from the CVP through the CVP's Tehama-
21  Colusa and/or Corning Canals pursuant to a "Long-Term Renewal
22  Contract Providing for Project Water Service From the Sacramento
23  River Division" between each member and the Bureau.  TCCA, in
24  turn, has a separate contract with the Bureau under which TCCA
25  operates and maintains the Tehama-Colusa and Corning Canals and
26  their related facilities on behalf of its members.  All
27  Defendants' water service contracts are entered into and
28  performed under Reclamation law.

                                7

1    Plaintiff and its Members' first claim is based on the
2    Bureau allegedly:

3    a)   Reducing Plaintiff's water allocations under their water
4    service contracts in times of "water shortage" disregarding area
5    of origin protections and alleged priority right of Plaintiff's
6    provided by CWC §§ 11460, 11463 and 11128; Reclamation Law; Fifth
7    Amendment due process; and state law water rights under
8    *California v. United States*, 438 U.S. 645 (1978);

9    b)   Improperly declaring conditions of shortage as to
10   Plaintiff while exporting CVP water outside the Sacramento River
11   watershed and reducing Plaintiff's full contractual water
12   allocations;

13   c)   Arbitrarily allocating pro rata water allocations and/or
14   shortages among all CVP water service contractors without
15   applying area of origin protections and Plaintiff's "priority
16   rights" to CVP water;

17   d)   Violating the terms of Reclamation's State-issued
18   permits to operate the CVP by ignoring area of origin protection;
19   and

20   e)   Announcing conditions of water shortage, issuing a
21   statement of legal authority to allocate CVP supply without
22   compliance with area of origin protections, thereby issuing
23   unlawfully restricted licenses to CVP supply, imposing an order
24   or sanctions on Plaintiff as to its supply, and denying relief to
25   Plaintiff.

26   The second claim is for injunctive relief under Fed. R. Civ.
27   P. 65.

28   The third claim is for declaratory judgment under 28 U.S.C.

**8**

1  § 2201.

2      The fourth claim seeks attorney's fees pursuant to 5 U.S.C.

3  §§ 504(a)(1) and 504(b)(1)(C) and the Equal Access to Justice

4  Act, 28 U.S.C. §§ 2412(b) and (d).

5

6  A.    5 U.S.C. § 706(2).

7      Plaintiff asserts its claims are for violation of 5 U.S.C.

8  § 706(2) for alleged agency actions that are arbitrary,

9  capricious, unlawful, and in excess of statutory authority.

10     Defendants concede that review is available under Section

11 706(2), but is limited to claims arising within the six year

12 statute of limitations under the APA.  *Hells Canyon Preservation*

13 *Council v. U.S. Forest Service*, 593 F.3d 923, 930 (9th Cir.

14 2010).

15

16 B.    5 U.S.C. § 706(1).

17     TCCA further asserts that jurisdiction is proper under 5

18 U.S.C. § 706(1).  Section 706(1) applies to compel agency action

19 unlawfully withheld or unreasonably delayed.  Pursuant to Section

20 11460, Plaintiff seeks to preclude the export of CVP project

21 water necessary to preserve sufficient supply to meet TCCA

22 Members' and the area of origin's present and future needs to the

23 extent of their full contractual supplies. Judicial intervention

24 under § 706(1) to compel action only applies to discrete agency

25 action the agency is required to take.  *Norton v. S. Utah*

26 *Wilderness Alliance*, 542 U.S. 55, 64 (2004).  A required

27 "ministerial or nondiscretionary act on which an agency can be

28 ordered "to take action upon a matter, without directing how it

1  shall act." *Ctr. for Biological Diversity v. Veneman*, 394 F.3d
2  1108, 1112 (9th Cir. 2005).   Plaintiff suggests that water
3  deliveries under the water service contracts is only ministerial.
4  The Bureau's annual water allocations under the CVP water service
5  contracts are not ministerial, but rather entail uniquely
6  discretionary action that requires it to interpret CVP contracts
7  and balance all competing interests under operational
8  constraints, to comply with other statutory requirements,
9  including but not limited to, decisions of the SWRCB, the CVPIA,
10 Reclamation law and the ESA.   *Westlands Water Dist. v. U.S.*, 153
11 F. Supp. 2d 1133, 1144 (2001) ("*Westlands 2001*") ("[the Bureau]
12 has contractual authority and administrative discretion over how
13 it provides water service among the CVP's water and power-users,
14 and how it picks its priorities among them.")

15     Plaintiff invokes *Natural Resources Defense Council v.*
16 *Patterson*, 333 F. Supp. 2d 906 (E.D. Cal. 2004) as authority for
17 section 706(1)'s application because Section 11460's "plain
18 meaning, legislative history, and construction by the state
19 court" all confirm Plaintiff's interpretation. *Patterson* is
20 distinguishable as Cal. Water Code § 5937, at issue in that case,
21 expressly required the Bureau to comply with its mandate to
22 release water from Friant Dam.   *Id.* at 916.   Here, Congress
23 leaves "to Interior the use of its considerable experience and
24 expertise to implement CVP water supply allocations." *Central*
25 *Valley Water Agency v. United States*, 327 F. Supp. 2d 1180, 1206
26 (E.D. Cal. 2004), *San Luis & Delta-Mendota Water Authority v.*
27 *U.S. Dept. of Int.*, 637 F. Supp. 2d 777, 805 (E.D. Cal. 2008)
28 (Bureau's accounting [is] a complex process within the agency's

1  discretion).

2       Section 11460 does not provide a mandatory duty or
3  ministerial discretion.  Although § 11460 instructs that areas of
4  origin are not to be "denied" of the "prior right" to "the water
5  reasonably required to adequately supply the beneficial needs of
6  the watershed," it does not specifically identify what action the
7  Bureau is required to take to protect such "prior right."
8  Section 11460 does not address whether: 1) the "prior right" is
9  protectable by a requirement that limits the Bureau's ability to
10 divert water for export as the SWRCB has continuously interpreted
11 the statute, or 2) whether the Bureau must provide CVP
12 contractors within an area of origin a preference to CVP water at
13 the expense of other CVP contractors.  Without a mandatory duty
14 or ministerial action, the Court is limited to the inquiry
15 whether the Bureau has made a discretionary decision, not to
16 second guess whether the agency should have made a different
17 decision.  *Coos County Board of Commissioners v. Kempthorne*, 531
18 F.3d 792, 883 (9th Cir. 2008).  The Bureau makes discretionary
19 allocation determinations in performing all its CVP water service
20 contracts.  Plaintiff is not entitled to relief under § 706(1).

21      Relief by way of writ of mandate is equally unavailable
22 under 28 U.S.C. § 1361 because that extraordinary remedy lies
23 only to compel the performance of a clear nondiscretionary duty.
24 *Pittston Cost Group v. Sebben*, 48 U.S. 105, 121 (1988).

25

26               IV. HISTORICAL BACKGROUND.

27 A.   CREATION OF THE CVP.

28      California's two largest rivers, the Sacramento and the San

                              11

Joaquin, meet to form the Sacramento-San Joaquin Delta ("Delta") south of the City of Sacramento.  Their combined waters, if not diverted, flow through the Delta, Suisun Bay, and San Francisco Bay, to the Pacific Ocean.  This region, commonly known as the Bay-Delta, is the hub of California's two largest water distribution systems, the CVP, operated by the Bureau, and the State Water Project ("SWP"), operated by the California Department of Water Resources ("DWR").  *In re Bay Delta Programmatic Env. Impact Report Coordinated Proceedings*, 43 Cal. 4th 1143, 1151 (2008).  Plaintiff makes no claims against the DWR or its operation of the SWP.  The CVP and SWP are operated in a coordinated manner under the Coordinated Operating Agreement, Administrative Record ("AR") at 5046, *et seq.*, and State Water Resources Control Board ("SWRCB") Decision 1641(d), AR at 4106.

The California Legislature originally conceived the CVP "to conserve and put to maximum beneficial use the waters of the Central Valley of California."  *S. Delta Water Agency*, 767 F.2d at 533-34.  Maximizing the use of the Central Valley's water would be achieved by constructing an irrigation project capable of moving water from where water was plentiful in the north part of California above the Sacramento Valley, to the San Joaquin Valley, south of the Delta, which had abundant land but a shortage of water.  *United States v. Gerlach Live Stock Co.*, 339 U.S. 725, 728 (1950); *see also,* California State Engineer Bulletin 12 at 22, Supplemental Administrative Record ("SAR") at 3136.

The first step in development of the Projects was the California legislature's enactment of the Central Valley Project

1   Act of 1933, ch. 1042, 1933 Cal. Stat. 2643 (1933), which

2   authorized construction of Kennett Dam and Reservoir (now Shasta

3   Dam and Shasta Lake) on the Sacramento River, to pump water from

4   the lower Sacramento River to the lower San Joaquin River, and

5   Friant Dam on the San Joaquin River, with canals to carry water

6   to the southern San Joaquin Valley.  The Act also included the

7   area of origin statutes, codified as CWC sections 11460-11463 and

8   intended to protect water use within areas of origin.  CWC

9   §§ 11460 and 11463 were made applicable to the Bureau in 1951.

10  See CWC § 11128.[2]

11      The State of California was unable to finance the Project

12  alone and sought participation by the United States to do so.

13  Federal authorization for the CVP was enacted under the

14  provisions of the Emergency Relief Appropriation Act of 1935, ch.

15  48, 49 Stat. 115, § 4.  Congress re-authorized the CVP pursuant

16  to the Rivers & Harbors Act of August 26, 1937, ch. 832, 50 Stat.

17  844, 850 and the Act of October 17, 1940, 54 Stat. 1198 (1940)

18  ("Rivers & Harbors Act").  As initially authorized, the CVP did

19  not include any facilities intended to provide water to the

20  Sacramento Valley.  Congress did not authorize any facilities for

21  the CVP until 1950.  *See* An Act to Authorize Sacramento Valley

22  Irrigation Canals, Central Valley Project, California, Pub. L.

23  No. 81-839, 64 Stat. 1036, § 2 (1950) ("1950 Act"), AR at 9136-

24  38.

25

26      [2] Section 11463 addresses water exchanges and is not
    implicated here.  The CWC also includes an area of origin statute
27  designed to protect counties, CWC § 10505, not directly at issue
    in this case.
28

13

1    It is undisputed that the federal Legislative history for
2 the 1950 Act describes it as: "a desirable step to implement the
3 intent of the legislation of the State of California which
4 preserves the water supply that will be required to meet present
5 and future beneficial needs in the various watersheds of origin."
6 S. Rep. No. 81-2447 at 638-39 (1950), AR at 9131-32.  Congress
7 effectuated the California Legislature's intent by bringing
8 subsidized irrigation water to a valley that was then primarily
9 devoted to dry-farming to "create a much more intensified and
10 diversified farming economy."  *Id.* at 636, AR at 9133.  The 1950
11 Act specifically addressed how the canals of the CVP, that served
12 Plaintiff's members, would be operated.  The 1950 Act did not
13 direct that the canals be operated to provide area of origin
14 contractors with a priority over other contractors, rather
15 Congress required that the canals be "coordinated and integrated"
16 with the operation of "the existing features of the Central
17 Valley Project in such manner as will effectuate the fullest and
18 most economic utilization of the land and water resources of the
19 Central Valley of California *for the widest public benefit*."  1950
20 Act, § 4 (emphasis added).  This irreconcilable conflict between
21 Plaintiff's position that areas of origin have statutory priority
22 and the Congressional enactment that provided the existing
23 features of the CVP were to be coordinated and integrated to
24 effectuate the fullest and most economic use of the lands and
25 water resources of the Central Valley of California <u>for the</u>
26 <u>widest possible public benefit</u> is the crux of this dispute.
27 B.   <u>OPERATION OF THE CVP</u>
28    The CVP operates under a Coordinated Operating Agreement

14

between the Bureau and the DWR as an integrated unit. *Westlands 2001*, 153 F. Supp. 2d at 1170-71. The modern CVP encompasses more than twenty (20) reservoirs and five hundred (500) miles of major canals, it continues to be generally operated as an integrated unit. *Id.* Contractors receiving water from the CVP do not apply for appropriative water rights from the SWRCB, as is required to perfect a water right from a California water source. Instead, they obtain CVP water — developed or appropriated through Bureau facilities — by contracting solely with the Bureau. 43 U.S.C. § 511 (authorizing Interior to contract with irrigation entities, not individual water users, for the delivery of Bureau Project water). It is undisputed that the Plaintiff nor any of its Members has ever applied for, nor has the SWRCB ever issued to them, appropriative water rights permits.

C.   <u>ALLOCATION OF CVP WATER</u>.

The Bureau normally allocates CVP water between its divisions on a pro rata basis; except when 1) operational constraints or 2) contract provisions dictate priority allocation. M&I Water Shortage Policy at 1, SAR at 853 (providing general policy and operational constraints); *Del Puerto Water Dist. v. U.S. Bureau of Reclamation*, 271 F. Supp. 2d 1234, 1243 (E.D. Cal. 2003), *aff'd O'Neill v. United States*, 50 F.3d 677 (9th Cir. 1995) (recognizing contract-based priority of Exchange Contractors to CVP water.) In dry water years, all CVP contractors have received less than their full contractual entitlements of water. The drought's impact on water supplies,

1  reservoir storage levels, and water allocation within the CVP has

2  not been uniform.  Operational limitations at the Delta

3  facilities mean that allocation shortages are not solely a

4  reflection of water supply conditions and contractors south-of-

5  Delta usually bear an increased burden of the shortages.

6       The two dry water years at issue in this case are 2008 and

7  2009.  In 2008, TCCA and other north-of-Delta water service

8  contractors received 100% of their allocation, while south-of-

9  the-Delta contractors received only 50%.  AR at 2244.

10 In 2009, a drought year that caused the Governor of California to

11 declare a State of Emergency; AR at 1862, north-of-Delta received

12 40% of their contractual quantity, while south-of-Delta

13 contractors subject to operational constraints received only 10%.

14 AR at 1862.

15

16 D.   **STATE LAW AREA OF ORIGIN STATUTES**.

17      The area of origin statutes, CWC §§ 11460-11465 ("area of

18 origin statutes"), were enacted to alleviate the concern that

19 construction of the CVP would leave inadequate water supplies for

20 local uses.  *United States v. State Water Resources Control Bd.*,

21 182 Cal. App. 3d 82, 138 (1986).  Reclamation's appropriation of

22 water for the CVP is subject to those statutes.  *Natural Res.*

23 *Des. Council v. Kempthorne*, 621 F. Supp. 2d 954, 993 (E.D. Cal.

24 2009) *clarified on other grounds*, 2009 WL 2424569 (Aug. 6, 2009).

25 However, Area of Origin statutes do not dictate the allocation by

26 the Bureau of CVP water.  Area of Origin statutes help determine

27 the quantity of water available to the Bureau for allocation, not

28 how the water is allocated by the Bureau's Contracting Officer.

                              16

1.   <u>THE CALIFORNIA ATTORNEY GENERAL ANALYZES THE AREA OF ORIGIN STATUTES</u>.

In 1955, a California Attorney General Opinion performed an analysis of the scope and Effect of area of origin statutes.  25 Ops. Cal. Att'y Gen. 8 (1955)  ("AG Op."), AR at 9498.  The AG Op. found Section 11460 was intended to protect area of origin water users by creating an "inchoate" priority to a water right. AG Op. at 20; AR at 9509.  To protect the statutory right, inhabitants of any area of origin "must comply with the general water law of the state . . . to apply for and perfect a water right . . . ."  AG Op. at 20-21; AR at 9509-10.

The Attorney General opined that Area of Origin provisions were constitutional and California had the authority to incorporate their protections into conditions on the permits issued to the Bureau for the CVP.  AG Op. at 28-29, 32; AR at 9517-18, 9521.

2.   <u>THE BUREAU'S PERMITS FOR CVP WATER SUPPLY ARE CONDITIONED TO PROTECT APPROPRIATION OF WATER WITHIN THE AREA OF ORIGIN</u>.

In 1961, the SWRCB approved the United States' application to appropriate Sacramento River water for the CVP by Decision 990 ("D-990").  AR at 5463.  D-990 recognized one of the CVP's principal functions is to export water from the Sacramento River watershed into the San Joaquin Valley. D-990 at 65, AR at 5528. D-990 also spoke to the SWRCB's interpretation of the area of origin statutes:

> The public interest requires that water originating in the Sacramento Valley Basin be made available for use within the Basin and the Sacramento-San Joaquin Delta before it is exported to more distant areas, and the permits granted

17

1    herein will so provide.

2  D-990 at 72-73; AR at 5535-36.

3       This protection was implemented by the condition Term 22
4  imposed on the Bureau's water rights permits.  Term 22 made the
5  Bureau's water permits "subject to rights initiated by
6  applications for use within said watershed and Delta regardless
7  of the date of filing said applications."  D-990 at 73, 85; AR at
8  5536, 5548 (emphasis added).  Term 22 protects *appropriators* of
9  water with permits within the area of origin, not CVP
10 contractors.

11      The Bureau's permits also include a condition, Term 23, that
12 addresses the use of Project water by water users within an area
13 of origin.  Term 23 does not require CVP water to be allocated
14 for the benefit of areas of origin.  Rather, it granted then-
15 current water users within the Sacramento River watershed a three
16 year period to request water service contracts from the Bureau
17 which would be preferred over requests from users outside the
18 watershed.  It also included a ten year preference in obtaining a
19 water service contract to those within a watershed area then
20 using water.  D-990 at 73, 85-86; AR at 5536, 5548-49.  SWRCB
21 decision D-1641 states that the "basis for Term 23 may have been
22 protection of the public interest, but it was not compelled by
23 the area of origin statutes."  D-1641 at 100; AR at 4217.

24      In 1978 the SWRCB modified the Bureau's CVP permits to
25 require the Bureau to meet water quality standards in the Delta
26 and Suisun Marsh.  D-1485 at 10; AR at 5188.  This required the
27 CVP to either release water from storage or to curtail diversions
28 so that outflow from the Delta would be sufficient to prevent sea

                                18

1     water from intruding into the Delta and to enhance water quality

2     by decreased salinity. D-1594 at 1-3, SAR at 1377-79; *United*

3     *States v. SWRCB*, 182 Cal. App. 3d at 125.   The California Court

4     of Appeal affirmed D-1485 recognizing the SWRCB's authority to

5     modify the Bureau's water right permits, but criticized the SWRCB

6     for actions it took to meet water quality standards solely by

7     restricting the CVP and the SWP while imposing no obligations on

8     other water rights holders.

9        To protect water availability, in 1965 the SWRCB added Term

10    80 to new water rights permits which reserved the SWRCB's

11    jurisdiction over the permit.   In 1984, the Board responded to

12    the Court of Appeals' criticism with D-1594, which addressed how

13    to determine water availability for over 500 water rights permit

14    holders in the Delta watershed that were issued with Term 80. *See*

15    D-1594 at 2; SAR at 1378.   The implementation means was Term 91,

16    which has been applied to those and all subsequent water permits

17    within the watershed.   *El Dorado Irr. Dist. v. State Water Res.*

18    *Control Bd.*, 142 Cal. App. 4th 937, 951 (2006).

19        The SWRCB adopted Term 91 "to protect persons claiming

20    paramount rights to divert water from the Delta and the water

21    quality upon which such rights depend and to protect fish and

22    wildlife."   *Id.* at 953.   Term 91 imposes on new appropriators

23    shared responsibility to meet Delta water quality standards.   D-

24    1594 at 9, SAR at 1372.   "Term 91 prohibits permitees from

25    diverting water when stored Project water is being released to

26    meet Delta water quality standards or other in-basin demands."

27    D-1594 at 8, SAR at 01385; *El Dorado*, 142 Cal. App. 4th at 950.

28    This Term 91 prohibition is to ensure sufficient outflow of water

1   from the Delta to keep sea water from intruding into the Delta
2   and increasing salinity, which degrades water quality. Adequate
3   water quality increases availability of water throughout the
4   Delta watershed.  D-1594 at 2, SAR at 1378.  Term 91 uses the
5   affected area of origin provisions, because Term 91 assumes that
6   the CVP's and SWP's export water rights are junior to all other
7   water rights in the watersheds of origin.  *Phelps v. State Water*
8   *Res. Control Bd.*, 157 Cal. App. 4th 89, 107 (2007), D-1594 at 40,
9   SAR at 01417 (an underlying assumption of Term 91 methodology is
10  to prefer in-basin permittees over CVP and SWP exports.)

11          3.   APPLICATION OF THE AREA OF ORIGIN STATUTES BY SWRCB AND
               REJECTION OF TCAA CLAIM FOR PREFERENCE TO CVP WATER.
12
13          Plaintiff contends that since the Bureau first obtained
14  water rights through the SWRCB permit process, 50 years ago,
15  § 11460 has been applied to protect the ability of potential in-
16  basin water users to obtain a natural flow water right by
17  appropriation.  The terms of the Bureau's water rights permits,
18  and those of hundreds of other water rights holders, in effect
19  treat the CVP's right to export water out of the area of origin
20  as junior to all water rights, even future water rights, within
    an area of origin.
21
22          Based on this premise, two TCCA member agencies, Glyde and
23  Orland-Artois Water Districts, filed a complaint with the SWRCB
24  in 1991 claiming preferential access to CVP water supply under
25  the area of origin statutes, which was rejected by the SWRCB's
26  decision that the TCCA members had no preferential access to CVP
27  water supply under the area of origin statutes.  The SWRCB
28  explained: Sections 11460-11463 "allow [] water users within the

watershed of origin to appropriate water under a priority senior

to rights of the Bureau . . . ."  AR at 4952 (May 24, 1991 Letter

from SWRCB).  The SWRCB interpreted § 11460 in that response:

> The statutes and permit terms protecting the areas of
> origin do not guarantee that the water supply needs of
> the entire area of origin, or any particular water
> users within the area of origin, will be met.  Rather,
> the area-of-origin protections protect water users
> within the area of origin against previous
> appropriations for export.  They are a guarantee that,
> up to the amount of the exports, the Board will not
> reject a new application in the area of origin on the
> basis that no water is available for appropriation.
>
> The area-of-origin provisions provide only priority;
> export projects approved subject to the area-of-origin
> requirements do not have rights senior to water
> projects approved by the Board subsequently for the
> area of origin.  The right to obtain a priority does
> not accord other rights such as a right to obtain water
> at the price it would cost under a contract from an
> exporter.

AR at 4956.

The SWRCB restated its interpretation during the 1990's.

Order 95-6 confirmed that the correct way to obtain area of

origin protections is to "file a water right application and

receive a permit with seniority over the rights of the DWR or the

USBR to export water from the area."  SAR at 1256-57; *see also*

SWRCB Order 98-09 (1998), SAR at 1037.  Plaintiff and its Members

hold no such water rights permits.  The SWRCB again addressed

area of origin statutes in D-1641, issued December 29, 1999.  AR

at 4428.  The SWRCB rejected TCCA's arguments "that the CVP is

required under Water Code §§ 11460, *et seq*. to supply water to

meet the needs of users in the Sacramento Valley."  D-1641 at 99,

101-102.  The Board responded to petitions for reconsideration of

D-1641, by removing its findings regarding area of origin law at

pp. 101-102 of the original D-1641.  AR at 4438.  On

reconsideration, the Board explained: "TCCA has been advised in the past that the appropriate way to obtain additional service water supplies under the Watershed Protection Act is to file applications to appropriate the additional water."  AR at 4217.  The revised D-1641 confirmed: "[T]he USBR is subject to Water Code sections 11460 and 11463, which are part of the area of origin laws, and if it violates those sections, the SWRCB has authority to require compliance."  AR at 4211.  The SWRCB has never found that the Bureau violated the Watershed Protection Act.

E.    THE DISPUTED CVP WATER SERVICE CONTRACTS.

CVP water is only available under water service contracts with the United States through Interior and the Bureau. *Westlands 2001*, 153 F. Supp. 2d at 1144 (*citing*, 42 U.S.C. § 511).  Reclamation has contracted with water districts from the CVP's nine divisions, including the Sacramento, San Luis, San Felipe, and Delta Divisions to provide CVP water service. Plaintiff's 16 members are located within the Sacramento Division, north of the Delta.  SAR at 129; 706.  Defendant Intervenors San Luis & Delta-Mendota Water Authority and Westlands Water District are located south of the Delta, within the CVP's San Luis, San Felipe and Delta Divisions.  *Westlands 2001*, 153 F. Supp. 2d at 142.  In CVP Federal water service contracting, there are at least three categories of contracts. The first are "Exchange Contracts" which give express contractual priority to CVP water service to designated "Exchange Contractors" on the basis of their pre-existing pre-1914 riparian

22

and appropriative rights to the San Joaquin River.  *Westlands Water Dist. v. United States*, 337 F.3d 1092, 1096 (9th Cir. 2003) ("*Westlands 2003*").  The Exchange Contractors "traded" their pre-existing water rights to the Bureau, which obtained water permits from the SWRCB based on these exchanged water rights, for which the Bureau in turn granted priority access to CVP water supply to the Exchange Contractors in federal water service contracts.  This enabled the Bureau to provide water for a proposed CVP expansion in other areas of the San Joaquin Valley.  *Westlands 2003*, 337 F.3d at 1096-97 (*citing*, *Westlands Water Dist. v. U.S.*, 864 F. Supp. 1536, 1539 (E.D. Cal. 1994).

The second category of CVP contracts are Settlement Contracts including the Sacramento River Settlement ("SRS") Contracts, which grant a contractual priority to CVP water supply through limitations on shortage provisions.[3]  *Kempthorne*, 2008 WL 5054115 at *23 (E.D. Cal. 2008) (not reported).  The SRS Contracts' priority arises from: "[T]he CVP's water rights are subject to the Settlement Contractors' [pre-existing water rights]" which include riparian, appropriative, and other water rights recognized by the State Board.  *Id.* at *23.

The third category of contracts are held by CVP contractors, north-of-Delta, in-Delta, and south-of-Delta.  All of these third

---

[3] Glen-Colusa Irrigation District, a TCCA Member, holds a Sacramento River Settlement Contract.  As a result, Glen-Colusa's renewal contract has different shortage terms from other TCCA Member contracts.  Glen-Colusa receives lesser shortage reductions based on the difference in its contract's shortage terms.  This Settlement Contract is not an issue in this case. AR at 3717-60.

1   category CVP contractors, which include TCCA and its Members,

2   (except Glen-Colusa), SLDMA and Westlands, held no pre-existing

3   water rights to offer as consideration for CVP water service and

4   have no priority access rights to CVP water supply or deliveries

5   in times of shortage; no guarantee of 100% contract water

6   deliveries; and no recognition they include pre-existing water

7   rights.  The Bureau allocates reduced CVP water supplies during

8   Shortages to the third category of CVP water service contractors

9   on a CVP-wide basis in accordance with the terms of all these

10  contracting Districts' water service contracts.

11

12          1.   <u>TCCA MEMBERS' RIGHT TO CVP WATER UNDER THEIR LONG-TERM
                  CVP WATER SERVICE CONTRACTS</u>.

13          TCCA Members executed their original CVP water service

14  contracts in the 1960's and 1970's.  *See* AR at 2781, 2992, 3543

15  (1960's); AR at 2890, 2920, 3434 (1970's).  All original TCCA

16  contracts contained "shortage" provisions which permitted the

17  Bureau to apportion and reduce the available water supply in

18  years of shortage.  *See, e.g.*, Dunnigan Water Service District

19  Contract (Feb. 5, 1963) ("Dunnigan Renewal Contract"), Request

20  for Judicial Notice ("RJN"), Ex. 3 at 17.  Before the original

21  TCCA CVP contracts expired in 1995, the Bureau delivered less

22  than 100% of contract amounts to TCCA Members in five shortage

23  water years, 1977, 1990, 1991, 1992, and 1994.  SAR at 3177.  In

24  those years, other third category contractors received similarly

25  reduced amounts of water, including Westlands.  SAR at 3177.

26          In 1992, Congress enacted the Central Valley Project

27  Improvement Act ("CVPIA"), Pub. L. No. 102-575, 106 Stat. 4706

28  (1992), which reallocated priorities for use of CVP water.  Among

other things, the CVPIA precluded the Secretary from entering into new CVP contracts for delivery of CVP water for any purpose other than fish and wildlife until certain environmental requirements were met and directed that 800,000 acre-feet of "Project yield" would be immediately dedicated to the implementation of the fish, wildlife and habitat restoration purposes established by the Act.  CVPIA at §§ 3404(a), 3406(b)(2). The passage of the CVPIA came just as many CVP contracts were about to expire.  The process of developing new CVP water contracts began.

## 2.   INTERIM CONTRACTS.

In 1995, TCCA Members entered into "interim" renewal contracts awaiting review and assessment of long-term renewal contracts.  SAR at 382.  Interim renewal contracts commenced execution in 1995 and were subsequently renewed for periods up to two years until 2005.  SAR at 382.  The TCCA interim contracts included water shortage provisions prescribed by Article 12, authorizing the Bureau to determine conditions of shortage and to apportion the reduced available water supply among CVP contractors.  *See* Dunnigan Renewal Contract at 24-25.  TCCA Members' interim contracts did not provide for preferential water allocations based on area of origin.  SAR at 1065-66.  During the interim TCCA contracts, the Bureau reduced available water supply among all CVP water service contracts in four shortage years, 1995, 1997, 1999, and 2001.  Through 2005 TCCA CVP water service contracts always included a shortage provision.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

### 3.   NEGOTIATION OF CURRENTLY OPERATIVE TCCA RENEWAL CONTRACTS: THE BUREAU'S INTERPRETATION AND PERFORMANCE.

TCCA was afforded an opportunity to comment and discuss the renewal of long-term contract provisions with the Bureau.  SAR at 518.  The Bureau and TCCA Members extensively discussed the applicability of area of origin laws to the CVP contracts and the Bureau's authority to reduce water deliveries to CVP contractors in times of shortage.

The Bureau asserted the non-applicability of Section 11460 to allocation and delivery of CVP water under CVP contracts.  In 1994 the Bureau issued a November 2, Area of Origin Issue Paper, SAR at 1317, which stated the Bureau's position that Section 11460 is "directed toward obtaining prior water rights, not obtaining deliveries of water under the Project's rights."  In 1996 another Bureau draft report addressed applicability of area of origin statutes to the CVP, confirming that area of origin statutes in California water law "do not guarantee that the water supply needs of an entire area of origin, will or can be met." SAR at 1154:

> Under these statutes, water rights applicants within
> the area of origin are essentially guaranteed that new
> water right applications filed for the development of
> water within the area of origin, will not be rejected
> by the [Board] on the basis that no water is available
> for appropriation by virtue of a senior water right to
> export the water from the water shed.  While the area
> of origin statutes may result in future reductions in
> the quantities of CVP water that can be delivered to
> CVP export customers, the area of origin provisions do
> not become part of a contract for the delivery of
> water; they are part of the water rights on which the
> contract is based and subject that right to
> appropriations by users within the area of origin.

The Bureau found: "Area of origin statutes . . . do not establish any priority to the allocation of CVP contract water or

CVP water used for implementation of the [CVPIA]."   SAR at 1156.
Many contractors responded to the draft report.  *See, e.g.*, SAR
at 1105-11; 1125-32, 1133, 1134-37, 1138-40, 1150-53.   TCCA then
acknowledged that "the Bureau's conclusions come as no surprise,
as this is a restatement of positions they [sic] have articulated
on numerous occasions in the past."   SAR at 1141.   In 2000,
Reclamation again stated: "Area of origin/county of origin
statutes do not give any CVP user a priority over any other CVP
user regarding water service provided by CVP contracts . . . this
is also the position of the State Water Resources Control Board .
. . ."   SAR at 977.

The Bureau consistently rejected requests that an area of
origin provision be included in north-of-Delta CVP contracts.
SAR at 1317; 1308; 3238.   TCCA proposed draft contract language
precluding water reductions to TCCA Members "unless and until
reductions have also been imposed in irrigation users receiving
water from the integrated CVP water supply who are outside the
Sacramento River watershed."   SAR at 3238.   TCCA contractors
requested area of origin transfer provisions and increased CVP
contract water allocations based on alleged area of origin
protections.   SAR at 1004-7 (request for area of origin transfer
provisions); SAR at 1021-24 (request for water quantity
increase); SAR at 1000-1 (same); SAR at 831 (same).   Both interim
TCCA contracts included a similar area of origin transfer
provision, SAR at 1308, as did the TCCA Renewal Contracts. AR at
307-71.   The Bureau did not adopt contract terms to increase
contract quantities or afford protection against shortages.   AR
at 3056 (same contract amounts in interim and renewal contracts).

27

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**4.   TCCA ACCEPTS LONG-TERM RENEWAL CONTRACTS WITHOUT PRIORITY ALLOCATION TERMS: THE SHORTAGE PROVISIONS.**

All TCCA Members executed long-term CVP water service contracts in 2005 ("TCCA Renewal Contracts").  All TCCA renewal contracts contain identical shortage provisions, including Dunnigan Water District, AR at 3043-97; Colusa County Water District, AR at 3539-93; Corning Water District, AR at 2777-2834; Cortina Water District, AR at 2917-30; Colusa County Water District, AR at 3539-93; Corning Water District AR at 2777-2834; Cortina Water District AR at 2917-30; Davis Water District AR at 3150-3201; 4M Water District, AR at 2887-2901; Glyde Water District, AR at 3430-82; Holthouse Water District, AR at 2960-73; Canawha Water District, AR at 3098-3149; Kirkwood Water District, AR at 2673-2723; LaGrande Water District, AR at 3377-3429; Orland Artois Water District, AR at 3322-76; Proberta Water District, AR at 2835-86; Thomes Creek Water District, AR at 2724-76; Westside & Westside Water District, AR at 3202-52.

All TCCA Renewal Contracts contain an Article 12 shortage provision substantively identical to the shortage provision in the prior long term contracts under which the Bureau declared conditions of shortage and then allocated less than full contractual amounts to TCCA and its Members under interim TCCA contracts.  *See* Dunnigan Renewal Contract at 24-25.  The TCCA long term renewal contracts memorialize the agreement of "the United States and [each] contractor . . . to enter into the contract pursuant to Federal Reclamation law on the terms and conditions set forth below."  AR at 3208.  These purposes include: operation of the CVP "for diversion, storage, carriage,

28

distribution and beneficial use, for flood control, irrigation,
municipal, domestic, industrial, fish and wildlife mitigation,
protection and restoration, generation and distribution of
electric energy, salinity control, navigation and other
beneficial uses."

The TCCA Renewal Contract's Article 12 shortage provision
authorize the Bureau to determine shortages and apportion waters
in times of shortage:

> 12(a): in its operation of the Project, the Contracting
> Officer will use all reasonable means to guard against
> a Condition of Shortage in the quantity of water to be
> made available to the Contractor pursuant to this
> contract.  In the event the Contracting Officer
> determines that a Condition of Shortage appears
> probable, the Contracting Officer will notify the
> Contractor of said determination as soon as
> practicable.

> 12(b): if there is a Condition of Shortage because of
> errors in physical operations of the Project, drought,
> or other physical causes beyond the control of the
> Contracting Officer or actions taken by the Contracting
> Officer to meet legal obligations then, except as
> provided in subdivision (a) of Article 18 of this
> Contract, no liability shall accrue against the United
> States or any of its officers, agents, or employees,
> for any damage, direct or indirect, arising therefrom.

> 12(c): In any year in which there may occur a shortage
> for any of the reasons specified in subdivision (b)
> above, the Contracting Officer shall apportion the
> available Project Water supply among the Contractor and
> others entitled, under existing contracts and future
> contracts . . . and renewals thereof, to receive
> Project Water consistent with the contractual
> obligations of the United States.

> 12(d): Project Water furnished under this Contract will
> be allocated in accordance with the then-existing
> Project M&I Water Shortage Policy.  Such Policy shall
> be amended, modified, or superseded only through a
> public notice and comment procedure.

*See, e.g.*, AR at 3073-74.  Article 12 authorizes the Bureau to
apportion available CVP supply among all CVP water service

contractors during conditions of shortage, without regard to whether those water service contractors are within or outside an area of origin, as it has for the over-sixty year history of the CVP and almost forty years of active dispute with TCCA over area of origin alleged priority in CVP federal water service contracts.

5.    **TCCA MEMBERS' VALIDATION OF ALL RENEWAL CONTRACTS IN STATE COURT**.

Article 38 of the TCCA Renewal Contracts provides that TCCA Members obtain a State Court judgment validating each member contract.  AR at 3090("The Contractor shall furnish the United States a certified copy of the Final Decree, the validation proceedings, and all pertinent supporting records of the Court approving and confirming this Contract, and decreeing and adjudging it to be lawful, valid, and binding on the Contractor.").  This validation process, undertaken by each TCCA member confirmed and validated under state law each renewal contract, establishing the valid execution and enforceability of every provision of the TCCA Renewal Contracts by judgment of the State Superior Court.  SAR at 23-31; 34-42; 43-45; 46-59; 60-64.

6.    **EXECUTION BY PERFORMANCE AND CONDUCT UNDER THE TCCA RENEWAL CONTRACTS**.

Following execution and validation of the TCCA Renewal Contracts, the Bureau continued to make water deliveries and performed by reducing Plaintiffs' water allocations in water years when shortages were declared, as it had previously done under the original and interim TCCA contracts.  Under Article 12,

the Bureau declared conditions of shortage in 2007, 2008, and 2009.  SAR at 317-80.  The Bureau delivered less than full contract amounts to all CVP water service contractors, including TCCA members in 2008 and 2009.  AR at 1591 (the cause of reduction was "the ongoing absence of precipitation in Northern California").  In correspondence that followed execution of the TCCA Renewal Contracts, the Bureau affirmed its interpretation that area of origin laws did not conflict with the terms of Article 12 of the Renewal Contracts and the reduced apportionment of CVP water so authorized.  AR at 1602-3; 1589.  TCCA admitted that the Bureau had "consistently maintained more than a decade that CVP contractors in the Sacramento River watershed are entitled to no priority to CVP water supplies under Section 11460."  AR at 1596.

## V.  STANDARDS OF DECISION.

A motion for summary judgment must be granted when "there is no genuine issue as to any material fact and . . . the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986).  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (summary judgment motion should be granted "so long as whatever is before the district court" shows that the standard set by Rule 56(c) is satisfied.

For purposes of summary judgment, a fact is "material," when it could affect the outcome of the suit.  *Anderson*, 477 U.S. at 248.  A dispute about a material fact is "genuine" when the evidence is such that a reasonable jury could return a verdict

1  for the party opposing the motion.  *Id.* at 248.  The moving party

2  must show that it is entitled to summary judgment because, under

3  the governing law, there can be but one reasonable determination

4  of the relevant cause of action or issue.  *Id.* at 250; *Margolis*

5  *v. Ryan*, 140 F.3d 850, 852 (9th Cir. 1998).  In ruling on a

6  motion for summary judgment, the court draws all inferences in

7  favor of the non-moving party, makes no credibility

8  determinations, and does not weigh the evidence.  *Anderson*, 477

9  U.S. at 249-250.  If the matter can be decided as a matter of

10  law, because there are no genuine factual issues, there is no

11  need for a trial and summary judgment is proper.  *Id.* at 250-251.

12      In an APA case, the Court may not resolve factual questions

13  but determines "whether or not, as a matter of law, the evidence

14  in the Administrative Record permitted the agency to make the

15  decision it did."  *Consolidated Delta Smelt Cases*, 760 F. Supp.

16  2d 855, 868 (E.D. Cal. 2010) (quoting *Sierra Club v. Mainella*,

17  459 F. Supp. 2d 76, 90 (D.D.C. 2006).)  In administrative review

18  cases, the Court determines "whether the Agency action is

19  supported by the Administrative Record and otherwise consistent

20  with the APA standard of review."  *Id.* at 90.

21

22              VI.   LAW AND ANALYSIS.

23  A.    STATUTE OF LIMITATIONS.

24      Plaintiff's counsel conceded at oral argument that APA

25  claims are subject to a six year statute of limitations and any

26  claims prior to February 11, 2004 are time-barred.  *Hells Canyon*

27  *Preservation Council*, 593 F.3d at 930.  Water shortages have been

28  declared under CVP water service contracts in 10 of the last 33

                              32

years.  Summary judgment is GRANTED as to any claims arising before February 11, 2004.  Only the water shortages declared in 2008 and 2009 remain in dispute.

**B.  CVP STATUTES AND SECTION 11460 DO NOT CONTAIN OR SUPPORT THE PRIORITY ALLOCATION RIGHT TO CVP WATER THAT TCCA ADVANCES.**

TCCA contends that Congress, the State of California, and Reclamation "all intended the CVP to provide for the water needs of the Sacramento Valley with a priority over exports."  The non-Federal Defendants rejoin that TCCA's reliance on engineering documents, reports, statements by State officials, and state laws, need not be referenced based on unambiguous federal statutory language and do not bear on Congress' intent in passing Federal laws that authorize the CVP and are inconsistent with state law.

TCCA argues:

1.  Water service and deliveries to TCCA members must be given priority over other CVP divisions and water service contractors to provide 100% contract allocations to TCCA members before south-of-Delta CVP contractors receive water service; and

2.  Its proposed allocation aligns with the 1950 Act's directive to "effectuate the fullest and most economic utilization of the land and water resources of the Central Valley of California for the widest possible public benefit."  1950 Act, § 4.

The Federal-Defendants argue that TCCA's construction of Section 11460 conflicts with the congressional directive in the legislation authorizing the CVP canals, emphasizing the total

33

1  lack of any language in the Reclamation Acts, or CVPIA,

2  recognizing or granting such origin priority to TCCA.  To the

3  contrary, Congressional enactments have repeated the federal

4  legislative intent that the CVP created was for multiple public

5  benefits throughout the Central Valley and that Interior's

6  mandate was to integrate and coordinate the Sacramento River

7  Division into the entire CVP to achieve the legislative purpose

8  of "the widest possible public benefit."

9       As a matter of ascertaining legislative intent, a court

10 looks first to the words of the statute.  *United States v.*

11 *Monsanto*, 491 U.S. 600, 610 (1989) ("Congress' intent is 'best

12 determined by [looking to] the statutory language that it chooses

13 . . .'").  Where the plain language of a statute clearly

14 expresses Congress' intent, there is no need to resort to

15 legislative history.  *Abraham & Sons Enterprises v. Equilon*

16 *Enterprises ORC*, 292 F.3d 958, 963 (9th Cir. 2002).

17

18       1.   STATUTORY INTERPRETATION OF THE CVP STATUTES.

19            a.   Plain Language.

20       The language of the original enactment for the CVP in 1935

21 grants no area of origin priority or intended preference to store

22 and provide water with priority for users in the Sacramento

23 Valley.  Emergency Relief Appropriations Act of 1935, 49 Stat.

24 115 (1935).  Congress' express language manifests its intent that

25 the CVP be used to satisfy multiple purposes to achieve the

26 broadest public benefit for the entire Central Valley.  The

27 Rivers & Harbors Act of 1937 stated the original purposes for

28 creating the CVP:

1
2
3
4

> Improving navigation, regulating the flow of the San Joaquin River and the Sacramento River, controlling floods, providing for storage and for the delivery of the stored waters thereof, for the reclamation of arid and semi-arid lands and lands of Indian reservations, and other beneficial uses and for the generation and sale of electric energy . ..

5   Rivers & Harbors Act of August 26, 1937, Pub. L. No. 75 392,
6   50 Stat. 844, 850 (1937).

7       None of the Federal laws authorizing the CVP include an
8   "area of origin" provision directing the Bureau to deliver 100%
9   of CVP water contract-allocations to Sacramento Valley users
10  before deliveries to other CVP contractors.  Rather, Congress
11  intended the CVP to be used and operated for multiple purposes to
12  achieve broad public benefits for the entire Central Valley.
13  *Dugan v. Rank*, 372 U.S. 609, 612 (1963) (footnote omitted) (CVP
14  intended "to conserve and put to maximum beneficial use, the
15  waters of the Central Valley of California.").

16      TCCA contends that "Congress authorized the physical means
17  to meet the CVP's [area of origin] obligations" through the 1950
18  Act.  TCCA refers to § 3 of the 1950 Act, which relates to
19  "locating and designing [of] the works authorized by § 2,"
20  concerning engineering and construction. TCCA asserts § 3
21  directed the Secretary of the Interior to give the State Engineer
22  Bulletins 13 and 26 "due consideration" in locating and designing
23  the Sacramento Canals Unit.  According to Plaintiff, this
24  language demonstrates that Congress was well aware of the
25  Bulletins and of the Act's affect on "local interests."  1950 Act
26  at § 3.  This section says nothing about an area of origin
27  priority.

28

1    Defendants rejoin that § 4 of the 1950 Act ("Section 4")

2 expressly states as to the Tehama-Colusa Conduit Canal:

3       [T]he Secretary of the Interior is directed to cause
        the operation of said work . . . to be coordinated and
4       integrated with the operation of . . . the existing
        features of the Central Valley Project in such manner
5       as will effectuate the fullest and most economic
        utilization of the land and water resources of the
6       Central Valley of California for the widest public
        benefit.
7

8    TCCA contends that Section 4 is a "broad mandate" which does

9 not direct agencies to perform any specific nondiscretionary

10 actions.   Under Section 4 of the 1950 Act, Congress gave two

11 instructions for the Unit's operation: (1) the canals are to be

12 operated to achieve the widest possible public benefit and (2)

13 that benefit would be realized by the fullest and most economic

14 utilization of the land and water resources of the Central

15 Valley, not just the Sacramento Valley.

16    The lack of any federal statutory language recognizing or

17 granting an area of origin priority in CVP water service

18 contracts defeats TCCA's self-serving, and wholly unsupported

19 contention that such a priority exists and is not inconsistent

20 with the CVP's purposes.   *See Westlands Water District v.*

21 *Firebaugh Canal*, 10 F.3d 667, 671 (9th Cir. 1993).   *Firebaugh*

22 *Canal* reviewed the district court's refusal to grant San Luis

23 (non-priority contractors) a CVP water priority under the

24 authorizing statute:

25       The strongest argument in favor of the Bureau is that the
         Act nowhere mandates that the Reservoir first be used to
26       satisfy the needs of the San Luis Contractors before any
         diversion to other contractors is allowed. Creating a
27       preference in favor of the San Luis Contractors and others
         similarly situated, or providing that Reservoir water is for
28       their exclusive benefit, would have been a simple enough

36

> drafting exercise for Congress. In effect, the San Luis
> Contractors ask us to add an important substantive provision
> to the Act. Such a provision cannot be found in the plain
> language of the Act, and indeed would be inconsistent with
> the mandate that the San Luis Unit be operated as an
> integral part of the whole CVP.

*Id*. at 671.

b.  <u>Legislative History of the CVP Statutes.</u>

Both sides claim support in the legislative history of the 1950 Act.  TCCA asserts that select documents, including a letter to then-Congress member Engle from the Assistant Secretary of the Interior, represent "unequivocal policy statements' by Reclamation that only excess water would be diverted outside of the Sacramento Valley basin.  AR 9735 ("I can assure you that the Bureau will determine the amounts of water required in the Sacramento Valley drainage basin to the best of its ability so that only surplus waters would be exported to the San Joaquin . . .")).

Plaintiff's legal authority cited to support finding these remarks "informative" demonstrate the opposite:  "We are mindful of the limited persuasive value of the remarks of an individual legislator.  Nevertheless, the <u>unanimously</u> expressed understanding of the scope of [Federal legislation] assists our analysis, particularly when that expressed understanding is in complete harmony with the Congressional purpose and statutory text."  *Ileto v. Glock, Inc.*, 565 F.3d 1126, 1137 (9th Cir. 2009).  No evidence has been submitted of later Congressional history of any uniform understanding that any legislation authorizing or implementing the CVP recognized a state area of origin priority.

37

1    To the contrary, the same CVP Documents Plaintiff invokes

2  provide statements defeating the existence of any uniform

3  understanding.  The House Special Subcommittee on Irrigation and

4  Reclamation, cited by TCCA, provides:

5         (a) That the statements of policy with respect to the
          importation of surplus water from the Sacramento Valley
6         made by the State of California, the original sponsors
          of the Project, and subsequently repeated in a similar
7         manner by Interior Department representatives, are
          certainly confusing, if not misleading;

8
          (b) Categorical statements about the reservation of
9         water for Sacramento Valley needs, such as the
          assurance given by Secretary Krug in Oroville on
10        October 12, 1948, cannot be substantiated as a
          practical matter in view of the increasing Sacramento
11        Valley uses . . . .

12  AR at 9162.

13    The Special Subcommittee further stated:  "[T]he statements

14  by Federal officials in the reports appear to guarantee water for

15  the Sacramento valley.  However, as Chairman Engle said at

16  Sacramento on October 28, 1951, ". . . these commitments must be

17  considered in the light of other commitments made then or since

18  that time."  AR at 9176.  Such "other commitments" are included

19  in the text of Federal CVP legislation including the 1950 Act and

20  the CVPIA.  The language of those statutes controls over the

21  conflicting statements of individual Federal officials.

22    This case cannot be decided on the anecdotal evidence from

23  individual legislators or conflicting legislative history of the

24  1950 Act.  Despite having knowledge of Reclamation's alleged

25  "unequivocal policy statements," Congress not only drafted the

26  1950 Act without any express provision, or even any language

27  inferentially providing any water rights preference for in-basin

28  users; the 1950 Act contains the exact opposite — a direction

1  that the Unit operate to achieve the widest possible benefit

2  across the entire Central Valley.   The Rivers & Harbors Act nor

3  the 1950 Act do not create or recognize a priority for area of

4  origin CVP contractors.

5          2.    STATUTORY INTERPRETATION OF SECTION 11460.

6                a.   Plain Language.

7          Plaintiff contends that the plain language of Section 11460

8  is "clear from its use of the definite article, 'the' prior

9  right," as opposed to, *inter alia*, "a", "previously perfected,"

10 or "appropriative right."   Defendant-Interveners rejoin that "the

11 word 'contract' does not appear . . . . Nor do words such as

12 'preference,' 'allocation,' or 'shortage.'"   Defendant-

13 Interveners argue that while TCCA claims that its members are

14 entitled to CVP contracts that grant them preferential allocation

15 of CVP water during Conditions of Shortage, § 11460's plain terms

16 include no such entitlement.   Defendant-Interveners further argue

17 that the area of origin statutes only allow for new property

18 rights against the *DWR*, not Reclamation.   Federal Defendants join

19 Interveners, asserting that reading the area of origin statutes

20 together demonstrates that Section 11460 applies only to rights

21 previously perfected by way of application to the SWRCB.   Section

22 11460 provides:

23              In the construction and operation by the Department of any
               project and with the provisions of this part, a watershed or
24              area of origin wherein water originates, or any area
               immediately adjacent thereto which can be conveniently
25              supplied with water therefrom, shall not be deprived by the
               Department directly or indirectly of the prior right to all
26              of the water reasonably required to adequately supply the
               beneficial needs of the watershed area, or any of the
27              inhabitants or property owners therein.

28

1  Section 11462 provides: "[T]he provisions of this Article
2  shall not be so construed as to create any new property rights
3  other than against the department [of Water Resources] as
4  provided in this part . . . ."[4]

5  That the area of origin statues list only the DWR, and not
6  the Bureau is significant.  Given section 11462's specific
7  limitation, Section 11460 cannot be construed to allow a CVP
8  contract to create any state-based water right against the
9  *Bureau*.  *See El Dorado*, 142 Cal. App. 4th at 976 ("In other
10 words, although [a permitee] may be entitled to assert a priority
11 under Section 11460 over the Bureau and the [DWR] to the
12 diversion of water originating in the watershed of [origin], that
13 priority does *not* extend to water the projects have properly
14 diverted to storage at an earlier date*."*) (emphasis in
15 original).[5]  Section 11462 categorically precludes a finding that
16 Section 11460 confers a right in users in the area of origin to
17 insist on a preferential water contract to the *Bureau's* diverted
18 and stored water.[6]

19

20  [4] "Department" means Department of Water Resources.  CWC §
21  22.

22  [5] There is a total lack of proof that the water TCCA asserts
23  Section 11460 priority over is not previously diverted and stored
    CVP water or that any such water originated in a relevant area of
24  origin.

25  [6] It is undisputed that the Plaintiffs have never applied
26  for, and the SWRCB has never issued, appropriative or other water
    rights permits to any of the Plaintiffs applicable to CVP water.
27  Under state law, Plaintiffs are required to obtain any water
    right under Section 11460 by complying with SWRCB water project
28  permitting process.

40

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

        b.   **Decades of Consistent Interpretation By the California Attorney General, the SWRCB, and the Bureau is That Section 11460 Governs Appropriation Not Allocation of Water in the Area of Origin**.

            i.   **Attorney General Opinion.**

    Under California law, "in the absence of controlling authority, an Attorney General opinion may be persuasive because we presume the Legislature is aware of the opinion and would have amended the statute if it disagreed."  *Life Care Centers of America v. Cal. Optima*, 133 Cal.App.4th 1169, 1178 (2005); *ARC Students for Liberty Campaign v. Los Rios Community College* 732 F. Supp. 2d 1051, 1057 (2010) (*citing City of Irvine v. S. Cal. Ass'n of Gov'ts*, 175 Cal. App. 4th 506, 521 (2009) ("Under California law, the Attorney General's opinions are not binding, yet are 'entitled to great weight and, in the absence of contrary controlling authority, persuasive.'")).

    The 1955 AG Op. analyzed and addressed the application of section 11460 and California's area of origin laws in detail.

    The AG Op explains that the area of origin statutes do not grant to the land or inhabitants in a watershed of origin a right to use water stored by project facilities:

    **No inhabitant of a watershed of origin becomes possessed of any presently vested title or right to any specific quantity of water as a result of this statute.** As the need of such inhabitant develops he must comply with the general law of the state, both substantively and procedurally, to apply for and perfect a water right for water which he then needs and can then be put to beneficial use (secs. 1200 to 1800). However, when he makes such an application, as a member of the class of persons protected by the statute, his application is not to be gainsaid, denied or limited by reason of any activity on part of the Water Project Authority. Specifically, this means that if, prior to the development of the applicant's increased needs, such use by the authority would not justify denial of the application. Assuming the application to be otherwise meritorious, the State Engineer would grant a permit in the usual form, and

41

1   the authority would thereafter be compelled to honor the
2   water right thus created and vested.

AG Op. at 20-21 (emphasis added.)

3
4               ii.   **The Bureau's Interpretation of Reclamation**
                      **Law.**

5        "Unless unreasonable or clearly contrary to the statutory

6   language or purpose, the consistent construction of a statute by

7   an agency charged with responsibility for its implementation is

8   entitled to great deference."  *Dix v. Superior Court*, 53 Cal. 3d

9   442, 460 (1991); *RTC Transp., Inc. v. Conagra Poultry Co.*, 971

10  F.2d 368, 370 (9th Cir. 1992) ("We accord substantial deference

11  to statutory interpretations by an agency charged with

12  administering a statute."); *Mesa Verde Const. Co. v. N. Cal.*

13  *Dist. Council of Laborers*, 861 F.2d 1124, n. 5 (1988) (*citing*

14  *Chevron U.S.A. v. Natural Resources Defense Council, Inc.*, 467

15  U.S. 837 (1984)("[A] court may not substitute its own

16  construction of a statutory provision for a reasonable

17  interpretation made by the administrator of an agency.")).

18       The Bureau has consistently stated its position that Section

19  11460 does not create a priority allocation to TCCA Members or

20  any area or origin CVP water contractors.  *See e.g.*, SAR at 1317

21  (1994) ("[Section 11460 is] directed toward obtaining prior water

22  rights, not obtaining deliveries of water under the Project's

23  rights."); SAR at 1154 (1996)("Area of origin statutes . . . do

24  not establish any priority to the allocation of CVP contract

25  water or CVP water used for implementation of the [CVPIA]"); SAR

26  at 977 (2000) ("Area of origin/county of origin statutes do not

27  give any CVP user a priority over any other CVP user regarding

28

42

1  water service provided by CVP contracts . . . this is also the

2  position of the State Water Resources Control Board.").

3      The Bureau consistently rejected requests that an area of

4  origin provision be included in north-of-Delta CVP contracts.

5  SAR at 1317; 1308; 3238.  TCCA proposed draft contract language

6  precluding water reductions to TCCA Members "unless and until

7  reductions have also been imposed in irrigation users receiving

8  water from the integrated CVP water supply who are outside the

9  Sacramento River watershed."  AR at 2802.  TCCA contractors

10 requested area of origin transfer provisions and increased CVP

11 contract water allocations based on alleged area of origin

12 protections.  SAR at 1004-7 (request for area of origin transfer

13 provisions); SAR at 1021-24 (request for water quantity

14 increase); SAR at 1000-1 (same); SAR at 831 (same).  The Bureau

15 did not adopt any contract terms to increase contract quantities

16 or afford Plaintiff's Members protection against shortages.[7]  AR

17 at 3056 (same contract amounts in interim and renewal contracts).

18

19         [7] As was recognized in *Westlands 2001*, Plaintiff's Members'

20 contracts "do not create special, preferential rights, in
   derogation of the overall integrated management of the CVP.

21 Rather, they contain shortage provisions that abate the right []
   to receive CPV water .. . in water-short years."  *Westlands 2001*,

22 153 F. Supp. 2d at 1167.  TCCA's Members are not like the

23 Exchange Contractors in *Westlands*.  There, the senior priority
   appropriator and riparian water rights of the Exchange

24 Contractors were both historically established and recognized by
   the express language in the Exchange Contracts.  *Id.*; *Del Puerto*

25 *Water Dist.*, 271 F.Supp.2d at 1243 (CVP contractor did not have

26 an unqualified right to the delivery of irrigation water).
   Plaintiff's Members' contracts recognize § 11460 limits the

27 Bureau's diversion of natural flow water for export, not its

28 allocation of CVP water.

1

2

     iii. **The SWRCB Has Independently Interpreted**
        **Section 11460 in the same manner as the AG**
        **Op.**

3    The SWRCB decisions are consistent with the AG Op. and the

4 Bureau's interpretation, and have never recognized the water

5 rights Plaintiff and its Members claim.  The SWRCB has

6 historically and continuously interpreted § 11460 in the same

7 manner as the AG Op.  *See e.g.*, AR at 4952-56 (interpreting area

8 of origin sections to give priority for new appropriations

9 only)); Order 95-6 (same); SAR at 1256; Order 98-09 (same); SAR

10 at 1037(same); *see also* AR at 4956 (1991 Letter from SWRCB

11 rejecting two TCCA members' complaint seeking area of origin

12 based preference to CVP water.)

13    3. **SECTION 11460's INTERPRETATION BY THE AG Op, SWRCB, AND**
      **THE BUREAU ARE ALL CONSISTENT WITH THE PERMIT TERMS**.

14

15    D-990, which approved the United States' application to

16 appropriate Sacramento River water for the CVP, was implemented

17 by the conditions Term 22 and 23.  Term 22 made the Bureau's

18 water permits "subject to rights initiated by *applications* for

19 use within said watershed and Delta regardless of the date of

20 filing said applications."  D-990 at 73, 85, AR at 5536, 5548

21 (emphasis added.)  Term 22 protects *appropriators* of water <u>with</u>

22 <u>permits within the area of origin</u>, not CVP contractors.

23    Term 23 granted then-current water users within the

24 Sacramento River watershed a three year period (long-since

25 passed) to request water service contracts, which would be

26 preferred over requests from users outside the watershed. D-1641

27 at 100, AR at 4217.  D-1614 expressly states "[the] basis for

28 Term 23 may have been protection of the public interest, but it

1   was not, compelled by the area of origin statutes."  By the

2   language of D-1641, the SWRCB explicitly clarified that area of

3   origin statutes do not apply to CVP contracts.

4        Finally, SWRCB adopted Term 91 "to protect persons claiming

5   paramount rights to divert water from the Delta and the water

6   quality upon which such rights depend and to protect fish and

7   wildlife."  *El Dorado,* 142 Cal. App. 4th at 953.  Term 91 imposes

8   on new *appropriators* shared responsibility to meet Delta water

9   quality standards.  D-1594 at 9, SAR Doc. 103.  "Term 91

10  prohibits permitees from diverting water when stored Project

11  water is being released to meet Delta water quality standards or

12  other in-basin demands."  D-1594 at 8, SAR at 1385; *El Dorado*,

13  142 Cal. App. 4th at 950.  Term 91 does not grant an area of

14  origin priority to CVP contractors.

15

16        4.   SUBSEQUENT LEGISLATIVE ACTS.

17        Defendants assert that subsequent CVP legislative

18  authorizations reenforce that Congress did not intend the area of

19  origin statutes to apply in the manner TCCA suggests.  In 1955,

20  just after the AG Op. was published, the Bureau was authorized

21  "to construct, operate, and maintain, as an addition to and an

22  integral part of the Central Valley project, California, the

23  Trinity River division."  Trinity River Division Act of August

24  12, 1955, Pub. L. No. 84-386, 69 Stat. 719 (1955).  One purpose

25  of the Trinity River division is "to transport Trinity River

26  water to the Sacramento River."  *Id*.  Section 2 of the Act

27  provides that "the operation of the Trinity River division shall

28  be integrated and coordinated, from both a financial and an

45

operational standpoint, with the operation of other features of
the Central Valley project, as presently authorized and as may in
the future be authorized by Act of Congress, in such manner as
will effectuate the fullest, most beneficial, and most economic
utilization of the water resources hereby made available
[Provided] [t]hat not less than 50,000 acre-feet shall be
released annually from the Trinity Reservoir and made available
to Humboldt County and downstream water users." *Id.* at § 2
(emphasis added).  The Trinity River furnishes substantial
volumes of CVP water that are stored for CVP use by conveyance
through the Sacramento River.

In 1962 Congress re-authorized the New Melones project on
the Stanislaus River.  The New Melones project moves water from
the Stanislaus River basin to the San Joaquin River.  The
authorizing statute directs that "before initiating any diversion
of water from the Stanislaus River Basin in connection with the
operation of the Central Valley Project, the Secretary of the
Interior shall determine the quantity of water required to
satisfy all existing and anticipated future needs within that
basin and the diversions shall at all times be subordinate to the
quantities so determined." Flood Control Act of 1962, Pub. L. No.
87-874, 73 Stat. 1180, 1191 (1962) (emphasis added).

These later enacted Trinity River and New Melones Acts,
demonstrate that Congress knew how to create a preference in the
allocation of CPV water for an area when it wanted to do so.  The
Trinity River Division Act prioritizes 50,000 acre feet of CVP
water to Humboldt County.  The New Melones Unit Act prioritizes
CVP water for the Stanislaus River Basin.  Both these Acts employ

1  express language to grant such priorities to CVP water.  The
2  timing of these subsequent Acts is significant because they were
3  enacted after the California State Legislature specifically
4  applied § 11460 to Reclamation by CWC § 11128 and after the AG
5  Op. was published.  Had Congress believed a different approach
6  was warranted, it certainly could have enacted a different
7  statute.  *Saxbe v. Bustos*, 419 U.S. 65, 74 (1974) (a
8  "longstanding administrative construction is entitled to great
9  weight, particularly when [] Congress has revisited the Act and
10 left the practice untouched.").  Instead, recognizing the CVP
11 Acts did not include area of origin protection, Congress created
12 two express legislative priorities for use of CVP water with
13 particularized statutory language applicable to the Trinity River
14 Division and the New Melones Unit.

15

16      5. CALIFORNIA CASE LAW.

17      Plaintiffs and Defendants both claim support from California
18 case law.  Defendants assert that, the more recent case law, *El
19 Dorado Irrigation Dist.*, 142 Cal. App. 4th 937 and *Phelps*, 157
20 Cal. App. 4th 89, confirm that Section 11460 does not create an
21 area of origin priority to CVP water.  Plaintiffs rejoin that
22 dicta from *Water Resources Control Bd. Cases*, 136 Cal.App.4th 674
23 (2006) ("SWRCB Cases") states that there is "no reason why" CVP
24 contractors cannot have a Section 11460 area of origin right to
25 priority CVP water allocation.

26      a.   The El Dorado and Phelps Decisions

27      The *El Dorado Irrigation District* case, in response to a
28 challenge that application of Term 91 to the district's water

47

deliveries violated their area of origin priority, held that "Section 11462 contradicted the trial court's conclusion that appropriators [with water permits] in an area of origin may assert a priority to water from that area or that was properly stored by another in an earlier season."  142 Cal. App. 4th at 976.  The court concluded: "Although El Dorado may be entitled to assert a priority under § 11460 over the Bureau and the Department to the diversion of water originating in the watershed of the South Fork of the American River, that priority does not extend to water the Projects have properly diverted to storage at an earlier date."  *Id.*  Although *El Dorado* is not on all fours with this case, the decision demonstrates that California courts have rejected the application of Section 11460 to the allocation of stored CVP water; the same category water TCCA and its Members use and to which they assert a Section 11460 priority.[8]

*Phelps*, addressed a challenge to a SWRCB civil liability order assessing fines for water users' illegal diversion of water during times when they were required to curtail diversions, while the CVP and SWP were releasing stored water to meet water quality standards.  157 Cal. App. 4th at 99. The Plaintiffs there challenged the SWRCB's imposition of term 91 diversion restrictions on the grounds that those restrictions deprived Plaintiffs of their rights under the area of origin statutes

_____

[8] It cannot be disputed that the CVP stores carryover water from prior seasons to meet a number of statutory, regulatory, and operating requirements.  TCCA does not present any proof the water TCCA asserts Section 11460 priority to is not previously diverted and stored CVP water.

§§ 11460-11463.  *Id.*  As here, The *Phelps* plaintiffs sought to divert previously stored water released by the CVPand SWP.  The *Phelps* decision affirmed the SWRCB's explanation for limiting diversions of stored water:

> The water stored upstream by DWR and the USBR during periods of excess flow, however, is appropriated at times when its appropriation does not injure any other water rights holders.  When this water is subsequently released from the reservoirs to flow downstream to the export facilities, it is already appropriated, and is not naturally present in the rivers . . . Accordingly, the stored water transported to the rivers to the export pumps by the Projects, is not available for others to appropriate.

*Id.* at 107.

*Phelps* confirmed: "[W]e affirmed this reading of the [area of origin statutes] in *El Dorado, supra*, 142 Cal. App. 4th at p. 976 . . . ."  *Id.*  As in *El Dorado*, *Phelps* held:  "Based on the foregoing authority, we conclude that the [area of origin statutes] do[] not bar enforcement of Term 91 against Plaintiffs;" affirming it was proper for the SWRCB to prohibit an area of origin user from diverting water when the only available water was stored upstream of the Delta CVP and SWP Project supply.  This California water jurisprudence defeats TCCA's Section 11460 priority assertion by interpreting Section 11460 to mean that once water has been properly appropriated to storage by the Bureau, Section 11460 is inapplicable.  TCCA relies on a different California case, the SWRCB Cases, to justify TCCA and its Members' CVP Renewal Contracts claims for preferential rights to CVP water supply.

        b.   The SWRCB Cases Provide No Binding Or Persuasive
             Precedent.

Plaintiff depends upon language from the *SWRCB Cases* decision, that no violation of Section § 11460 occurred from use of stored water in the New Melones Reservoir to meet Delta water quality standards, because the Delta was within the area of origin.  136 Cal. App. 4th at 758-60.  Recognizing the inapplicability of this ruling because of the express statutory priority language for New Melones in-basin users, Plaintiff seizes on the following dicta:

> To the extent § 11460 reserves the inchoate priority for the beneficial use of water within its area of origin, <u>we see no reason why that priority cannot be asserted by someone who has [or seeks] a contract with the Bureau for the use of that water.</u>  (*See, Robie & Kletzing Area Area of Origin Statutes - the California Experience* (1979) 15 Idaho L. Rev. 419, 436-438 (discussing right of area of origin users to contract with Department for SWP water.)  This does not mean a user within the area of origin can compel the Bureau to deliver a greater quality of water than the user is otherwise entitled under the contracts.  It simply means the Bureau cannot reduce that user's contractual allotment of water to supply water for uses outside the area of origin, absent some other legal basis for doing so that trumps § 11460.

136 Cal.App.4th at 758 (emphasis added).

There are at least three reasons why Plaintiff's reliance on this dicta is misplaced.

<u>First</u>, the operation and effect of the Bureau's federal water service CVP contracts was not an issue presented for nor necessary to *SWRCB Cases'* decision.  *See United States v. Westlands Water Dist.*, 134 F. Supp. 2d 1111, 1130 (E.D.Cal. 2001) ("*Westlands*")(*citing Trent v. Valley Elec. Ass'n, Inc.*, 195 F.3d 534, 537 (9th Cir. 1999) (interpreting prior panel's statement as

1   dicta and therefore not binding under the law of the case

2   doctrine)).[9]

3       **Second**, no comprehensive analysis or in-depth scrutiny was

4   applied to federal CVP water Renewal Contract rights under

5   Conditions of Shortage.  The portion of the cited law review

6   article quoted in the *SWRCB Cases* decision was exclusively

7   confined to state SWP contracts, not federal CVP contracts, and

8   addressed obligations and actions of the DWR, not the Bureau.  AR

9   at 5169-71.

10      The *SWRCB Cases* dicta offered a strong caveat regarding CVP

11  contracts: "[T]his does not mean a user within the area of origin

12  can compel the Bureau to deliver a greater quantity of water than

13  the user is otherwise entitled [to] under the contract." *SWRCB*

14

---

15      [9] Notwithstanding that this language has nothing to do with
16  the holding, Plaintiff urges its acceptance, citing *United States
    v. Johnson*, 256 F3d 895, 914 (9th Cir. 2001) (en banc) ("Where a
17  panel confronts an issue germane to eventual resolution of the
    case, and resolves it after reasoned consideration in a published
18  opinion, that decision becomes the law of the circuit (i.e., it
    is precedential) regardless of whether the decision was necessary
19  in some strict logical sense.").  That the Ninth Circuit has a
    unique view of the force of dicta, does not apply to the
20  jurisprudential effect of state court dicta.  Further, the *SWRCB
    Cases'* decision does not meet the *Johnson* standard.  The decision
21  did not consider key elements required to make a determination
    whether a federal CVP contractor can assert an area of origin
22  priority over the Bureau and other CVP contracts.  The *SWRCB
    Cases* court only poses the rhetorical question "why not?". In a
23  decision subsequent to *Johnson*, *Cetacean Community v. Bush*, 386
24  F.3d 1169, 1173 (9th Cir. 2004), the Ninth Circuit clarified that
    "rhetorical flourishes" are not precedential.  *See also Camreta
25  v. Greene*, 131 S. Ct. 2020, 2045 (2011) ("Judicial observations
26  made in the course of explaining a case might give important
    instruction and be relevant. . . But as dicta those remarks would
27  not establish law and would not qualify as binding precedent.").
28

51

1  *Cases*, 136 Cal. App. 4th at 758.  As the following discussion

2  explicates, the § 12 shortage provisions of Plaintiff's CVP

3  contracts gave no preference to Plaintiff or its Members in times

4  of shortage despite multiple requests for such priority.  The

5  Bureau remains subject to its contractual duty to reduce the

6  remaining CVP water to be allocated ratably among all federal

7  water service contractors in accordance with the terms of their

8  CVP Renewal Contracts.

9      <u>Third</u>, Plaintiff's interpretation and proposed application

10  of § 11460 to CVP water service contracts would bring the state

11  law, § 11460, into direct conflict with two express federal

12  Reclamation law Congressional directives.  *S. Delta Water Agency*,

13  767 F.2d at 537-41.  Under Reclamation law, the Bureau must renew

14  CVP contracts on terms "mutually agreeable to the parties."  43

15  U.S.C. § 485h-1(1).  The record of contract negotiations and the

16  express terms of Plaintiff's Renewal Contracts unequivocally

17  prove that the Bureau did not agree to include any term to grant

18  a priority allocation of CVP water to TCCA Members based on area

19  of origin priority.  TCCA and its Members were not compelled to

20  sign contracts that were not mutually agreeable.  The CVPIA

21  directed the Secretary of the Interior to "renew" existing CVP

22  water contracts.  CVPIA § 3404(c).  Plaintiff's interpretation of

23  § 11460 would grant them new, different and more favorable

24  contract terms that have never been included in Plaintiff's and

25  its Members' CVP contracts.  Such an interpretation and action

26  bring § 11460 into conflict with federal law governing CVP

27  contracts.

28

1    TCCA's proposed interpretation of Section 11460 also

2    conflicts with § 4 of the 1950 Act's directive that the CVP be

3    "coordinated and integrated" for the widest possible benefit to

4    the entire Central Valley.

5        The *SWRCB Cases* provide no binding or persuasive precedent.

6    The decision is distinguishable, and is not controlling in a

7    federal court faced with different issues of fact and law.

8

9        **6.    Plaintiff's Interpretation of Section 11460 Conflicts
              With The Congressional Directive of the 1950 Act.**

10

11       In 1951, the California State Legislature expressly applied

12   § 11460 to the Bureau via CWC § 11128.   Under Section 8 of the

13   1902 Reclamation Act, federal reclamation projects must be

14   operated in accordance with state water law, when not

15   inconsistent with congressional directives.   *California*, 438 U.S.

16   at 674.[10]   "[T]he federal statute [is examined] as a whole to

17   determine . . . whether, in light of the federal statute's

18   purpose and intended effects, state law poses an obstacle to the

19   accomplishment of Congress's objectives."

20       TCCA contends that Section 11460 is consistent with the 1950

21   Act, citing *Trinity Country v. Andrus*, 438 F. Supp. 1368, 1386 n.

22   10 (E.D. Cal. 1977).  Footnote 10 states:

23

24       [10] Here, the SWRCB's interpretation of Section 11460 is
25   directly aligned with the Bureau's, reflecting "the 'cooperative
     federalism' which the [1902 Reclamation] Act embodie[s] in § 8.'"
26   *California*, 438 U.S. at 648.   It is TCCA and its Members'
     interpretation of Section 11460 that brings the state law into
27   conflict with the Congressional purpose prescribed by Section 4
28   of the 1950 Act.

A few statutes authorizing the construction of CVP units have specifically directed the Secretary to give priority to the needs of the area of origin. 43 U.S.C. § 616eee (Auburn-Folsom South Unit); River and Harbor Act of 1962, Pub.L.No.87-874, § 203, 76 Stat. 1173, 1191 (New Melones Project).

Congress knows how to and in the New Melones Unit Act created an express priority for the Stanislaus River Basin.   76 Stat. at 1191.   TCCA's interpretation of Section 11460 is inconsistent with Congress' express mandate the Bureau operate the CVP for the widest possible benefit.   The allocation priority here sought, unlike the New Melones Act, is not based on the 1950 Act or any other express provision of reclamation law.

The *Trinity County* case footnote also cites the Auburn Act-Folsom, authorizing the Auburn-Folsom South unit of the CVP. That Act includes a similar operational directive provision to the 1950 Act, § 4.   *See* Pub. L. No. 89-161, 79 Stat. 615-618, § 2 (1965) ("the operation of the Auburn-Folsom South unit, American River division, shall be integrated and coordinated, from both a financial and an operational standpoint, with the operation of other features of the Central Valley project. . . in such a manner as will effectuate the fullest, most beneficial, and most economic utilization of the water resources.") *Trinity County* found that Section 11460 is consistent with the Folsom-Auburn Act.   This finding, however, lends no support to the claim that Plaintiff's interpretation of Section 11460 is consistent with Congressional directives relating to the operation of the CVP. TCCA ignores a critical aspect of point about *Trinity County*[11]

---

[11] TCCA also cites *S. Delta Water Agency*, 767 F.2d at 536-539. The same analytical void applies. *S. Delta Water Agency*

1  that considered Section 11460 as it has historically been
2  applied, *not* as TCCA seeks to have the statute applied.  No
3  federal court has ever held that any "area of origin" contractor
4  enjoys a "prior right" to previously stored and appropriated CVP
5  water.  As it has been consistently administered, Section 11460
6  complies with congressional directives because the section has
7  never been applied to dictate how the Bureau *allocates* CVP water
8  under its water service contracts.

9      TCCA's construction of the statute would handcuff the
10  Bureau's discretionary allocation of Project water in its
11  administration of water service contracts and do so in a manner
12  violative of congressional intent.  The 1950 Act does not create
13  an allocation priority for area of origin CVP contractors.
14  Instead, the Act directs that the CVP be "coordinated and
15  integrated" in a way that utilizes the "land and water resources"
16  of the Central Valley for "the widest possible benefit."  1950
17  Act, § 4.  A piecemeal operation of the CVP that does not strive
18  for and achieve this highest use of both land and water resources
19  throughout the entire CVP, is inconsistent with Section 4.  The
20  CVP is not intended to commit the water resources of one part of
21  the Central Valley to the detriment of another part of the
22  Central Valley.

23
24  C.    CONCLUSION RE: STATUTES.

25      Congress has never created an allocation preference for CVP
26  water contractors in an area of origin.  It is not the role of a

27
28  considered Section 11460 as it has historically been applied, not
    as TCCA seeks to have the statute applied.

trial court to grant Plaintiff relief that Congress and its
delegee, the Bureau, have continuously refused to provide.
*Schweiker v. Chillicky*, 487 U.S. 412, 429 (1988) (courts should
defer to Congress' judgment because "Congress is the body charged
with making the inevitable compromises required in the design of
a massive and complex . . . program.") Plaintiff's demand under §
11460 is in material contravention to the express intent of
Congress, and would turn the world of federal CVP water
contracting on its head.

D.    INTERPRETATION OF LONG-TERM CVP WATER SERVICE CONTRACTS.

        TCCA's claim is premised on a showing that the Bureau had no
authority to allocate water as it did.   Alternatively, TCCA
alleges the Bureau acted arbitrarily, capriciously, or contrary
to law in exercising its contracting authority and in performing
TCCA's water service contracts.   Defendant Intervenors respond:

        1.) The express terms of the TCCA Renewal Contracts
specifically authorized Reclamation to declare conditions of
shortage and to apportion CVP water in times of shortage.

        2.)   At the time Plaintiffs executed their TCCA Renewal
Contracts, TCCA Members understood exactly how Article 12 would
apply and had been applied to limit their CVP water deliveries in
times of declared shortage.

        3.)   The Bureau has statutory and contractual discretion to
apportion CVP water pro-rata to TCCA Members and all other non-
priority CVP water contractors during declared Conditions of
Shortage.

4.)   The *post hoc* interpretation of the Contract terms by TCCA is entitled to no weight, as it violates the Bureau's and TCCA's express mutual understanding of the meaning of and their agreement to the shortage provisions at the time they contracted based on almost forty years of contracting history, and because TCCA's interpretations are incorrect as a matter of law.

1.   <u>FEDERAL CONTRACT LAW.</u>

Federal law governs the interpretation of a contract if the United States is a party, especially federal reclamation contracts. See *Mojave Valley Irrigation & Drainage Dist. v. Norton*, 244 F.3d 1164, 1165 (9th Cir. 2001) (citing cases); *see also Westlands*, 134 F. Supp. 2d at 1135 (applying federal law to interpret Westlands' 1963 water-service contract) (*citing Klamath Water Users Protective Ass'n v. Patterson*, 204 F.3d 1206, 1210 (9th Cir. 1999) (*citing O'Neill*, 50 F.3d at 682)). For guidance, federal courts also follow general principles of contract interpretation. *See Westlands*, 134 F. Supp. 2d at 1135 (*citing Saavedra v. Donovan*, 700 F.2d 496, 498 (9th Cir. 1983) (*citing United States v. Seckinger*, 397 U.S. 203, 209-11 (1970))).

The plain language within the four corners of the contract must first be examined to determine the mutual intent of the contracting parties.  *See, e.g., United States v. Clark*, 218 F.3d 1092, 1096 (9th Cir. 2000) ("Following traditional rules of contract interpretation, we must examine the plain language of the term in the context of the document as a whole.") (quoting sources).  In "cases of contracts, language is to be given, if possible, its usual and ordinary meaning.  The object is to find

57

out from the words used what the parties intended to do." *Fla. Cent. R.R. Co. v. Schutte*, 103 U.S. (Mem.) 118, 140, 13 Otto 118, 26 L.Ed. 327 (1880).  "A written contract must be read as a whole and every part interpreted with reference to the whole, with preference given to reasonable interpretations." *Klamath*, 204 F.3d at 1210.  "[C]ourts should attempt to construe contracts to avoid absurdity, and must reject interpretations which would make the contract unusual, extraordinary, harsh, unjust, or inequitable." *Blecher & Collins, P.C. v. N.W. Airlines, Inc.*, 858 F. Supp. 1442, 1459 (C.D. Cal. 1994) (citing sources).

"In fashioning federal rules, guidance is gained from general principles for interpreting contracts." *Saavedra,* 700 F.2d at 498 (*citing United States v. Seckinger*, 397 U.S. 203, 209-11 (1970)).[12]  The Uniform Commercial Code ("U.C.C.") is one source of federal common law used to interpret any contract to which the federal government is a party.  *See O'Neill*, 50 F.3d at 684 (applying the U.C.C. to the disputed contracts).  "[T]he backdrop of the legislative scheme that authorized" a government contract may also be examined to interpret that contract. *Peterson v. U.S. Dept. of Interior*, 899 F.2d at 799, 807 (*citing Fed. Hous. Admin. v. Darlington, Inc.*, 358 U.S. 84, 87-88 (1958)).  Additional contract interpretation rules apply:

[12] Sources of federal common law include: (1) the Restatement of Contracts (2d); (2) the U.C.C.; (3) federal caselaw; and (4) state law.  *Westlands*, 134 F. Supp. 2d at 1134 (citing Robert E. Jones, Gerald E. Rosen, William E. Wegner, and Jeffrey Scott, Federal Civil Trials and Evidence ¶ 8:4455 (2000) (citing cases)).

(1) the four corners of the contract must be read as a whole;

(2) preference is given to reasonable interpretations, favoring those that avoid internal conflict;

(3) under the U.C.C., extrinsic evidence, including usage of trade;[13] course of dealing[14]; and course of performance[15], is admissible to determine whether the contract is ambiguous;

(4) if the contract is ambiguous, i.e., whether "reasonable people could find its terms susceptible to more than one interpretation," extrinsic evidence may be considered to interpret the parties' intent in light of earlier negotiations, later conduct, related agreements, and industry-wide custom;

(5) whether a contract (or any term) is ambiguous is a question of law.

*See Westlands*, 134 F. Supp. 2d at 1134-38 (quoting and citing cases).

---

[13] Under U.C.C. § 1-205(2) usage of trade is:
any practice or method of dealing having such regularity of observance in a place, vocation or trade as to justify an expectation that it will be observed with respect to the transaction in question. The existence and scope of such a usage are to be proved as facts.

[14] Under U.C.C. § 1-205(1) a course of dealing is:
a sequence of previous conduct between the parties to a particular transaction which is fairly to be regarded as establishing a common basis of understanding for interpreting their expressions and other conduct.

[15] "Where the contract for sale involves repeated occasions for performance by either party with knowledge of the nature of the performance and opportunity for objection to it by the other, any course of performance accepted or acquiesced in without objection shall be relevant to determine the meaning of the agreement." U.C.C. § 2-208.

59

### 2. STANDARDS RE: THE BUREAU'S STATUTORY DISCRETION TO APPORTION CVP WATER IN TIMES OF SHORTAGE.

The Bureau, "has contractual authority and administrative discretion over how it provides water service among the CVP's water and power-users, and how it picks its priorities among them." *Westlands 2001*, 153 F. Supp. 2d at 1144. The Bureau is expressly empowered to allocate CVP water under the shortage provisions in its various CVP Contracts. *Westlands Water Dist. v. Bureau of Reclamation*, 805 F. Supp. 1503, 1513 (E.D. Cal. 1992) ("*Westlands 1992*"). In *Westlands 1992*, the court found the plain language of similar water shortage provisions: "Vest[ed] conclusive authority to apportion the entire . . . Unit water supply in the Contracting Officers of the Bureau." *Id.* at 1512. The Bureau "had the prerogative to exercise its allocation powers granted under the water shortage provisions in the relevant supply contracts." *Id.* at 1513; *see also, San Luis & Delta-Mendota Water Authority v. U.S. Dept. of the Interior*, 637 F. Supp. 2d 777, 795 (E.D. Cal. 2008) (recognizing discretion of Interior through the Bureau to allocate water under the CVPIA).

The same prerogative exists under Plaintiff's and its Members' Renewal CVP Contracts. The Bureau has discretion to declare Conditions of Shortage and to exercise its water allocation powers accordingly. Plaintiff's contention that the Bureau lacks discretion to allocate prorata CVP water supply by reducing deliveries under Conditions of Shortage is contrary to *Westlands 1992* and the express language of Plaintiff's CVP Renewal Contract. TCCA correctly points out that Article 12(c) does not specify that apportionment of limited Project Water

supply must be equal or pro-rata, however, that decision is allocated to the Bureau's discretion to declare water shortages and to allocate water accordingly during dry years.  The Bureau has the discretion to perform the Contracts in the manner it has historically done and in accordance with the parties' long-standing course of dealing and course of performance.  *Westlands 1992*, 805 F. Supp. at 1513.  The Bureau's "water allocation decisions are entitled to judicial deference, [if] they are neither unlawful nor unreasonable."  *Id*.

> 3.   <u>TCCA MEMBER LONG-TERM CVP CONTRACTS: SHORTAGE TERMS.</u>

Every TCCA renewal contract includes Article 12 empowering the Bureau to declare conditions of shortage and to apportion water in times of shortage.  The shortage provision states:

> (b) If there is a Condition of Shortage[16] because of errors in physical operations of the Project, drought, other physical causes beyond the control of the Contracting Officer or actions taken by the Contracting Officer to meet legal obligations then, except as provided in subdivision (a) of Article 18 of this Contract, no liability shall accrue against the United States or any of its officers, agents, or employees for any damage, direct or indirect, arising therefrom.
>
> (c) In any Year in which there may occur a shortage for any of the reasons specified in subdivision (b) above, the Contracting Officer shall apportion the available Project Water supply among the Contractor and others entitled, under existing contracts and future contracts (to the extent such future contracts are permitted under subsections (a) and (b) of Section 3404 of the CVPIA) and renewals thereof to receive Project Water consistent with the contractual obligations of the United States.

---

[16] Article 1(c) defines condition of shortage as: "A condition respecting the Project during any Year such that the Contracting Officer is unable to deliver sufficient water to meet the Contract Total."

1
2
        (d) Project Water furnished under this Contract will be
        allocated in accordance with the then-existing Project M&I
        Water Shortage Policy.

3
        Renewal Contract, Article 16 (b), (c), (d).

4       The present CVP M&I Water Shortage Policy generally

5  allocates project water between divisions on a pro rata basis,

6  except when "specific operational constraints on Reclamation

7  require otherwise."  SAR at 853, M&I Water Shortage Policy at 1.

8

9           a.   Discretionary Interpretive Authority in Renewal
                 Contract Shortage Provisions.

10
11      TCCA Renewal Contract Article 12 grants the Bureau authority

   to determine when Conditions of Shortage occur and to ratably
12
   apportion CVP water during those times.  AR at 3073-74.  Article
13
14 12 defines "Condition of Shortage" as "a condition respecting the

   Project during any Year such that the Contracting Officer is
15
16 unable to deliver sufficient water to meet the Contract Total."

17 SAR at 3049.  Article 12(b) provides that a "Condition of

   Shortage may occur "because of errors in physical operations of
18
19 the Project, drought, or other physical causes beyond the control

   of the Contracting Officer or actions taken by the Contracting
20
21 Officer to meet legal obligations."  AR at 3073.  The Contracting

   Officer must notify contractors when it determines that a
22
23 Condition of Shortage is probable, and no liability shall accrue

   against the United States for any damage from a Condition of
24
   Shortage.  Renewal Contract, Article 12(a); 12(c).  The language
25
26 of Article 12 grants the Bureau unqualified ability to determine

   when a Condition of Shortage exists under any CVP water service
27
   contract, absent language expressly limiting such discretion.
28

When the Bureau determines a Condition of Shortage exists, Article 12(c) directs that "the Contracting Officer shall apportion the available Project Water[17] supply among the Contractor and others entitled . . . to receive Project Water consistent with the contractual obligations of the United States."  None of the statutes authorizing the Project provide for area of origin priority nor does Plaintiff TCCA or its Members - with the possible exception of Tehama-Colusa Canal Company - hold priority water rights acquired pursuant to California law.[18]  The contractually required apportionment by the Contracting Officer, for the Bureau, calls for Project Water supply to be allocated among the Contractor and other CVP Contractors.

Further authority is granted to the Bureau during a declared shortage to apportion water among all CVP Contractors, within and outside the areas of origin under 12(d): "Project Water furnished under [each Renewal Contract] will be allocated in accordance with then-existing Project M&I Water Shortage Policy."  AR at

---

[17] Contract Article 1(u) defines "Project Water" as "all water that is developed, diverted, stored and delivered by the Secretary in accordance with the statutes authorizing the Project and in accordance with the terms and conditions of water rights acquired pursuant to California law."  SAR at 3052.

[18] The Plaintiffs' Contracts do not define the term "apportion."  Apportion is defined in common usage as "to divide and assign in proportion."  Webster's Third New Int'l Dictionary 105 (2002).

1  3074.[19]   The M&I Policy "define(s) water shortage terms and

2  conditions applicable to *all* CVP M&I contractors."   SAR at 853

3  (emphasis added).   The M&I Policy requires the Bureau to allocate

4  to non-priority contractors a reduction in 5% increments until

5  75% of their contractual supply is reached, then, "(W)hen

6  allocation of irrigation water has been reduced below 75% and

7  still further water supply reductions are necessary, both the M&I

8  irrigation allocations will be reduced by the same percentage

9  increment."   SAR at 855-56.   The M&I Policy makes no distinction

10  between north-of-Delta and south-of-Delta water contractors.   Nor

11  does the M&I Policy distinguish between area of origin and non-

12  area of origin contractors.   Article (d) operates to require the

13  Bureau to allocate CVP water supply among all CVP contractors in

14  times of Condition of Shortage.

15
16
> b.   The Renewal Contract's Shortage Provisions Are Not
>       a Limitation on the Bureau's Discretion to
>       Apportion Contract Water.

17
18  Plaintiff advances multiple arguments related to the Renewal

19  Contracts Condition of Shortage term: 1) a "Condition of

    Shortage" cannot exist if water supply is provided to south-of-
20
    Delta contractors; 2) other CVP water service contracts in other
21
    CVP divisions do not create a "legal obligation" under Article
22
    12(b); 3) the meaning of the term "others entitled" does not
23
    apply to contractors holding non-area of origin CVP contracts;
24
    and 4) Section 11460 is a legal obligation under Article 12(b) to
25

26      [19] The draft M&I Water Shortage Policy dated September 11,
27  2001, governed the Bureau's water allocation to Plaintiffs during
    declared Conditions of Shortage in 2008 and 2009.   SAR at 843-57.
28

deliver all contract water to TCCA's Members before exporting to other non-area of origin CVP contractors.

Plaintiff's first argument is addressed in part by the contract definition that a "Condition of Shortage" is specifically defined as "a condition respecting the Project." AR at 2841. "Project refers to the entire Central Valley Project "owned by the United States and managed by the Department of the Interior, Bureau of Reclamation." AR at 2843. When the Bureau is unable to deliver sufficient CVP water to all CVP water service contractors, after calculating their contract requirements in the aggregate, a Condition of Shortage respecting the Project exists. The Bureau has interpreted the shortage provision to, in its discretion, require that "the remaining supply has to be apportioned among all CVP Contractors pursuant to Article 12(c), which could further reduce the amount of water available to all CVP Contractors." AR at 1591. No other non-priority CVP Contractors receive 100%, rather, all share in a reduced allocation of the available CVP supply. This interpretation is reasonable, fair and equitable, and is consistent with Congress' directive that the Bureau operate the CVP "in such manner as will effectuate the fullest and most economic utilization of the land and water resources of the Central Valley of California for the widest possible public benefit." Federal Act of 1950, § 4.

Second, Plaintiff argues that other CVP water service contracts in other CVP divisions do not create a "legal obligation" under Article 12(b) that constitutes a Condition of

Shortage.   There is no evidence the Bureau considered the existence of additional CVP contracts as causing shortage, as it cited <u>drought</u> as the justification for a declaring Condition of Shortage in both 2008 and 2009.   The existence of multiple CVP contractors is not a shortage-causing condition.

Third, Plaintiff contends that the meaning of the term "others entitled" under Article 12(c) does not to apply contractors not in the area of origin.  This view is discredited by Article 12(c)'s language that those holding "existing and future contracts" are entitled to CVP water without regard to their geographic location.  The apportionment of the available Project water supply under Article 12(c) is to those "entitled under existing contracts and future contracts . . . to receive Project Water . . . ."  No reference to geographic location is provided for any contractor.  Geographic location is not a qualifying condition to full water service.  TCCA ignores that although the Renewal Contracts did not define the term "others entitled," the Bureau, in its discretion, has historically and consistently maintained that "others entitled" means all other CVP Contractors.  AR at 4590 (1990 letter from the Bureau to TCCA Member Districts); AR at 4950 (1999 Bureau letter to CVP Contractors); AR at 4904 (1994 Bureau letter to CVP Contractors); SAR at 1154-56 (1996 Draft Paper on Applicability of Area of Origin Statutes).  The Bureau has without exception, allocated water pursuant to similar language in the original and the interim TCCA Contracts, pro-rata among contractors without differentiating the amounts of reduction.  TCCA has acknowledged

the Bureau's consistent pro rata allocations.  SAR at 977; SAR at 865; AR at 1596 (A March 12, 2000 letter from TCCA stating "Reclamation has asserted the same position [concerning area of origin protection] . . . in the long-term water service contract renewal negotiations completed in 2005").

Plaintiff cites *Westlands 2001* to support its final argument that "'available' Project Water, subject to allocation to export contractors under their own versions of Article 12(c), cannot include water needed to serve the 'prior right' [under Section 11460] held by TCCA contractors."  *Westlands 2001* is factually distinguishable.  In *Westlands 2001*, Exchange Contractors held senior riparian and pre-1914 appropriative rights, recognized by the SWRCB under prior permits and those senior rights were expressly identified and reserved in the Exchange Contractors' CVP water service contracts.  In this case, Section 11460 creates no water allocation priority for CVP contractors in the area of origin and the TCCA Renewal Contracts have no express or implied reservation of priority to CVP water based on area of origin "right" to TCCA Members or any other legal priority of any kind or nature.  No court has ever held that any "area of origin" contractor enjoys a "prior right" to CVP water that originates in an area of origin.

The Bureau is, however, under a legal obligation to "use all reasonable means to guard against a Condition of Shortage in the quantity of water to be made available to the Contractor."  AR at 3073, Renewal Contract, Article 12(a); AR at 2308. The Bureau is under a legal mandate to optimize deliveries for all CVP

1  Contractors.  AR at 3072, Article 11(a); AR at 2307.  Each CVP

2  Water Service Contractor is entitled to a "stated share or

3  quantity of the Project's available water supply."  43 U.S.C.

4  § 485h-1(4).  The Bureau has historically met this obligation in

5  operating the CVP by apportioning CVP water supplies to

6  Contractors in all Divisions of the CVP in times of shortage.

7      Plaintiff ignores and refuses to acknowledge that since the

8  inception of the CVP and through the manifestly significant

9  amendments to add non-water service priorities through the CVPIA,

10  the Bureau has never recognized it is under any legal obligation

11  to observe any area of origin "priority"; has never reduced CVP

12  water deliveries on the basis of any area of origin legal

13  obligations to Sacramento Valley CVP contractors; and has

14  continuously and consistently refused to accept such an

15  interpretation of Plaintiff's water service contracts; nor has it

16  recognized any area of origin priority which would conflict with

17  the federal CVP's legal purposes and mandate that the Bureau

18  operate the CVP in such manner to effectuate the fullest and most

19  economic utilization of the land and water resources of the

20  Central Valley of California for the widest possible public

21  benefit.[20]  The Bureau's contractual interpretation and its

22  performance and Plaintiffs' performance under prior and existing

23  TCCA Renewal CVP Water Service Contracts comply with federal and

24  state law and are not arbitrary or capricious.  *Central Arizona*

25  *Irrigation & Drainage Dist. v. Lujan*, 764 F. Supp. 582, 590 (D.

26  _____

27      [20] No CVP contract now includes and has never included any
   contract provision that identifies a "legal obligation" under

28  § 11460.

68

1  Az. 1991) (inclusion of term and Bureau water service contract
2  not capricious because the "administrative record is replete with
3  correspondence between all of the affected parties and the Bureau
4  of Reclamation").

5      Plaintiff's interpretation is contrary to and would
6  improperly restrain and limit the Bureau's contractual authority
7  and discretion to allocate the CVP water supply.

8             c.   Article 18(a) in Not a Limitation on the Bureau's
9                  Discretion to Apportion Contract Water.

10      Plaintiff contends that Article 18(a) limits the shortage
11  provisions to favor Plaintiff or its Members.  However, Article
12  18(a) only reserves the right of the Bureau and the Contractor to
13  challenge in court any action TCCA either believes is "predicated
14  upon arbitrary, capricious, or unreasonable opinions or
15  determinations."  This provision says nothing about water
16  allocation.  Contract Article 12(c) specifically limits the
17  amount of CVP water any contractor is entitled to Contracting
18  Officer's exercise of discretion in allocating CVP water among
19  CVP contractors.  AR at 1590.  No language in the shortage
20  provisions or anywhere else in Plaintiff's or its Members'
21  contracts specify any entitlement to full contract deliveries
22  during a Condition of Shortage.[21]

23  _____

24      [21] There is, however, proof in the Renewal Contracts that
    Plaintiff and its Member knew how to reserve a disputed issue.
25  Article 7(n) is an express reservation regarding "Rates for M&I
    Water" that was in dispute between the parties at the time of
26  contracting.  Article 7(n) states in relevant part:

27
        Contractor asserts that it is not legally obligated to repay
28      any Project deficits claimed by the United States to have

69

d. **Article 3 and 1(u) Are Not a Limitation on the Bureau's Discretion to Apportion Contract Water.**

Plaintiff argues that Article 3 and 1(u) of its Members' contracts incorporate state law, including § 11460. Articles 3 and 1(u) recognize that § 11460 applies to the Bureau through the terms of the Bureau's water rights permits, limiting the Bureau's ability to divert natural flow water for export rather than mandating preferential allocation of CVP water. The National Environmental Policy Act ("NEPA") review for these contracts was based on that understanding. SAR at 130-3, Finding of No Significant Impact at Findings 1, 3 & 4. Plaintiff again cites the *SWRCB Cases* decision and D-990, which authorized the Bureau's CVP water permits. Term 22 of the Bureau's permits effectuating § 11460 does not direct the Bureau to recognize a priority in area of origin contractors; rather, it affords protection to state permitted appropriators of water within an area of origin, not federal water contractors. D-990 at 73, 85, AR at 5536, 5548. Consistent with approximately forty years of contracting with Plaintiff, § 11460 at most imposes limits on the Bureau's

accrued as of the date of the Contract. . . [T]he Contractor does not waive any legal rights or remedies that it may have with respect to such issues. Notwithstanding execution of this Contract. . . the Contractor may challenge in the appropriate administrative or judicial forums [regarding] [] the existence, computation, or imposition of any such deficit. . .

AR at 2699.

No such express reservation exists as to Plaintiff's interpretation of Section 11460, despite decades of dispute on the issue.

70

ability to divert natural flow in the area for export use.  It does not require a preferential allocation to Plaintiff or its Members of CVP water.

       **4.   CONTRACT NEGOTIATION AND PERFORMANCE.**

Plaintiff and its Members had express notice and knowledge of the Bureau's historical and continuous interpretation of Article 12 and the Bureau's actual past and intended performance under its CVP Water Service Contracts.  *See Kemmis v. McGoldrick*, 767 F.2d 594, 597 (9th Cir. 1985) (ambiguous contract provisions are interpreted based on parties' intent at the time contracts are executed).  Plaintiff admits that "Reclamation has reduced water deliveries under the Water Service Contracts north-of-Delta, including deliveries to TCCA Members, in ten of the past 33 contract years, the period from 1976 through 2009." (Complaint at 7:17-19).  The course of dealing and performance between Plaintiff and the Bureau proves the Bureau has always reduced water deliveries to Plaintiff's Members and applied Article 12's mandated CVP-wide apportionment reduction in years when "Reclamation delivered some quantity of CVP water to south-of-Delta contractors" under declared Conditions of Shortage.  SAR at 3177-80.

Uncontradicted substantial evidence of the history of the CVP establishes that TCCA recognized, understood, and disputed the Bureau's long standing consistent application of Article 12, including the Bureau's expressed disavowal of any intent to recognize, coupled with its actual non-recognition of area of origin preference in TCCA and its Members, in the present renewal

and under prior CVP contracts.   SAR at 977; 1154-56; 1308; 1317.
TCCA has on more than two occasions formally disputed the
Bureau's interpretation of the Article 12 shortage conditions and
has unsuccessfully sought to include area of origin priority in
their CVP Water Service Contracts, which the Bureau consistently
denied.

The historic practice of the Bureau during shortages has
been to, without exception, reduce CPV water deliveries to TCCA
and its Members to effect pro rata apportionment of CVP water to
all north-and south-of-Delta CVP Water Service Contractors.
TCCA's proffered interpretation of Article 12 is manifestly
different from the express understanding of the parties at the
time of contract formation that, pro-rata allocations and water
reductions were required of all contractors under Conditions of
Shortage.   Plaintiff now asserts for the first time in any
federal judicial proceeding that contract Article 12 is illegal
because the shortage provisions of Article 12 are wholly
inconsistent with the requirement that the Bureau apply § 11460
to those Contracts.   It is indisputable that when the latest
Renewal Contracts were executed, Plaintiff and its Members
possessed actual knowledge that a dispute over the area of origin
priority existed and that the Bureau had never acquiesced and did
not agree to Plaintiff's interpretation.   The Bureau notified a
TCCA Member in 1990:

> Reclamation has reviewed the appropriate statute and has
> concluded that the Contract . . . between Reclamation and
> your District satisfies any obligation Reclamation might
> have under the California Water Code to provide water for
> the 'area of origin.'   The District has agreed to the terms

1
2
3
4

> and conditions of that Contract.  So, the imposition of shortages on the District, in accordance with that Contract as a result of drought conditions, does not give the District the right to claim water in addition to the amount provided for in that Contract.  <u>Users of CVP water are sharing in the shortage of water from the CVP</u>.

5
6
7
8
9
10
11
12
13
14
15

AR at 4590 (May 27, 1990 Letter from the Bureau to Orland-Artois Water District) (emphasis added).  In 1994 the Bureau issued a November 2nd, Area of Origin Issue Paper, SAR at 1317, which stated the Bureau's position that Section 11460 is "directed toward obtaining prior water rights, not obtaining deliveries of water under the Project's rights."  In 1996 another Bureau draft report addressed applicability of area of origin statutes to the CVP, confirming that area of origin statutes in California water law "do not guarantee that the water supply needs of an entire area of origin, will or can be met."  SAR at 1154:

16
17
18
19
20
21
22

> Under these statutes, water rights applicants within the area of origin are essentially guaranteed that new water right applications filed for the development of water within the area of origin, will not be rejected by the [Board] on the basis that no water is available for appropriation by virtue of a senior water right to export the water from the water shed.  While the area of origin statutes may result in future reductions in the quantities of CVP water that can be delivered to CVP export customers, the area of origin provisions do not become part of a contract for the delivery of water; they are part of the water rights on which the contract is based and subject that right to appropriations by users within the area of origin.

23
24
25
26
27
28

The Bureau found: "Area of origin statutes . . . do not establish any priority to the allocation of CVP contract water or CVP water used for implementation of the [CVPIA]."  SAR at 1156.  Many contractors responded to the draft report.  *See, e.g.*, SAR at 1105-06; SAR at 1107-11; SAR at 1125-32; SAR at 1133; SAR at

73

1134-37; SAR at 1138-40; SAR at 1150-53.  TCCA then acknowledged
that "[T]he Bureau's conclusions come as no surprise, as this is
a restatement of positions they [sic] have articulated on
numerous occasions in the past."  SAR at 1141 (emphasis added).
In 2000, the Bureau again stated: "Area of origin/county of
origin statutes do not give any CVP user a priority over any
other CVP user regarding water service provided by CVP contracts
. . . this is also the position of the State Water Resources
Control Board . . . ."  SAR at 977.

     The Bureau consistently rejected requests that an area of
origin provision be included in north-of-Delta CVP contracts.
SAR at 1317; 1308, *see also*, SAR at 3238.  TCCA proposed draft
contract language precluding water reductions to TCCA Members
"unless and until reductions have also been imposed in irrigation
users receiving water from the integrated CVP water supply who
are outside the Sacramento River watershed."  TCCA contractors
requested area of origin transfer provisions and increased CVP
contract water allocations based on alleged area of origin
protections.  SAR at 1004-7 (request for area of origin transfer
provisions); SAR at 1021-24 (request for water quantity
increase); SAR at 1000-1 (same); SAR at 831 (same).  Both
proposed interim TCCA contracts included a similar area of origin
transfer provision SAR at 1308) as did the TCCA Renewal Contracts
AR at 307-71.  The Bureau did not adopt contract terms to
increase contract quantities or afford protection against
shortages.  AR at 3056 (same contract amounts in interim and
renewal contracts) Plaintiff and all TCCA Members signed their

CVP Renewal Contracts with full knowledge of the Bureau's contracting position.

At the time the most recent long-term TCCA Renewal Contracts were executed, shortages had been implemented in at least five prior years and continued to be implemented in the same manner, providing TCCA and its members express notice and actual knowledge of the Bureau's consistent continuing performance of the shortage conditions and pro-rata reduction of TCCA CVP water deliveries during shortages without recognition of area of origin priority.  The Bureau is authorized under its state water permits issued by the SWRCB to manage and deliver water under Federal CVP water service contracts without recognizing the priority TCCA seeks; has done so for almost the past 40 years; and TCCA has not taken any judicial action to have its Federal water service contract rights otherwise established.

     5.   <u>CONCLUSION RE: INTERPRETATION OF THE CONTRACT RENEWAL TERMS.</u>

Fatal to plaintiffs' interpretation of its CVP contracts is the total absence of any language granting an area of origin preference, or that limits or abrogates the Article 12 allocation mandate which binds the Bureau and its Contracting Officer.  A Court "cannot under the guise of construction, add words to a contract, which would impermissibly re-write that contract." *Westlands 2001*, 153 F. Supp. 2d at 1162.  Plaintiff's water service contract is devoid of any language that limits "available Project Water" by the existence or operation of any area of origin statute, nor does the language suggest that 'others

entitled' is limited solely to area of origin users."  Contract
Article 12 contains no reference to "area of origin," Section
§ 11640, or any preference or priority of any kind in favor of
Plaintiff.[22]  The Bureau has performed Plaintiff's water service
Contracts and other third category water service contractors'
contracts precisely in accordance with the plain language of
Article 12, in 2008 and 2009 and in prior years under similar
shortage provisions.

In the two disputed shortage years, 2008 and 2009, the
Contracting Officer declared a Condition of Shortage when it was
determined inadequate CVP water supplies existed to deliver full
contract allocations to all CVP contractors.  AR at 2128-30.  The
Bureau cited drought as the basis for the Conditions of Shortage
pursuant to Article 12(b).  *See* AR at 2091 (referencing
"critically dry period").  The Bureau ratably reduced CVP water
deliveries among all CVP Water Service Contractors to honor the
terms and conditions of all CVP Water Service Contracts.

6.  **EFFECT OF TCCA RENEWAL CONTRACT VALIDATION.**

After they executed their most recent Renewal Contracts,
TCCA and its Members invoked the procedures under Cal. Code Civ.
Proc. § 860 *et seq.*, to obtain validation judgments that each of
their Renewal CVP Water Service Contracts is valid and
enforceable.  Under validation precepts, a public agency is

_____

[22] The "others entitled" language is included in CVP Water
Service Contracts throughout the divisions of the CVP although
modified to some extent on a division-by-division basis.  AR at
2309.

1  authorized to "bring an action in the Superior Court of the
2  County in which the principal office of the public agency is
3  located to determine the validity of such matters," and the
4  "action shall be in the nature of a proceeding in rem."  Such
5  validation proceedings under state law are the exclusive means by
6  which to challenge the validity of certain contracts and their
7  terms.  Cal. Code Civ. Proc. § 869: "No contest . . . of anything
8  or matter under this chapter shall be made other than within the
9  time and manner herein specified."  California law prescribes
10 that validation statutes are construed to uphold the purpose of
11 affording public agencies a prompt method for settling all
12 questions regarding the validity of their actions.  *McLeod v.*
13 *Vista Unified Sch. Dist.*, 158 Cal. App. 4th 1156, 1166 (2008).

14
15      The validation proceedings were instituted in the Superior
16 Court of California for the County of Colusa and each TCCA Member
17 sought an "order, judgment and decree approving, confirming, and
18 declaring valid and binding upon the respective parties thereto,
19 each and all provisions of the Contracts . . . ."  *See, e.g.*, SAR
20 at 30.  Each validation judgment provides: "The Contract has been
21 validly executed and each and all provisions thereof are lawful,
22 valid, enforceable and binding upon the respective parties
23 thereto."  SAR at 26-31; 34-42; 43-45; 46-59; 60-64 (judgments
24 for other TCCA Renewal Contracts)).  All Plaintiffs' validation
25 judgments became final in 2005.  Under Cal. Code Civ. Proc.
26 § 870, each validation judgment is now:

27          forever binding and conclusive, as to all matters therein
            adjudicated or which at the time could have adjudicated
28          against the agency and against all other persons, and the

judgment shall permanently enjoin the institution by any person of any action or proceeding raising issue as to which the judgment is binding or inconclusive.  All such validated contracts pursuant to the respective validation judgments do not include any area of origin priority to CVP water deliveries therein, nor does any such contract address the Bureau's ability to declare Conditions of Shortage and apportion CVP water deliveries under the terms of each Member's CVP Water Service Contract without regard to state area of origin laws all of which are foreclosed by the validated judgments.

The validation judgments are entitled to full faith and credit in the United States Courts pursuant to 28 U.S.C. § 1738, which provides:

The records and judicial proceedings of any court of any such State. . . or copies thereof, shall be proved or admitted in other courts within the United States . . . by the attestation of the clerk and seal of the court annexed, if a seal exists, together with a certificate of a judge of the court that the said attestation is in proper form.

Such Acts, records and judicial proceedings or copies thereof, so authenticated, shall have the same full faith and credit in every court within the United States. . . as they have by law or usage in the courts of such State. . . from which they are taken.

The claim for preclusive effect of a validation § 870 judgment includes matters "which have been or which could have been adjudicated in a validation action, such matters – including constitutional challenges – must be raised within the statutory limitations period (30 days from entry of judgment) in § 870 et seq., or they are waived."  *Friedland v. City of Long Beach*, 62 Cal. App. 4th 825, 846-847 (1998).  Plaintiff TCCA and its Members are categorically barred from raising any challenge to the legality, validity, and enforceability of the TCCA Renewal Contracts they signed and by which they agreed to be bound.

1    As mentioned above, the plain preclusive effect of the State
2  Court validation judgments are given effect under 28 U.S.C.
3  § 1738 because it is "settled that a federal court must give to a
4  state court judgment the same preclusive effect as would be given
5  that judgment under the law of the state in which the judgment
6  was granted." *Migra v. Warren City School Dist. Bd. of Educ.*,
7  465 U.S. 75, 81 (1984); *see Heath v. Clairy*, 708 F.2d 1376, 1379
8  (9th Cir. 1983) (relying on 28 U.S.C. § 1738) ("To determine
9  whether to give preclusive effect to a state court decision both
10 in terms of collateral estoppel and res judicata, you look to the
11 law of the state in question.")  Plaintiff and its Members are
12 bound by their conduct in judicially validating every provision
13 of their Renewal Contracts which include the Article 12 shortage
14 provisions.  These California judgments are afforded full faith
15 and credit and preclude any subsequent challenge to the validity
16 enforceability of all TCCA and its Members' Renewal Contracts.
17 These validated contacts are as a matter of law enforceable and
18 not illegal.  Plaintiff and its Members sought validation knowing
19 of this dispute and are presumed to know the legal effect and
20 consequences of their choice.  TCCA Members voluntarily validated
21 their CVP Renewal Contracts with full knowledge of the Bureau's
22 interpretation and performance of the Shortage provisions in
23 contravention of Plaintiff's and its Members' interpretation.

24 E.    THE BAR OF EQUITABLE ESTOPPEL.

25    "Equitable estoppel precludes a party from claiming the
26 benefits of a contract while simultaneously attempting to avoid
27 the burdens that contract imposes."  *Mundi v. Union Sec. Lic.*

*Ins.*, 555 F.3d 1042, 1045 (9th Cir. 2009).  Equitable estoppel also applies to alleged third party beneficiaries' rights under a contract based on equity and fairness, which prevent a litigant from "having it both ways" by claiming benefits, while denying obligations contained in the contract for the convenience of the parties seeking to avoid the effects of that parties' prior conduct.  *Omega Indus. Inc. v. Raffaele*, 894 F. Supp. 1425, 1433 (D. Nev. 1995) (equitable estoppel "stands for the basic precepts of common honesty, clear fairness and good conscience").

A party seeking to invoke the doctrine of estoppel must establish the following four elements: (1) the party to be estopped knows the facts; (2) he or she intends that his or her conduct will be acted on or must so act that the party invoking estoppel has a right to believe it is so intended; (3) the party invoking estoppel must be ignorant of the true facts; and (4) he or she must detrimentally rely on the former's conduct.  *Lehman v. United States*, 154 F.3d 1010, 1016-1017 (9th Cir. 1998).

The first element of estoppel is established because TCCA had full knowledge of all facts before they entered into the disputed long term Renewal Contracts and the Bureau had always disagreed and never recognized or granted an entitlement in TCCA members to preferential CVP water allocations during shortages. *Lehman*, 154 F.3d at 1016-1017.  Plaintiff has consistently argued and objected that it is not subject to ratable allocation when Conditions of Shortage are declared based on its alleged area of origin priority.  Plaintiff previously complained to the SWRCB that the Bureau's implementation of Plaintiff's and its Members'

Water Service Contracts violated California area of origin law
and the Bureau's state water rights permits by which it operates
the CVP.   The SWRCB rejected Plaintiff's Complaint and found no
violation of state law, explaining that Plaintiff had to apply
for an appropriative water right to gain any priority protection
afforded by the area of origin laws.   AR at 4952-56.

During negotiations for long term renewal of TCCA Water
Service Contracts, Plaintiff and its Members knew their renewed
contracts did not include and were not intended to include or
reserve any area of origin water service priority to CVP water
supplies based on the Bureau's consistent refusal to acknowledge
any such rights or priorities.   To the contrary, several of
TCCA's Members had express knowledge, based on historical
reallocations, that the Bureau intended to and would perform the
Water Service Contracts by reducing pro rata deliveries to TCCA
Members, and other CVP contractors whenever water shortages
caused by drought conditions made it impossible for the Bureau to
deliver full contract water supplies to all CVP Water Service
Contractors, whether north-or south-of-Delta.   Plaintiff and its
members knew of these burdens based on the Bureau's unwavering
interpretation of their Water Service Contracts for almost forty
years, and at the time they executed the current Renewal
Contracts, including all previous pre-TCCA Water Service
Contracts.   SAR at 977; 1154-56; 1308; 1317.

The second element of estoppel, intentionally misleading the
other party to its detriment, is said to be established through
Plaintiff's Members' negotiation and execution of the Renewal

Contracts, while not disclosing they had no intent to accept performance under the shortage provision in their contracts; rather, their true intent was to sue the Bureau to reform and/or avoid the Bureau's interpretation of Article 12 that reduced TCCA CVP water allocations in times of shortage.  Plaintiff argues that TCCA needed to renew the CVP contracts to provide a basis for suit against the Bureau.  Defendants maintain that by having the Renewal Contracts validated with the same shortage terms that historically existed under the parties' prior performance and course of dealing under such similar shortage terms, that Plaintiff and its Members have acquiesced and cannot by their performance upset the terms of their Renewal Contracts.

The third and fourth elements, whether the Bureau was ignorant of the true facts and whether the Bureau detrimentally relied on TCCA's objective manifestation of assent, are undisputed.  Plaintiff and its Members in no way disclosed that despite their express manifestation of intent by signing the contracts, without any reservation of rights, with full knowledge of the history of performance, they would sue to overturn the shortage provisions.  Federal Defendants noted at the oral hearing that an express reservation of rights was made in Article 7(n) of the contracts regarding "Rates for M&I Water," that are in dispute between the parties at the time of contracting. The provision states in relevant part:

> Contractor asserts that it is not legally obligated to repay any Project deficits claimed by the United States to have accrued as of the date of the Contract. . . [T]he Contractor does not waive any legal rights or remedies that it may have with respect to such issues. Notwithstanding execution of

this Contract. . . the Contractor may challenge in the appropriate administrative or judicial forums [regarding] [] the existence, computation, or imposition of any such deficit. . .

AR at 2699.

Plaintiff and its Members knew how to reserve a disputed issue in their Renewal Contracts, but did not do so for the area of origin dispute. This intentional omission to disclose material facts induced detrimental reliance by the Bureau resulting in execution of the TCCA Renewal Contracts which provided the basis for this lawsuit to avoid the binding effect of and the plain meaning and historical execution by performance of the shortage provisions. Defendants argue that TCCA's strategy of feigning agreement to induce the Bureau to execute the Renewal Contracts so it could then claim there was no agreement to the essential terms governing shortage is behavior equity should not countenance. *First National Bank of Portland v. Dudley*, 231 F.2d 396, 400-401 (9th Cir. 1956) (citing *Dickerson v. Colgrove*, 100 U.S. 578, 580 (1879)).

Plaintiff's revisionist lawsuit to reinvent the CVP water world is founded on delay that has caused prejudice to the Bureau and all other CVP Water Service Contractors who have relied upon the Renewal Contracts' validity and enforceability. For decades, Plaintiff and its Members could have filed a claim with the SWRCB that the Bureau was allegedly violating its water permits from the SWRCB by performing the TCCA contracts to reduce water deliveries in times of CVP water shortage.  They did not. Plaintiffs could have filed a lawsuit to determine area of origin rights long ago.  They did not.  Instead, they judicially

83

validated their latest long-term Renewal Contracts.  The Bureau, as contracting party, was entitled to rely upon Plaintiff and its Members' acquiescence in the Bureau's categorically consistent interpretation that federal CVP Water Service Contracts do not and have never been performed to recognize any area of origin priority in water allocations.  The law demands there must be certainty in contracting.

Such inequitable conduct estops Plaintiff and its Members from seeking "a preliminary and permanent injunction prohibiting . . . (export of CVP water supplies) whenever such supplies are needed to meet the full contractual supplies for (TCCA)" and from obtaining any "declaratory judgment providing that Defendants must . . . implement the Water Service Contracts in accordance with the area of origin protections . . . ."  If the Bureau had known the true facts that Plaintiff and its Members did not intend to perform the Renewal Contracts as they had always been performed, the Bureau could have gained Plaintiff's express acquiescence and waiver, or elected not to execute new contracts. Plaintiff and its Members' conduct requires they be equitably estopped from obtaining the benefit of federal CVP water service without accepting the burden of those that reduces their water allocation during water shortages.

F.    **PLAINTIFF'S FUTILITY ARGUMENT IS WITHOUT MERIT**.

Plaintiff claims it would be "futile" for its Members to obtain their own water rights and build their own water conveyance facilities, separate from their Bureau-contracted

water rights, which entitles them to use of CVP water conveyance facilities.  This ignores the law.  Plaintiff and its Members have been told that the only way to obtain water rights they seek is to apply to the SWRCB for a permit.  Plaintiff and its Members seek to change the rules of the game after almost 40 years of contracting for CVP water service, to judicially create new contract terms granting preferential treatment to Plaintiff and its Members to CVP water supply during Conditions of Shortage that Congress, the Interior, the Bureau, SWRCB and TCCA's contracts have never provided.  Defendant Interveners correctly argue the law requires Plaintiffs to apply to the SWRCB for water rights permits.

VII. <u>CONCLUSION.</u>

As a matter of statutory interpretation, Plaintiff's post hoc view of the water world is that the CVP was authorized by Congress to first benefit them, and to operate to the exclusion of all other CVP users, to protect the Sacramento Valley and its water users.  Although this may have been a purpose sought by a local legislator, Congressman Engle, at the time the more parochial state CVP became a federally authorized and funded project.  Congress unequivocally expressed its intent that it created the CVP to benefit <u>all</u> the people of the Central Valley, Federal Act of 1950, § 4 (compelling coordinated operation of CVP "as will effectuate the fullest economic utilization of land and water resources of the Central Valley of California for the widest possible public benefit").  Notably absent from Congress' stated purposes in the CVP legislation is any recognition that

85

the "widest possible public benefit" was subject to a prior right that prefers the Sacramento Valley and its water users.  The ratable reduced allocation of CVP water among all non-priority CVP water service contracts during Conditions of Shortage achieves the widest possible public benefit intended by the CVP authorizing legislation.

This lawsuit brings new meaning to the adage: "If you do not at first succeed, try and try again."  The reality of the state area of origin priority statutes is that no express water rights are created by the law.  At most, TCCA has an inchoate water right that must be perfected by application for and issuance by the SWRCB of a water permit.  After more than twenty years of active dispute and having been told to do so by the Bureau, state courts, the SWRCB, and the AG Op., Plaintiff and its Members have chosen not to obtain such water rights.  The Bureau owes them no more CVP water than they have received.  All their disputed water service contracts provide for is pro-rata reductions which have been consistently administered to give full effect to the unambiguous contract terms requiring reductions for Shortages in the discretion of the Bureau's contracting officer.

For all the reasons stated above, Judgment shall be entered against Plaintiff and/or Plaintiff's Members as third party beneficiaries, and in favor of Federal Defendants and Defendant Interveners on all Plaintiff's claims for equitable, declaratory, and injunctive relief pursuant to the APA, 5 U.S.C. §§ 702, 703, 706(1), 706(2); the Declaratory Judgment Act of 1934, 28 U.S.C. §§ 2201-2202; and Fed. R. Civ. Pro. 65(d).  Plaintiff's motions

1  for summary judgment and/or summary adjudication are DENIED.
2  Federal Defendants' and Defendant-Interveners' motions for
3  summary judgment are GRANTED.

4      Defendants shall submit a form of judgment consistent with
5  this decision within five (5) days following electronic service
6  of this decision.
7
8  DATED:   July 29, 2011.
9
10                          _____/s/ Oliver W. Wanger_____
11                              Oliver W. Wanger
12                          UNITED STATES DISTRICT JUDGE
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28